## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

AMERICAN AUTOMOBILE ) CIVIL NO. CV15-00245
INSURANCE COMPANY, a ) ACK/KSC
Missouri Corporation; ) (Declaratory Judgment)
NATIONAL SURETY )
CORPORATION, an Illinois ) Oral Deposition of:
Corporation, ) WILLIAM HAYES
)
   Plaintiffs, )
)
versus )
)
HAWAII NUT & BOLT, INC. )
and SAFEWAY INC., )
)
   Defendants. )
_____ )
SAFEWAY INC.; HAWAII NUT &)
BOLT, INC., )
)
   Counterclaim Plaintiffs,)
)
versus )
)
AMERICAN AUTOMOBILE )
INSURANCE COMPANY, a )
Missouri Corporation; )
NATIONAL SURETY )
CORPORATION, an Illinois )
Corporation, )
)
   Counterclaim Defendants,)
)
and )
)
DOUGLAS MOORE, MONARCH )
INSURANCE SERVICES, INC., )
a Hawaii Corporation, and )
INSURANCE ASSOCIATES, )
INC., a Hawaii )
Corporation, )
)
   Additional Counterclaim )
   Defendants. )
_____ )

## Page 2

1   VIDEOTAPED DEPOSITION OF WILLIAM HAYES
2   AS 30(b)(6) REPRESENTATIVE OF HAWAII NUT & BOLT, INC.
3   AND IN HIS PERSONAL CAPACITY
4
5   Taken on behalf of the Counterclaim Defendants Douglas
6   Moore and Monarch Insurance Services, Inc. at the law
7   offices of Bronster Fujichaku Robbins, 1003 Bishop
8   Street, Suite 2300, Honolulu, Hawaii, commencing at
9   9:13 a.m., on Tuesday, the 13th of December, 2016,
10  pursuant to the Federal Rules of Civil Procedure.
11
12  REPORTED BY:  KATHY PEARSON, RPR, CRR, CSR No. 313
13
14  APPEARANCES:
15     For the Plaintiffs/Counterclaim Defendants
       American Automobile Insurance Company and
16     National Surety Corporation:
17        STEVEN D. ALLISON
          SAMRAH R. MAHMOUD
18        Crowell & Moring
          3 Park Plaza, 20th Floor
19        Irvine, California 92614
20     For the Real Party in Interest and
       Defendant/Counterclaim Plaintiff Safeway Inc.
21     and Defendant/Counterclaim Plaintiff Hawaii Nut &
       Bolt, Inc.:
22
          JUDITH ANN PAVEY
23        MAILE S. MILLER
          Starn O'Toole Marcus & Fisher
24        Pacific Guardian Center, Makai Tower
          733 Bishop Street, Suite 1900
25        Honolulu, Hawaii  96813

## Page 3

1   For the Counterclaim Defendants Douglas Moore
    and Monarch Insurance Services, Inc.:
2
       KENNETH S. ROBBINS
3      SASHA A. HAMADA
       Bronster Fujichaku Robbins
4      1003 Bishop Street, Suite 2300
       Honolulu, Hawaii  96813
5
       For the Counterclaim Defendants Douglas Moore
6      and Insurance Associates, Inc.:
7         CORLIS J. CHANG
          Goodsill, Anderson, Quinn & Stifel
8         First Hawaiian Center, Suite 1600
          999 Bishop Street
9         Honolulu, Hawaii  96813
10  Videographer:
11     Alan Nielsen
12  Also Present:
13     Douglas Moore
14
15
16
17
18
19
20
21
22
23
24
25

## Page 4

1              I N D E X
2
3   EXAMINATION BY MR. ROBBINS        Pg  7
4   EXAMINATION BY MS. CHANG          Pg 139
5   EXAMINATION BY MR. ALLISON        Pg 147
6   REEXAMINATION BY MR. ROBBINS      Pg 286
7   REEXAMINATION BY MR. ALLISON      Pg 292
8   * * * * * * * * * * * * * * * * * * * * * * * * * *
9   DEPOSITION EXHIBITS:
10  EXHIBIT NUMBER 46                 Pg 26
11    (stipulated judgment and order)
12  EXHIBIT NUMBER 47                 Pg 68
13    (Domingo 10-20-09 letter to Knapman)
14  EXHIBIT NUMBER 48                 Pg 76
15    (declaration of William Hayes III Safeway case)
16  EXHIBIT NUMBER 49                 Pg 78
17    (settlement and mutual release agreement)
18  EXHIBIT NUMBER 50                 Pg 147
19    (30(b)(6) notice of deposition)
20  EXHIBIT NUMBER 51                 Pg 154
21    (Moore/Soulsby e-mails FFIC-HNB013198-208)
22  EXHIBIT NUMBER 52                 Pg 159
23    (Cerchie/Lyons/Hayes e-mails HNB00000530/A000530)
24  EXHIBIT NUMBER 53                 Pg 163
25    (Moore/Bonak/Bronson e-mails FFIC-HNB013094-108)

1 (Pages 1 to 4)

**EXHIBIT G**

Page 9

1  sir?
2      A  Yes.
3      Q  And what are the claims that you brought
4  against the defendants in this case?
5      A  I don't understand the specifics.
6      Q  Well, from a lay standpoint, what you
7  understand, you have joined in with Safeway in claiming
8  against the various defendants in this case?
9      A  What was your question?
10     Q  My question is, as you understand it, you are
11 a plaintiff.  You have agreed to be a -- I realize that
12 we have a counterclaim here and there's an interesting
13 juxtaposition of parties, but for the purposes of this
14 deposition, I'm going to refer to you as a
15 claimant/plaintiff and our defendants as defendants in
16 this case.
17     So rather than referring to you as
18 counterclaim, defendant, plaintiffs, whatever the
19 jargon might be, you are making the claims against the
20 parties sitting around this table today, namely Monarch
21 Insurance Services, Insurance Associates, Doug Moore,
22 and also Fireman's Fund Insurance Company.  You
23 understand that you are participating in bringing those
24 claims.  Correct?
25     A  I understand I'm a participant.

Page 10

1      Q  Okay, and what do you understand those claims
2  to be?
3      MS. PAVEY:  And just for the record, so he
4  knows, there's an attorney client privilege for any
5  discussion that you've had with your lawyers.
6      So to the extent his knowledge of specifics
7  would come from the lawyers, I don't think that he can
8  testify, but I don't have a problem with him giving his
9  general understanding of what the case is about.
10 BY MR. ROBBINS:
11     Q  Go ahead.  Please answer the question.
12     A  The question is what is my general
13 understanding about the case?
14     Q  What are your claims against Fireman's Fund,
15 Doug Moore, Insurance Associates, and Monarch Insurance
16 Services?  As you understand it, what are the claims
17 that you're bringing against them?
18     A  I'm sorry, I just don't, I don't get that.
19 My understanding was the claims were being brought
20 against me by my insurance company.
21     Q  Okay, so as you sit here now, you have no
22 understanding of the fact that you have agreed to
23 cooperate with Safeway in bringing claims against
24 Fireman's Fund, Doug Moore, Monarch Insurance Services,
25 and Insurance Associates?  You have no understanding

Page 11

1  about the obligation that you have to Safeway to
2  cooperate with them in this claim?
3      MS. PAVEY:  Objection to the form.
4      A  That kind of goes over my head.  I understand
5  that I'm to cooperate.
6  BY MR. ROBBINS:
7      Q  And cooperate in connection with what?
8      A  The claims.
9      Q  What claims?
10     A  I suppose -- well, you're asking me to
11 speculate now.
12     Q  Well, you went through many years of
13 litigation as a defendant in a case brought against you
14 by Safeway.  Correct?
15     A  Correct.
16     Q  Okay, and you met with a number of the
17 lawyers throughout that litigation.  Correct?
18     A  Correct.
19     Q  Okay, and you understood that claims were
20 being made against HNB, Hawaii Nut & Bolt, which is
21 your company.  Correct?
22     A  Correct.
23     Q  Okay, and you were, throughout the process of
24 that litigation, you understood that Fireman's Fund was
25 raising questions about whether or not they actually

Page 12

1  owed HNB any indemnification.  Correct?  You understood
2  that?
3      A  Yes.
4      Q  You were very concerned -- in fact, your
5  lawyers have used a phrase, you were concerned about
6  the possible devastation of your business and your
7  family assets because of that lawsuit.  Correct?
8      A  That is true.
9      Q  Okay, and ultimately you agreed with Safeway,
10 the entity that was suing you, you agreed with Safeway
11 to work together in bringing the claims which we are
12 now discussing in this case.  Correct?
13     A  I was advised by my attorneys.
14     Q  In what connection?
15     A  In connection to your last statement.
16     Q  Okay, Mr. Hayes, you're doing fine so far,
17 and if you don't understand the question, you will let
18 me know.  Correct?
19     A  Correct.
20     Q  Okay, and if you answer a question, may we
21 assume that you understood the question?
22     A  No.
23     Q  Why do you say that?
24     A  A lot of this goes over my head.  It's very
25 technical.  I don't understand a lot of this.

3  (Pages 9 to 12)

Page 13

```
 1      Q   Okay.  Well, if you don't understand a
 2  question, I suggest you not answer it and ask me to, or
 3  whoever is asking you the questions, to explain the
 4  question.  Okay?
 5      A   Fair enough.
 6      Q   Okay, and if you don't understand a question
 7  you will, as I'm asking you questions now, you will
 8  tell me, I'm sorry, Mr. Robbins, but I don't understand
 9  the question.  Okay?
10      A   I'll try, yeah.
11      Q   All right.  So if you do not say, "I do not
12  understand the question," and answer the question, may
13  we assume that you understood the question?
14      A   No.  I might not even have the knowledge
15  to -- like I said, this is really technical.  It's not
16  my field, I'm not an attorney, I'm not in the insurance
17  industry.
18      Q   Okay, so if you answer a question, we may not
19  assume that you understood the question.  Is that what
20  you're saying?
21      A   I'm a bit confused.  I don't know why we're
22  assuming anything.
23      Q   Okay.  Do you understand, Mr. Hayes, that --
24  well, let's back up.  Okay, let's start in a less
25  contentious note.
```

Page 14

```
 1      How long has HNB been in business?
 2      A   Since approximately 1980.
 3      Q   And who started the business?
 4      A   My father.
 5      Q   And when did you take over the business?
 6      A   As owner, in 2003.
 7      Q   And historically, what types of products has
 8  HNB sold?
 9      A   A broad scope of products.
10      Q   Okay, such as?
11      A   Oh, boy.  Construction related.
12      Q   Could you be more specific?  Historically,
13  what kind of, historically, what kind of construction
14  related products your company has sold?
15      A   It's always evolving, always changing.  It
16  depends.  I guess the best way to describe it is we
17  fill customer needs, and our customers tend to be in
18  the construction industry.
19      Q   Okay, so do you sell all kinds of
20  construction products?
21      A   Yes.
22      Q   You sell nuts?
23      A   We do sell nuts.
24      Q   You sell bolts?
25      A   We do sell bolts.
```

Page 15

```
 1      Q   You sell fasteners?
 2      A   Correct, yes.
 3      Q   Does your company provide construction
 4  services and advice?
 5      A   We provide technical information as requested
 6  by our customers.  They'll ask for a catalog and we'll
 7  provide a catalog.  Those catalogs contain technical
 8  info.
 9      Q   Historically, does HNB attend construction
10  meetings and offer construction advice?
11      A   Can you break that into two questions?
12      Q   Sure.  Historically, in providing services to
13  your clients, do you or any other representatives of
14  HNB customarily and ordinarily sit down with your
15  customers and offer construction advice?  Quite apart
16  from what products they should use, but how to use
17  them.
18      A   No.
19      Q   Does your company have a policy against doing
20  that?
21      A   I don't think the industry allows that.
22  We're more of a conduit.  We connect people with the
23  information they need to make the decisions.
24      Q   Okay, so apart from offering such things as
25  catalogs to your clients, HNB does not offer
```

Page 16

```
 1  construction advice such as sitting in a construction
 2  meeting and saying, well, you should use this type of
 3  product as opposed to that type of product.
 4      A   Not -- use is not the right word for our
 5  role.
 6      Q   Okay.  Did Tim Lyons do that in connection
 7  with the Safeway project?
 8      A   Tim's role was also to be a conduit, to
 9  connect people with catalogs, brochures,
10  specifications, printed specifications from the
11  manufacturers that we, we would represent.
12      Q   In the many years that you lived with the
13  lawsuit, this litigation, did you ever see any,
14  anything at all which indicated that Tim Lyons was
15  actually meeting with folks who were involved in
16  construction, who were involved with the roofing
17  project at Safeway and offering advice?
18      A   I hang up on the word advice.  Tim Lyons was
19  also involved on that project when he was not working
20  for me, so I can't qualify on everything Tim did.
21      Q   Okay.  Well, let's back up.  When did you
22  meet Tim Lyons?
23      A   I've known Tim for a while, back when he
24  worked with previous employers, Wire Products Hawaii
25  and G.W. Killebrew.  He had his own independent rep
```

## Page 25

1  time?
2     Q  Well, I'm just asking you if you are aware of
3  the fact that when he was attending meetings that he
4  was making recommendations such as that.
5     A  I can't say yes to that. He worked on that
6  project under a number of different hats.
7     Q  What do you mean by that?
8     A  He, I believe he began working on that
9  project as an employee for G.W. Killebrew and then as
10  Versatech, I believe, which was his independent rep
11  firm when he was a representative for VersaFlex.
12     Q  So is it at the end of April 2006 that
13  Mr. Lyons was terminated from Killebrew/Allied, but as
14  you understood it, continued to be the -- serve as the
15  distributor of VersaFlex products?
16     A  If I recall correctly, he went from
17  Allied/Killebrew to his rep firm, where he repped
18  VersaFlex products.
19     Q  Is it correct that you were not familiar with
20  VersaFlex products until you met Mr. Lyons?
21     A  I was not familiar with all of their
22  products.
23     Q  Were you, as president of HNB, familiar with
24  VersaFlex products prior to meeting Tim Lyons?
25     A  Can you clarify products a little bit for me,

## Page 26

1  please?
2     Q  Sure. Well, you've signed a stipulated
3  judgment, Mr. Hayes, in which it was represented
4  that -- and I'll show you a copy of it.
5     MR. ROBBINS: We'll mark this as Exhibit 1.
6     MS. PAVEY: Just to clarify this. We had
7  been keeping a running tally of exhibits, consecutive
8  numbers. Do you want to keep that going or did you
9  want to start fresh? Up to you.
10     MR. ROBBINS: I'm happy to do it however
11  would be most convenient for everybody.
12     MR. ALLISON: I tend to prefer the
13  consecutive numbering, if we can figure out what number
14  we're on.
15     MS. PAVEY: Well, do you want me to try to
16  find out --
17     MR. ROBBINS: Sure.
18     MS. PAVEY: -- what the last number was?
19     MR. ROBBINS: Sure.
20     MR. ALLISON: Samrah may have the number
21  here.
22     MS. MAHMOUD: We might be on 46.
23     MR. ALLISON: That's our best information.
24     MS. MAHMOUD: The last one was 45, you said.
25     MS. PAVEY: So this would be 46, Samrah?

## Page 27

1     MR. ALLISON: We're double-checking.
2     MS. PAVEY: Okay.
3     MR. ALLISON: Yeah, the last we have at
4  Ms. Galasso's depo was 45.
5     MS. PAVEY: Okay.
6     MR. ALLISON: She would have been the last
7  one.
8     MS. PAVEY: Yeah, okay.
9     MR. ALLISON: So it would be 46, Ken.
10     MR. ROBBINS: Okay, great. Thank you, Steve.
11     (Whereupon Deposition Exhibit Number 46 was
12  marked for identification.)
13  BY MR. ROBBINS:
14     Q  If you look at page, if you look at page 13
15  of this document, which is entitled Stipulated Judgment
16  and Order, is that your signature on page 13?
17     A  Yes, sir.
18     MS. CHANG: Just for the record, Ken, there
19  are several page thirteens because of the multiple
20  signatures.
21     MR. ROBBINS: That's true.
22     MS. CHANG: So can we clarify that?
23     MR. ROBBINS: It's the first page 13, which
24  is FFIC-HNB 026172, the lower right-hand corner.
25  BY MR. ROBBINS:

## Page 28

1     Q  That is your signature, sir?
2     A  That is my signature.
3     Q  Okay, good. Did you review this document
4  before you signed it?
5     A  I believe so.
6     Q  Okay, and did you have legal counsel
7  assisting you at the time that you reviewed and signed
8  this document?
9     A  I don't recall where I was physically at when
10  I signed, but I typically consult with my attorneys.
11     Q  Okay. Do you recall who was representing you
12  at the time you signed this document?
13     A  Specifically?
14     Q  Is it Peter Knapman who came in toward the
15  end of this lawsuit, as you were negotiating the terms
16  of a settlement? Was it Mr. Knapman who came in to
17  offer you legal counsel?
18     A  Peter Knapman came in when my insurance
19  company dropped me, or was trying to drop me. So if
20  that's what you're asking.
21     Q  Yeah. So does that refresh your
22  recollection? Was it Mr. Knapman who assisted you in
23  reviewing and offering you advice with respect to this
24  document?
25     A  Perhaps Mr. Takase also.

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 73

1    A   At that point, I wasn't sure who was coming
2    after me anymore.
3    Q   When you signed this document, Number 46,
4    which is the stipulated judgment and order, were you
5    aware of the fact that you were agreeing to a six
6    million dollar judgment in favor of Safeway against
7    you?
8    A   There's a lot of legal stuff I don't
9    understand.  I'm not an attorney.
10   Q   Well, I'm just asking you, did you understand
11   that.
12   A   I don't understand a lot of this.
13   Q   Did you understand that, Mr. Hayes?
14   A   Not specifically.  I'm still hung up on being
15   worried.
16   Q   When this matter was resolved between you and
17   Safeway, did you understand that they were -- that
18   Safeway was agreeing to never pursue you for any money?
19   A   A lot of it is going over my head.  I had to
20   rely on my attorneys.
21   Q   Mr. Hayes, would you have agreed to sign a
22   judgment against you in the sum of six million dollars
23   if you were not assured some protection?
24   A   We're speculating.  I mean, it's -- I really
25   don't know.  A lot of this is I don't know.  It goes

Page 74

1    over my head.
2    Q   Well, as you sit here now, what is your
3    understanding as to whether or not you agreed to
4    cooperate with Safeway in pursuing a judgment against
5    Doug Moore, Monarch Insurance Services, and Insurance
6    Associates?
7    A   I'm sorry, I'm lost.
8    Q   Did you agree to cooperate with Safeway in
9    attempting to obtain a judgment against Fireman's Fund,
10   Doug Moore, Monarch Insurance Services, and Insurance
11   Associates?
12   A   I followed the advice of my attorneys at the
13   time.
14   Q   And do you understand that you agreed to
15   cooperate with Safeway in its attempt to obtain a
16   judgment against the folks I just mentioned?
17   A   I followed the advice of my attorneys at the
18   time.
19   Q   I asked you what your understanding is.
20   A   My understanding is a lot of this, I don't
21   understand, and I relied on the advice of my attorneys.
22   Q   Do you know that you are suing Doug Moore?
23   A   I don't understand how all of this works.
24   Q   So you're just a pawn?  You're just -- you
25   don't understand a thing and you're just doing whatever

Page 75

1    your lawyers tell you to do?
2    MS. PAVEY:  Objection, that is argumentative
3    and --
4    MR. ROBBINS:  It is, and I'll withdraw the
5    question.
6    BY MR. ROBBINS:
7    Q   Well, Mr. Hayes, you were very concerned
8    about a huge judgment against you.  Correct?
9    A   Yes.
10   Q   And are you saying that you do not understand
11   as you sit here now that Safeway has agreed to never
12   pursue you for a single dollar?
13   A   Are you stating that that's the case?
14   Because if you are, then --
15   Like I've told you, this goes over my head.
16   I relied on the advice of my attorneys.
17   Q   Has any attorney ever told you that if you
18   agreed to sign a declaration, agree to stipulate to a
19   judgment against you, that they would release you from
20   any -- that Safeway would release you from having to
21   pay them any money?
22   MS. PAVEY:  I'll just object.  You're asking
23   for an attorney client privileged communication, so
24   I'll instruct him not to answer that.  And the document
25   speaks for itself.

Page 76

1    MR. ROBBINS:  Judy, boy, we're going to be
2    coming back.  You know, you know --
3    MS. PAVEY:  The document speaks for itself,
4    Ken.  It's not a question that you need to ask Bill
5    about anyway.
6    MR. ROBBINS:  I'm asking your client what his
7    understanding is, as you know.
8    MS. PAVEY:  And I'm saying that you're asking
9    for an attorney client privileged communication,
10   specifically you asked him about his conversation with
11   an attorney, and I am saying that it's not necessary
12   for you to ask him the question anyway, and the
13   documents speak for themselves.
14   MR. ROBBINS:  I think it is necessary.  I
15   think it goes to motive, I think it goes to all sorts
16   of things that are relevant here.
17   BY MR. ROBBINS:
18   Q   So anyway, so, Mr. Hayes, do you have any
19   understanding at all as to how -- do you have any
20   understanding at all as to your relationship with
21   Safeway now and whether Safeway still has any claims
22   against you?
23   A   I don't understand this.  I don't.
24   Q   Before the document which is asserting a
25   claim on behalf of HNB against Doug Moore, Monarch

19  (Pages 73 to 76)

Page 89

1 connection with the claims that Safeway made against
2 you?
3     A   I know there's lots of stuff about insurance
4 that attorneys are discussing.  The guts of it is not
5 my field.
6     Q   Well, Mr. Hayes, are you aware of the fact
7 that Fireman's Fund took the position that it didn't
8 owe you any indemnification in the claims brought
9 against you by Safeway?
10     A   Again, I know there's lots of conversations
11 going back and forth between attorneys and insurance
12 companies, I believe that's why I'm here today, but the
13 details are for the experts in those fields.
14     Q   Well, you're the businessman, the owner of
15 this business, the president and CEO of HNB.  Correct?
16     A   Absolutely.
17     Q   And as such, as far as the financial status
18 of HNB is concerned, you are the person who is
19 primarily responsible for that.  Correct?
20     A   That's correct.
21     Q   Okay, and whether or not a twenty million
22 dollar lawsuit plus is going to wind up in a judgment
23 against you for that amount of money, that's something
24 that you should know about.  Correct?
25     A   There's a twenty million dollar?  That's news

Page 90

1 to me.  Twenty million?
2     Q   Were you aware of the fact that Safeway in
3 the original lawsuit said that it was out of pocket
4 about 23 million dollars?
5     A   I don't recall the details.
6     Q   So you're not aware of the fact that -- well,
7 you were concerned about that lawsuit devastating your
8 business and your family.  Correct?
9     A   The Safeway lawsuit?
10     Q   Yes.
11     A   I felt I was insured.
12     Q   Well, you signed the stipulated judgment,
13 Exhibit 46, which said that you were concerned about a
14 huge judgment, devastation to HNB, and that HNB was
15 left completely unprotected against any judgment.  You
16 signed words to that effect in the stipulated judgment.
17 Correct?
18        If you want to take a look at page 11, it's
19 there.
20     A   Well, you continue to refer me to documents
21 prepared by attorneys in my best interest.
22     Q   I'm talking about your feelings, your
23 knowledge.  I'm talking about you as president and CEO,
24 the head of your family, what you were concerned about.
25 Why were you concerned about those things?

Page 91

1     A   Because there were case filed in court.
2     Q   And you knew that Fireman's Fund was taking
3 the position that you had no insurance for those claims
4 against you.  Correct?
5     A   I'm aware of those discussions.
6     Q   You were aware of the fact that that was
7 Fireman's Fund and still remains Fireman's Fund
8 position to this day, that it does not owe you any
9 indemnification.  Correct?
10     A   I'm not aware of how Fireman's Fund's
11 positions evolve.
12        MS. PAVEY:  Ken, we've been going for about
13 an hour again.
14        MR. ROBBINS:  Okay, take a break.
15        MS. PAVEY:  Take a break?
16        MR. ROBBINS:  Yeah.
17        THE VIDEOGRAPHER:  Okay, we're going off the
18 record at 11:28 a.m.
19        (Off the record at 11:28 a.m., deposition
20 resumed at 11:37 a.m.)
21        THE VIDEOGRAPHER:  Okay, we're back on record
22 at 11:37 a.m.
23 BY MR. ROBBINS:
24     Q   Okay.  So, Mr. Hayes, the underlying
25 lawsuit -- by underlying lawsuit, I mean the lawsuit in

Page 92

1 which Safeway sued your company, HN&B, Nordic, CBT Tech
2 Services, Cascade Industries, among others.
3        It was approaching trial, and you learned
4 that an agreement had been reached as to how, at least
5 as far as the Safeway's claims against you were
6 concerned, how that would be, how they would be
7 resolved.  That was explained to you, correct?
8     A   Possibly.
9     Q   You weren't -- were you curious as to how
10 this thing was going to end with respect to Safeway's
11 claims against you?
12     A   Yes.
13     Q   Whether you would owe any money, for example?
14     A   Sure.
15     Q   Okay, and were you told that if you were
16 agreeable to signing certain documents, there would be
17 no further claims against you by Safeway?
18        MS. PAVEY:  Again, Ken, you're asking him to
19 discuss attorney client privileged communications, so I
20 have to instruct him not to answer.
21 BY MR. ROBBINS:
22     Q   No, I'm not asking what was said.  Was it
23 your understanding --
24        MS. PAVEY:  Well, you did.  You asked him,
25 were you told --

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 105

1    Q   But you acknowledged to Mr. Moore that you
2    knew that Fireman's Fund was refusing to provide
3    coverage for you. No matter how you felt about whether
4    or not you were or were not insured, you knew that that
5    was the position Fireman's Fund was taking.
6    A   I still felt like I was insured.
7    Q   Right, that's how you feel. You feel that
8    you're still insured. Correct? Right?
9    A   It's my belief that I was insured.
10   Q   Okay, but you also understand that Fireman's
11   Fund is saying sorry, Hawaii Nuts & Bolts, we don't
12   insure you for these claims brought against you by
13   Safeway. Correct?
14       MS. PAVEY: You're talking about before they
15   filed their dec action?
16       MR. ROBBINS: Yeah.
17   A   What is the dec action?
18       MS. PAVEY: Fireman's Fund versus you, saying
19   we don't --
20   BY MR. ROBBINS:
21   Q   Mr. Hayes, all I'm asking you -- don't worry
22   about the dec action. As you sit here now you know,
23   although you think you're insured, Fireman's Fund is
24   saying you're not insured.
25   A   Yeah.

Page 106

1    Q   You know that, correct?
2    A   That sucks.
3    Q   Sorry?
4    A   That sucks. Yeah, that, that --
5    Q   That's correct, right? You know that.
6    A   I think Fireman's Fund doesn't want to insure
7    me and that's why they took me to court.
8    Q   Okay, so my question simply is this,
9    Mr. Hayes. As you sit here now, you know that
10   Fireman's Fund's position, whether you think you're
11   insured or not, their position is no, we don't think
12   that we insure you. You're aware that that's what
13   Fireman's Fund is saying. Correct?
14   A   I'm not sure what Fireman's Fund is up to.
15   Q   So is it your position as you sit here now
16   that Fireman's Fund is saying, sure, Hawaii Nuts &
17   Bolts, we do insure you? Is that your understanding?
18   A   No. I'm here today to answer your questions
19   the best I can. The rest of it is what you guys do. I
20   don't get it.
21   Q   So, Mr. Hayes, I trust you're a good
22   businessman. Are you a good businessman?
23   A   That's kind of subjective. I've been in
24   business for a long time.
25   Q   Right. So are you, are you seriously saying

Page 107

1    as you sit here now, you do not know what Fireman's
2    Fund's position is with respect to whether or not it
3    does or does not insure you for the claims brought by
4    Safeway against you?
5        MS. PAVEY: Object to the form.
6    BY MR. ROBBINS:
7    Q   Is that, is that what you're saying?
8        MS. PAVEY: Object to the form,
9    argumentative.
10   A   I would not be surprised if Fireman's Fund is
11   not being completely straight up with anybody. They're
12   looking after their own best interest. I really don't
13   know. You're asking me to speculate.
14   BY MR. ROBBINS:
15   Q   So you don't know whether Fireman's Fund is
16   saying we do insure Hawaii Nuts & Bolts for the claims
17   brought against that company by Safeway or that we do
18   not. You don't know one way or the other what
19   Fireman's Fund's position is?
20   A   It feels like a moving target to me. I don't
21   know where --
22   Q   By moving target, are you saying that
23   Fireman's Fund has said we will insure you, and they're
24   saying at some other point we're not going to insure
25   you, and they're saying at another point, well, we're

Page 108

1    not going to insure you? Is that what you mean by
2    moving target?
3    A   I mean the process evolves and moves and
4    changes in ways that I could never anticipate or even
5    imagine. It's pretty trippy for me to be a part of.
6    Q   Okay, so besides your being here to answer
7    questions, what you understand -- strike that.
8        Okay, so we understand that, so far, that HNB
9    hereby agrees to give to Safeway all of its claims
10   against the insurance companies. You understand that
11   in this paragraph. Correct?
12       MS. PAVEY: You're back to Exhibit 49?
13       MR. ROBBINS: Yeah, 49 --
14       MS. PAVEY: Paragraph --
15       MR. ROBBINS: -- paragraph three.
16       MS. PAVEY: -- three, okay.
17   A   I see where it says that.
18   BY MR. ROBBINS:
19   Q   Okay. All right, good. And you understand
20   those words?
21   A   I don't understand what's going on in this
22   context. That's why I have lawyers.
23   Q   All I'm doing is asking you what this, what
24   your understanding of these words is. Because I think
25   it's important for the jury to know what you believe

27  (Pages 105 to 108)

Page 133

1 or Monarch, in their opinion, breached their contract
2 or breached their agreement with you?
3    A  No.
4    Q  Do you know what -- perhaps you don't. I
5 think Ms. Pavey objected to my use of this phrase
6 before, but do you know what the phrase fiduciary duty
7 means?
8       MS. PAVEY: I don't think you used that
9 before, but I could be wrong.
10    A  I assume it means responsibility, obligation.
11 BY MR. ROBBINS:
12    Q  In your complaint, or actually it's
13 defendant/counterclaim plaintiff Safeway Inc. and
14 defendant/counterclaim plaintiff Hawaii Nut & Bolt,
15 Inc.'s second amended counterclaim and jury demand.
16 That's technically what the document, the document is
17 called in which you have joined the Safeway in
18 asserting claims against Mr. Moore, Monarch, and IAI
19 and Fireman's Fund.
20       Because it's such a mouthful, I've chosen not
21 to use that phrase, but simply to refer to your claims.
22       But do you have any facts to support in what
23 manner Mr. Moore and Monarch and IAI breached their
24 fiduciary obligations to HNB?
25    A  I have whatever my attorneys have.

Page 134

1    Q  Other than what your attorneys have asserted
2 on your behalf and what you've been relying on them for
3 them to do for you, have you given them any facts with
4 respect to how, in your opinion, breach of contract has
5 occurred or breach of fiduciary duty has occurred with
6 respect to the brokers?
7    A  I believed that I was insured. I don't know
8 how that's all put together as breach of contract.
9 That's not my thing.
10    Q  After you were sued, you were exchanging
11 e-mails with Mr. Moore with respect to the suit and
12 issues of insurance coverage. In any of those
13 communications that you had with Mr. Moore, or e-mail
14 specifically, did you ever mention to him the fact that
15 Safeway alleged that Tim Lyons was claimed to have
16 given construction recommendations and advice to
17 Safeway and its consultants?
18    A  That term is really broad, construction.
19 Would I have said that he gave them a catalog?
20 Possibly.
21    Q  And I believe you testified -- if I asked you
22 this question this morning, I apologize for it, but as
23 I understand it, this is the one and only instance in
24 which -- the only lawsuit in which HNB has been sued
25 for a product liability failure. Is that correct? Or

Page 135

1 a product failure.
2    A  VersaFlex being the only product that we've
3 been sued regarding?
4    Q  Yes.
5    A  Yes, only VersaFlex.
6    Q  Okay. Until this lawsuit came along, did you
7 consider the products that you sold products that were
8 likely to create liability for you?
9       I know you're not a lawyer, but as a
10 businessman, was there anything in your line of
11 products that you sold that you thought to yourself,
12 gee, I wonder if I'm adequately insured in the event of
13 a product failure of anything that I'm selling?
14    A  I'm sorry, I got lost.
15    Q  Sure, okay.
16    A  What was your question?
17    Q  Prior to VersaFlex, or since VersaFlex, have
18 there ever been any lawsuits against HNB subsequent to
19 this lawsuit, the VersaFlex lawsuit or the lawsuit
20 involving VersaFlex, in which HNB has been sued for
21 product failure?
22    A  Only VersaFlex.
23    Q  Okay. As someone who inherited the business
24 from your dad, and I gather worked for your dad for
25 some years before you took over the business, did you

Page 136

1 ever consider the line of products that HNB sold to be
2 the kinds of products that were likely to be the basis
3 of a lawsuit or a basis of a claim of liability in the
4 event of their failure as a product?
5       Again, this is from the standpoint of a
6 businessman, not from the standpoint of a lawyer.
7    A  I guess so. I wanted to make sure what we
8 sold, we were insured to sell.
9    Q  Was there anything in particular that was of
10 concern to you, that you thought could likely create a
11 liability for HNB in the event the product failed?
12    A  Things that I would worry about?
13    Q  Yeah.
14    A  Geez, I worry about installer error. I worry
15 about that a lot.
16    Q  Would installer error be your responsibility?
17 Again, you're not a lawyer, but as a businessman
18 running a business. You don't employ installers, do
19 you?
20       MS. PAVEY: I don't think he was finished
21 with his answer about the things that he was worried
22 about in terms of product failure. So can you let him
23 finish --
24       MR. ROBBINS: Sure.
25       MS. PAVEY: -- his answer?

Page 137

1   BY MR. ROBBINS:
2       Q   Go ahead.
3           MS. PAVEY:   Thank you.
4   BY MR. ROBBINS:
5       Q   I'm sorry, I didn't mean to interrupt.
6       A   That's okay.  I lost my train of thought on
7   that a little bit.
8           I am worried about product failure and that
9   we're adequately insured.
10      Q   Okay, and you mentioned a moment ago
11  installers, installer.  What were you concerned about
12  as far as installers were concerned?
13      A   Well, I would hope that they were trained,
14  they would do their job right.  That they were ordering
15  according to specifier instructions.
16      Q   And, you know, as you were hearkening back to
17  what you were testifying to earlier.  If you were
18  simply providing data and information about a product
19  and not making any recommendations and leaving it to
20  the customer as to what would be purchased, then you
21  wouldn't have any concerns as a businessman as to
22  whether you were selling an incorrect product.
23  Correct?
24          MS. PAVEY:   I will object to that question as
25  being a false statement of the law in terms of the

Page 138

1   exposure to the hardware business.
2           MR. ROBBINS:   Well, I'm asking him as a
3   businessman.
4   BY MR. ROBBINS:
5       Q   You may answer the question.
6       A   This, this case, this project was unique.
7   The installer was actually the factory paid
8   representative for VersaFlex.
9           So as a businessman, that was a unique
10  condition, where the installer was working side by side
11  with the manufacturer and having to provide warranties.
12  Not my company, but VersaFlex was providing a warranty.
13  And I don't know what the installer, how they were
14  connected.
15          But as a businessman, I was aware of that.
16      Q   I'm going to allow my colleagues to take over
17  the questioning at this point, Mr. Hayes.  Thank you
18  for your time.
19          I'm sorry if I took more of your time than
20  you wanted me to, but as you know from the case of
21  Safeway against you -- yeah, I think you gave a
22  deposition for two days, didn't you, in the, in the
23  underlying Safeway case?
24      A   Maybe twice, yeah.
25      Q   Yeah, okay.  Well, anyway, thank you very

Page 139

1   much.
2       A   You're welcome.
3           (Brief off the record comments)
4           EXAMINATION
5   BY MS. CHANG:
6       Q   Good afternoon, Mr. Hayes.
7       A   Hi.
8       Q   I promise you that I won't be as long as
9   Mr. Robbins.  He did all the heavy lifting.
10      A   Okay.
11      Q   But I will -- I represent Insurance
12  Associates, Incorporated, as well as Mr. Moore.
13  So let me first ask you.  Do you, do you know
14  or have an understanding of who Insurance Associates
15  is?
16      A   I would -- I think you're a broker.
17      Q   Okay, and have you ever had any direct
18  dealings with anyone at Insurance Associates?
19      A   Doug's my point of contact, so I don't -- do
20  people at Insurance Associates answer the phone when I
21  call for Doug?
22      Q   Well, I meant like if you had any
23  conversation beyond, you know, discussing insurance
24  with Mr. Moore.
25      A   I don't recall.

Page 140

1       Q   Okay.  Do you know who Sue Savio is?
2       A   I don't think so.
3       Q   Any connection that you had with Insurance
4   Associates, would it be fair to say, would be through
5   any communications you may have had with Mr. Moore
6   concerning your insurance for HNB?
7       A   He would be my point of contact.
8       Q   Okay, all right.  Prior to your deposition
9   today, did you look at any documents?
10      A   I've looked at a lot of documents.
11      Q   Okay.  In preparation for this deposition in
12  particular, not just looking at documents for purposes
13  of production.
14      A   You mean like this morning, did I look at
15  documents?
16      Q   This morning or perhaps in meetings with
17  counsel in preparation for today.
18      A   No.
19      Q   Okay.
20      A   No real preparation.
21      Q   Okay.  Did you take a look at your prior
22  deposition testimony?
23      A   The Safeway?
24      Q   Yes, in the Safeway litigation.  I think you
25  gave a deposition in 2011 and 2015.

35   (Pages 137 to 140)

Page 173

1    Q   That's how we mark these things so we know.
2        So this is one of the insurance policies that
3    Fireman's Fund's issued to Hawaii Nut & Bolt.  And my
4    question to you, and I know it's long, so you can flip
5    through it, but I just want to know if you've seen this
6    before, if you remember seeing it before.
7    A   What do I see here?
8    Q   Have you seen this policy before?
9    A   I don't know.
10   Q   Would you have expected it to have been in
11   whatever binder for that period of time that Mr. Moore
12   gave to you?
13   A   I've never -- sure.  I've never not had
14   something when I needed to find it.
15   Q   Okay, and when you received Exhibit 55 back
16   in 2008, would you have skimmed it, like you described
17   earlier?
18   A   If it was in the binder, yes, I would have
19   went through it.
20   Q   And you don't know for a fact that it was in
21   the binder, but you would presume, based on prior
22   practice, that it was.  Is that right?
23   A   Yeah.
24   Q   Okay.  At any point in time, whether this
25   particular policy or any of them, did you ever read the

Page 174

1    Fireman's Fund insurance policy from front to back?  I
2    know it's pretty long, but.
3    A   Yeah, I don't understand it either, so
4    probably not.
5    Q   And I believe you said that it was your
6    belief that you were insured for everything that you
7    sold at Hawaii Nut & Bolt.  Is that right?  Or you said
8    words to that effect this morning.
9    A   Yeah, I believe I was insured.  Yeah,
10   absolutely.
11   Q   Now, in either your conversations with
12   Mr. Moore or just your general experience as a business
13   person, are you aware that insurance policies are
14   contracts between your company, the insured, and the
15   insurance company?
16   A   I never viewed it as a contract.
17   Q   Did you have the opposite view, that it
18   wasn't a contract?
19   A   No.
20   Q   And again, based on either your conversations
21   with Mr. Moore or your general experience as a business
22   person, did you understand that there were limitations
23   to an insurance policy?  In other words, an insurance
24   policy doesn't cover everything, that there's certain
25   things it does and doesn't cover.

Page 175

1    A   I believe that my insurance policy covered
2    what it should cover.  It covered me doing business.
3    Q   Well, what do you mean by that, it covered
4    you doing business?
5    A   The scope of how I operated, I was insured to
6    do business in that manner.
7    Q   Well, so, for example, did you think that it
8    covered if one of your employees sued you for
9    mistreating them, wrongfully terminating them,
10   discriminating against them?  Did you think it covered
11   that sort of thing?
12   A   Never really thought about it.
13   Q   Okay.
14   A   I felt comfortable that I was covered for
15   whatever could come up.
16   Q   So did you believe that you were -- so you
17   believed you were purchasing comprehensive coverage
18   that would cover anything that could happen in your
19   business potentially.
20   A   No.  I was -- I always believed there was a
21   possibility that lawyers could find a seam and
22   there's -- it's impossible to be completely covered.
23   And even if you thought you were, lawyers would turn it
24   around so that you suddenly weren't.
25   Q   Well, did you ever ask Mr. Moore, I want to

Page 176

1    understand what we're covered for and what we're not?
2    And I'm talking now about before the Safeway lawsuit.
3    Did you ever have that conversation with him to try to
4    find out?
5    A   I don't need to understand the insurance
6    industry.  I need to make sure my business is covered.
7    Q   Okay, but did you have that conversation with
8    Mr. Moore, I want my business to be covered?
9    A   I always felt like my business was covered.
10   In fact, I know my dad had that conversation with him,
11   and he made sure that we were heavily covered.  At
12   least that's my understanding, our coverage was pretty
13   good.
14   Q   And how do you know your dad had that
15   conversation with Mr. Moore?
16   A   Talked about it with Doug.
17   Q   Okay, and when you say heavily covered, what
18   do you mean by that?  You've used that term, I think,
19   more than once.
20   A   I don't know the wording.  You can help me
21   with the wording if you need to, but I think we have
22   five million dollars in coverage where a lot of other
23   folks maybe are only carrying a million.
24   Q   Right, and that's the amount, and I
25   understand that.

44  (Pages 173 to 176)

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 177

1    Did you ever have any conversations with
2   Mr. Moore about the scope of the insurance coverage,
3   what it does and doesn't cover, as opposed to how much?
4       A   The scope is believed to cover my operation,
5   how we do business, and what a business like mine needs
6   to be covered for.
7       Q   And when you say, "A business like mine,"
8   what do you mean by that?
9       A   Somebody that sells the products that we
10  sell.
11      Q   But I believe you testified earlier that, and
12  correct me if I'm wrong, that Mr. Lyons' activities
13  were not something that was ever discussed with
14  Mr. Moore.  Is that right?
15      A   I'll disagree with that.
16      Q   You do disagree with that?
17      A   Actually, now I'm getting confused.
18      Q   That's okay.
19      A   Doug was aware that we had outside
20  salespeople.
21      Q   Sure.
22      A   Tim was an outside salesperson.
23      Q   Right, but what Mr. Moore was not aware,
24  though, of specifically what Mr. Lyons was doing.
25  Correct?

Page 178

1       A   I never gave him a day to day blow of what an
2   outside salesperson does, but he was free to always ask
3   questions as needed.
4       Q   And I know you talked about that with
5   Mr. Robbins quite a bit.
6           Now, prior to the Safeway lawsuit, did you
7   ever speak to anybody from Fireman's Fund Insurance
8   Company?
9       A   Possibly.  There would be a car crash and
10  somebody would call and ask about that, or talk about a
11  claim relative to a driver deliver -- our drivers would
12  bang into somebody with the delivery truck.  So I
13  probably talked to them about that kind of stuff.
14      Q   So about a particular claim.
15      A   Yeah.
16      Q   And those claims were auto claims, you said?
17      A   I think so.  I remember some auto stuff.
18      Q   Any other kind of claims that you can recall
19  discussing with Fireman's Fund prior to the Safeway
20  lawsuit?
21      A   No.
22      Q   And did you talk to Safeway -- excuse me.
23  Did you talk to Fireman's Fund about the policies
24  before you bought them?
25          In other words, not about a particular claim,

Page 179

1   but you were about to buy a policy that you and
2   Mr. Moore had discussed, and then you had a
3   conversation with Fireman's Fund about what was going
4   to be in the policy or not be in the policy, or things
5   of that nature.
6       A   Are you asking that after Doug showed me our
7   policy I got on the phone with Fireman's Fund?
8       Q   Right, I'm asking --
9       A   I did not.
10      Q   -- if that happened.
11          Did you ever meet with anybody from Fireman's
12  Fund in person, in a conference room or in your office,
13  or anything like that?
14      A   Perhaps.  I don't recall.
15      Q   Other than the auto claims, before the
16  Safeway claim, do you remember making any other claims
17  to Fireman's Fund?
18      A   I don't recall who the particular insurance
19  carriers were for everything.  We would call Doug.
20  Even for worker's comp, we would call him.  And I don't
21  know if Fireman's Fund handled that for us.
22      Q   So was it your practice, if you had a claim,
23  to tender it to Mr. Moore first?
24      A   Yes.
25      Q   Do you ever remember tendering a claim

Page 180

1   directly to Fireman's Fund, like going around Mr. Moore
2   and going directly to Fireman's Fund?
3       A   No.
4       Q   Did you ever ask Fireman's Fund any questions
5   about the terms of any -- of your insurance policies?
6   Like, hey, what does this mean in my policy?
7       A   I remember asking questions about my coverage
8   at federal court.
9       Q   After the Safeway lawsuit, correct?  Or
10  during it?
11      A   When Fireman's Fund took me to court.
12      Q   Correct, and we'll get to that in a minute.
13  So I should have made it a little more clear in my time
14  frame.  Sorry about that.
15          Do you ever recall talking to Fireman's Fund
16  prior to the Safeway lawsuit about any questions you
17  had about the terms of the policies?
18      A   Not to Fireman's Fund, I don't recall.
19      Q   And did you ever ask anybody before the
20  Safeway lawsuit about questions you had about the terms
21  of any of the Fireman's Fund policies?
22      A   I would have had conversations with Doug
23  about insurance policies, but I never identified them,
24  specifically who was the carrier.  Is that the right
25  word, the carrier?

Page 181

1     Q   Yeah, it is.
2     A   I never, I never identified the carrier. I
3   was concerned about the coverage. The carrier, he
4   handled.
5     Q   I want to just -- I'm going to spend very
6   little time on specifics in this, but I do want to draw
7   your attention to one or two things.
8         If you could look -- and you see there's the
9   bold numbers down there. If you could go to page
10   150 -- actually starts, excuse me, on 150. Do you have
11   that in front of you?
12     A   I do.
13     Q   Do you see there's a little "h" there, and it
14   says Exclusions?
15     A   I do.
16     Q   And then it goes on for a couple pages. Did
17   you ever review any of the next, let's say three pages,
18   from 150 to 154, of any of these exclusions to the
19   policy?
20         MS. PAVEY:  Just for the record, that
21   exclusion section goes from 150 through 157.
22         MR. ALLISON:  Fair enough.
23         MS. PAVEY:  And, I'm sorry, what was your
24   question, Steve?
25         MR. ALLISON:  Whether he ever reviewed any of

Page 182

1   these.
2     A   Maybe I went through with the agent or maybe
3   I fingered through them.
4   BY MR. ALLISON:
5     Q   And when you say with the agent, you mean
6   with Mr. Moore?
7     A   Yes.
8     Q   Okay, and drawing your attention to page 152.
9   There's exclusion "l" that says it excludes "Property
10   damage to your product arising out of it or any part of
11   it."
12         Did you ever review that prior to the Safeway
13   lawsuit?
14     A   Same answer as last time. It's possible.
15     Q   And do you remember having discussions with
16   anybody about that exclusion before the Safeway
17   lawsuit?
18     A   Huh-uh, no.
19     Q   Even if you didn't review these specific
20   ones, were you aware in general that there were certain
21   exclusions to the policy, to the insurance policy?
22     A   I don't know how policies work. It was my
23   understanding that we were insured for anything that
24   could happen.
25     Q   And so do you have a memory of ever

Page 183

1   discussing with Mr. Moore the topic of exclusions from
2   the policy?
3     A   I can't remember that.
4     Q   Okay.
5         (Whereupon Deposition Exhibit Number 56 was
6   marked for identification.)
7         Switch gears on you to something you're maybe
8   a little more familiar with. Exhibit 56 is an invoice
9   from, appears to be from VersaFlex to Hawaii Nut &
10   Bolt, dated June 14th, 2006. Again, it's got two Bates
11   number, an A 99 and HNB 99.
12         Have you seen Exhibit 56 before, Mr. Hayes?
13     A   Probably.
14     Q   Is this a -- have you seen VersaFlex invoices
15   before, even if you don't remember this particular one?
16     A   I see invoices come through. I don't enter
17   them, as it's handled by a different part of my
18   company, but I see invoices.
19     Q   Who's responsible for reviewing invoices,
20   making sure they get paid if they're appropriate?
21     A   I pay the bills.
22     Q   Do you have somebody review them as an
23   initial matter, before it gets sent to you to pay it?
24     A   Yeah, there is protocol it goes through.
25     Q   So if this bill got paid, though, you would

Page 184

1   have ultimately had to approve it for payment. Is that
2   right?
3     A   I would cut the check.
4     Q   Do you take a look through the invoices
5   before you pay them, or do you rely on your, the person
6   on your staff to do that for you?
7     A   There's multiple people. It goes through
8   checks and balances, through purchasing.
9     Q   So by the time it gets to you, you feel
10   fairly comfortable that it's appropriate?
11     A   Yeah. There's pretty standard industry
12   protocol that this goes through.
13     Q   Now, this is dated June 2006. Was this one
14   of the first sales of VersaFlex to Hawaii Nut & Bolt?
15     A   I don't know which sale this relates to.
16     Q   Okay. Can you tell from this what project
17   it's for? I tried to take a look and couldn't really
18   see.
19     A   There's nothing on here that says what
20   project it's for that I can see.
21     Q   You see here, though, the sales rep is noted
22   as Tim Lyons?
23     A   I do.
24     Q   So would that indicate to you that Mr. Lyons
25   would have been employed by you at least by this June

46  (Pages 181 to 184)

Page 217

1    so you can take a quick look at them.
2        Do you recall seeing these e-mails before,
3    Mr. Hayes?
4        A   I don't.
5        Q   Do you see in the second sentence -- well,
6    the first sentence actually says, "The letter to your
7    attorney on your behalf requested copies of invoices."
8    Do you see that?
9        A   I do.
10       Q   Does that refresh your recollection at all
11   that the invoices from Mr. Knapman were forwarded to
12   Fireman's Fund and ultimately paid?
13       A   No.
14       Q   Then the second sentence, Mr. Moore says,
15   "Defense coverage should be provided, although they
16   have a reservation of rights on paying for damages."
17   Do you see that?
18       A   I see that.
19       Q   So Mr. Moore was telling you that there was a
20   reservation of rights on paying for damages. Correct?
21       A   That's what it says here.
22       Q   Did you ever discuss with Mr. Moore what he
23   said in that e-mail, about reservation of rights on
24   paying for damages?
25       A   I don't recall talking with him about

Page 218

1    reservation of rights.
2        Q   Do you recall ever being informed by
3    Mr. Moore or anybody other than lawyers that Fireman's
4    Fund might not pay for the damages from the lawsuit?
5    In other words, they'd pay for the defense counsel, but
6    they might not pay for the damages.
7        A   I don't think so. I was completely surprised
8    and shocked when I learned that.
9        Q   So in November of 2009, when Mr. Moore said
10   that, that surprised you?
11       A   No, it surprised me when Fireman's Fund sued
12   me.
13       Q   So in November of 2009, you didn't -- this
14   didn't cause you to ask Mr. Moore, well, what does that
15   mean?
16       A   Mr. Moore was my agent, and I think it was
17   our mutual understanding that I was covered.
18       Q   Well, Mr. Moore here is saying they have a
19   reservation of rights on paying for damages. Correct?
20       A   Well, correct, but again, I don't know what
21   that means. I think we've established that.
22       Q   Right, and so you've also testified that you
23   don't recall whether you asked Mr. Moore to explain
24   what that meant.
25       A   That's correct.

Page 219

1        Q   Do you ever recall asking anybody to explain
2    what that meant?
3        A   No.
4        Q   Exhibit 62.
5        (Whereupon Deposition Exhibit Number 62 was
6    marked for identification.)
7        It's a series of e-mails, and the one I'm
8    most interested in is the bottom one, which is from
9    you, Mr. Hayes, to Mr. Moore, dated November 1st, 2010.
10   It said, "Hi Doug, I am completely out of
11   touch regarding HNB's insurance. I would like it very
12   much if you would educate me. Can we meet at HNB
13   Honolulu."
14       Do you recall in what context you were
15   sending this to Mr. Moore?
16       A   I do not.
17       Q   So you don't know whether it was with respect
18   to the Safeway lawsuit or more broadly, about your
19   insurance coverage for the company?
20       A   Correct.
21       Q   Do you remember meeting with Mr. Moore as a
22   result of this e-mail in or around November of 2010?
23       A   No.
24       Q   Okay, and so you don't recall anything that
25   the two of you discussed in this time frame as a result

Page 220

1    of this e-mail?
2        A   The specific contents of the discussion, I
3    don't remember.
4        Q   Any -- and I'm sorry, when you say specific,
5    I have to ask if you remember anything general.
6        A   I don't even remember the conversation.
7        Q   Fair enough. Stack's getting small. We're
8    almost there.
9        (Whereupon Deposition Exhibit Number 63 was
10   marked for identification.)
11       63. All right, Exhibit 63 is, again, a
12   series of e-mails between you and Mr. Moore, and this
13   is now all the way up to 2014.
14       And in the middle, second e-mail down, from
15   you to Mr. Moore, on May 23rd, 2014, you ask to meet
16   with Mr. Moore. You say, "There have been a few
17   changes that need to be incorporated in our coverage."
18       Do you recall why you wanted to meet with
19   Mr. Moore in May of 2014?
20       A   Are you asking if I recall what those changes
21   were?
22       Q   Sure, that's a better question.
23       A   I do not.
24       Q   Do you recall this meeting with Mr. Moore
25   that you suggested in May of 2014?

55 (Pages 217 to 220)

Page 225

1  Safeway is going after your policy limits, which is why
2  FFIC now is then denying based upon your misrepresentations
3  to Safeway on the product qualities, which were
4  misleading and false."
5      Do you see that, those two sentences?
6  A  I do.
7  Q  Did you ever discuss what Mr. Moore said in
8  those two sentences with him?
9  A  It appears that that's what I'm saying above.
10  Q  Right. I'm asking whether you talked about
11  it with him. Did you guys have any follow-up
12  conversations where you said, what do you mean by that?
13  A  I don't recall.
14  Q  Did anybody ever tell you that Safeway was
15  going after Hawaii Nut & Bolt solely because they had
16  large insurance policy limits?
17  A  I don't recall specifically. I feel, felt
18  that way, but I don't recall specifically.
19  Q  You thought the amount that Safeway was
20  seeking from Hawaii Nut & Bolt was not reflective of
21  what Hawaii Nut & Bolt actually did. Isn't that right?
22  A  I don't think we did anything wrong.
23  Q  Right. So you don't think you should have,
24  you or your insurance company should have had to pay
25  anything to Safeway, did you?

Page 226

1  A  I think I had insurance because this stuff
2  happens, and my insurance company should protect me.
3  Q  Well, do you think the insurance company
4  should pay claims that have no merit?
5  A  I don't think anybody should pay claims that
6  have no merit, but I don't know how to determine that.
7  Q  But it was certainly your belief that these
8  claims didn't have merit. Isn't that right?
9  A  I don't know how the insurance game works or
10  the attorney game works, but I know my role.
11  Q  Right. Yeah, I'm not talking about the
12  insurance claims. I'm just talking about in the
13  Safeway claim against Hawaii Nut & Bolt, that you guys
14  did something wrong out on that project or you should
15  be responsible for what happened on that project. You
16  didn't think that Hawaii Nut & Bolt was responsible for
17  that, did you?
18  A  That's correct.
19  Q  And if it was your money, you wouldn't have
20  paid them anything, would you?
21  A  I bought insurance with my money so that I
22  wouldn't have to.
23  Q  Right, but you didn't think that you did
24  anything wrong. Right?
25  A  In my role as distributor, I don't think I

Page 227

1  did anything wrong.
2  Q  Right, and did you ever tell Mr. Takase, boy,
3  I think we, you know, we really screwed up here. Did
4  you ever tell him anything like that?
5  A  No.
6  Q  As a matter of fact, you told him the
7  opposite, didn't you? That you thought that Hawaii Nut
8  & Bolt was in the right, that you guys didn't do
9  anything wrong.
10  A  I still don't think we did anything wrong.
11  Q  Right, and that's what you testified to in
12  the depositions that Ms. Pavey took of you. Correct?
13  A  (Witness nods head.)
14  Q  Isn't that right?
15  A  I don't recall those depositions --
16  Q  Right.
17  A  -- but I think I'm pretty consistent.
18  Q  Right, but you do recall that Ms. Pavey took
19  your deposition for over a day. Right?
20  A  That, I do recall.
21  Q  Right. Did you ever make an indemnity claim
22  to VersaFlex? Let me not use a lawyer word. Let me
23  say --
24      MS. PAVEY: Thank you.
25  BY MR. ALLISON:

Page 228

1  Q  Did you ever, did you ever tell VersaFlex,
2  you're responsible for this, you should pay?
3  A  It was always my belief that they were,
4  because they had a warranty. The warranty was through
5  them.
6  Q  Did you ever discuss with Mr. Takase whether
7  bringing a claim against VersaFlex was something that
8  should be done?
9  A  I think I might have wanted claims to be
10  filed against everybody even remotely involved that
11  brought me into that.
12  Q  And did Mr. Takase tell you that that was a
13  possible option?
14      MS. PAVEY: That what was a possible option?
15  BY MR. ALLISON:
16  Q  Bringing claims against the other folks that
17  were involved in the Safeway project.
18      MS. PAVEY: Just for the record, you are
19  getting into attorney client privileged communications
20  directly, so.
21      MR. ALLISON: There's a privilege? You're
22  now asserting there's a privilege between Mr. Takase
23  and HNB?
24      MS. PAVEY: I thought you were asking him
25  what Greg Takase told him.

Page 229

1      MR. ALLISON: Right.
2      MS. PAVEY: Greg was his lawyer.
3      MR. ALLISON: Correct.
4      MS. PAVEY: So that's an attorney client
5  communication.
6      MR. ALLISON: Correct, and how has that not
7  been waived by the fact that they've disclosed it to
8  Safeway, who was suing them for six figures?
9      MS. PAVEY: I hear you, and we're going to
10  have to figure out the parameters of the attorney
11  client privilege, just like we have to with regard to
12  your assertion of the privilege.
13      MR. ALLISON: That's a completely different
14  thing because we've produced --
15      MS. PAVEY: No, it's not.
16      MR. ALLISON: -- Mr. Takase's communications
17  with HNB, and you're well aware of that, and you said
18  that was fine, and you guys, you made clear on that,
19  so.
20      But whatever. We'll, we'll deal with that.
21  It's too late in the day to try to understand your
22  positions.
23      MR. ROBBINS: Are you advising Mr. Hayes to
24  not answer the question?
25      MS. PAVEY: Do you have more questions along

Page 230

1  those lines?
2      MR. ALLISON: I might. I mean, we'll see how
3  it goes. I'm pretty sure I will. So, I mean, I don't
4  want to spend all day on it and ask fifteen questions
5  that you're just going to instruct on.
6      So is it your position that communications
7  that Mr. Hayes had with Mr. Takase about the Safeway
8  lawsuit is privileged?
9      MS. PAVEY: Yes.
10      MR. ALLISON: Okay.
11      COURT REPORTER: 65.
12      (Whereupon Deposition Exhibit Number 65 was
13  marked for identification.)
14  BY MR. ALLISON:
15      Q   All right, Exhibit 65 is an e-mail from --
16  first one is from Mr. Hayes to Mr. Moore, dated July
17  2nd, 2015, and Mr. Moore is forwarding an e-mail
18  between Ms. Bonak at Fireman's Fund and himself.
19      Have you seen these e-mails before,
20  Mr. Hayes?
21      A   I don't recall them specifically.
22      Q   Okay. If you look at the e-mail that
23  Mr. Moore forwards you from Ms. Bonak, there is --
24  paragraph one, two, three at the bottom. It says,
25  "There appear to be little covered damages based on the

Page 231

1  information received from Safeway."
2      And then here is the part. "But according to
3  the notes, in Hawaii, if a carrier does not file a
4  declaratory judgment action, then neither the courts
5  nor the mediator take any notice of the coverage issues
6  and will look to the carrier to resolve the claim.
7  Therefore, we have a substantial exposure here."
8      Do you recall at all being informed of this,
9  that that was part of the rationale for why the
10  declaratory judgment action or the coverage action was
11  filed against Hawaii Nut & Bolt?
12      A   I don't remember this specifically.
13      Q   And at the top e-mail you say to Mr. Moore,
14  last sentence, "I'm still not even clear about why we
15  are being sued."
16      Did you ever get that question answered by
17  Mr. Moore or anybody else?
18      A   I feel like I would have.
19      Q   Do you remember what the answer was?
20      A   That I was covered.
21      Q   No, I understand that. You're asking the
22  question, why we are being sued. So in other words,
23  why did Fireman's Fund file this declaratory judgment
24  action against us. Did you ever get the answer as to
25  why that lawsuit was filed?

Page 232

1      A   I may have through my attorney.
2      Q   Apart from your attorney, did you get the
3  answer?
4      A   I don't believe so.
5      Q   There was some conversation earlier about
6  whether Fireman's Fund is seeking money from Hawaii Nut
7  & Bolt. Do you have an understanding that Fireman's
8  Fund is seeking money in this lawsuit from Hawaii Nut &
9  Bolt?
10      A   Fireman's Fund has cost my company money and
11  hurt my cash flow.
12      Q   Well, different question. We'll get to that,
13  but my question is that they're seeking money. In
14  other words, that in this lawsuit Fireman's Fund is
15  going to ask a judge or a jury, have Hawaii Nut & Bolt
16  pay Fireman's Fund money.
17      Do you have an understanding that that's
18  what's going to happen?
19      A   Is that what's happening?
20      Q   I can tell you it's not, but my question is
21  what's your understanding.
22      MS. PAVEY: Is that your representation on
23  behalf of Fireman's Fund?
24      MR. ALLISON: It's a declaratory judgment
25  action, but.

Page 233

1    MS. PAVEY: In your footnote, I believe you
2  said that Fireman's Fund might come after him for all
3  the defense costs that they paid in the case.
4    MR. ALLISON: A footnote? I don't know what
5  you're talking about. Judy, it's not my deposition,
6  I'm not taking a deposition of you --
7    MS. PAVEY: No, you just made a
8  representation to Bill, and I want to know if you're
9  making that with authority from Fireman's Fund.
10    MR. ALLISON: I'm not making any
11  representation with an authority from Fireman's Fund,
12  Judy. If you want to take my deposition, send a
13  notice.
14    MS. PAVEY: Don't make a representation then.
15    MR. ALLISON: I can say whatever I want
16  whenever I want, Judy.
17  BY MR. ALLISON:
18    Q    Now, my question to you is, do you have an
19  understanding as to whether Fireman's Fund is seeking
20  money from you in this lawsuit? You do or you don't.
21  Simple.
22    A    Well, I feel that way now after hearing what
23  I just heard.
24    Q    Well, you feel that way because of what
25  Ms. Pavey said?

Page 234

1    A    I've been worried about that for a while.
2  This just kind of adds to it.
3    Q    Okay. So your concern that Fireman's Fund is
4  seeking money from you is based on what Ms. Pavey just
5  said?
6    A    No, my concern about Fireman's Fund is based
7  on Fireman's Fund suing me.
8    Q    Okay. You said that you were out money. Can
9  you explain to me what you meant by that? I want to
10  get back to that.
11    A    Sure. I had to hire Peter Knapman to defend
12  me, to protect me from the people who were supposed to
13  be protecting me at Fireman's Fund.
14    Q    And how much did you pay to Mr. Knapman?
15    A    I believe I disclosed that. I don't have
16  that on me right now.
17    Q    Do you have an estimate? Is it $10,000? 5,
18  15?
19    A    I'm going to say 15, $20,000.
20    Q    Now, Mr. Knapman is no longer defending you
21  in this lawsuit. Correct?
22    A    He's still involved. I believe he has to do
23  a deposition, so I'm still bleeding.
24    Q    Well, let me ask it this way. Is your
25  counsel in the lawsuit now Ms. Pavey and her law firm?

Page 235

1    A    I don't know how it all works, but I know
2  Peter Knapman is still involved and I know Ms. Pavey is
3  involved.
4    Q    Okay. Are you paying bills from Ms. Pavey's
5  firm?
6    A    No.
7    Q    Is it your understanding that Safeway is
8  paying those bills?
9    A    I don't know who is paying those bills.
10    Q    But you just know you're not?
11    A    Yes.
12    Q    Now, at some point in time, did you attend a
13  mediation session in the Safeway lawsuit at the court?
14    A    That was the meeting at the federal court
15  building?
16    Q    Correct.
17    A    Yes, I did.
18    Q    Okay, and we'll talk about that in a minute.
19  Other than that and the deposition that you took in the
20  Safeway lawsuit, were there any other meetings that you
21  went to with all the lawyers in that Safeway lawsuit?
22    A    All the lawyers being from all parties?
23    Q    Right, to try to resolve the case. Did you
24  go to any other meetings like that other than the one
25  in federal court?

Page 236

1    A    We went on a road trip after that and we
2  walked to another courthouse that same day.
3    Q    Got it. Let's take it apart from that day.
4  Was there any other point in time where you went to a
5  meeting where there was an attempt to settle the
6  lawsuit in a courtroom or in a conference room like
7  this, where the lawyers and their clients were there?
8    A    I don't think so.
9    Q    Okay. Even if you didn't go to any of those,
10  do you remember being informed that those had occurred?
11    A    I don't recall the nature of all the
12  meetings.
13    Q    Okay. Now, let's talk about the one you went
14  to at the federal courthouse. Do you recall, first
15  off, the rough time frame of when that was?
16    A    Maybe around this time last year.
17    Q    So October 2015-ish or late 2015 sound fair?
18    A    Yeah, the last quarter.
19    Q    Okay, and how did you find out about it?
20    A    Attorneys.
21    Q    Mr. Takase and others?
22    A    Yes.
23    Q    Okay, and who did you go with to the
24  mediation? So in other words, did you meet people
25  there, did you drive with somebody? How did you get

59  (Pages 233 to 236)

Page 261

1 but that some of the damages might be excluded from
2 coverage? Or was your testimony that that was your
3 impression from talking with Ann?
4    A   This is my impression.
5    Q   And I believe earlier you said you don't
6 remember specifically what she said.  Is that right?
7    A   It was my impression.
8    Q   My question is, do you remember specifically
9 what she said on that topic?
10    A   Specifically, no.
11    Q   And when you say that HNB was covered, what
12 do you mean by that?  It says that HNB was covered.
13    A   Protected.
14    Q   Protected in what sense?
15    A   Financially.
16    Q   From any and all claims, of whatever nature?
17 Is that your testimony?
18    A   I believe that my, the way my business
19 operated, we were correctly covered.
20    Q   Have you ever heard of a performance bond in
21 the construction business?  Are you familiar with that?
22    A   I hear of bonding in the construction
23 industry, but it doesn't -- I don't know if I've
24 participated in that.
25    Q   Did you ever suggest or talk to Mr. Moore

Page 262

1 about whether you wanted a performance bond on
2 particular projects to make sure that you were covered
3 for more than just what a commercial general liability
4 policy would provide for you?  Did you ever have that
5 conversation?
6    A   I don't recall it.
7    Q   And then you go on to say -- and this is your
8 paragraph 10 here about what you were supposedly told
9 by Fireman's Fund representatives.  "But that some of
10 Safeway's damages might be excluded from coverage." Do
11 you see that part?
12    A   I do.
13    Q   Do you recall any conversations about which
14 parts of Safeway's damages might be excluded from
15 coverage?
16    A   Specific conversations, no.
17    Q   Do you recall any conversations with these
18 Fireman's Fund representatives that you referred to
19 about how much of Safeway's damages might be excluded
20 from coverage?
21    A   No.
22    Q   Paragraph 11, next page, please.  "I was
23 never informed that the Fireman's Fund policy coverage
24 had been altered to exclude coverage for claims
25 concerning property damage caused by a defective

Page 263

1 product distributed by Hawaii Nut & Bolt."
2    What do you mean here when you say that the
3 Fireman's Fund policy coverage had been altered?
4    A   It's my belief that the products I sold were
5 insured.  It always has been.
6    Q   And what's that belief based on?  You said
7 it's always been your belief.  So what was that belief
8 based on?
9    A   My money was accepted.  I met with
10 professional insurance people.
11    Q   And when you say you met with professional
12 insurance people, who are you referring to?
13    A   Specifically, Doug Moore.
14    Q   And you said that coverage had been altered.
15 Are you, are you attempting to really testify here in
16 this declaration that somehow the policy had actually
17 physically been changed?  In other words, like -- let
18 me finish.  That pieces of the policy that were there
19 before were no longer there?
20    MS. PAVEY:  And I'll just object to the form
21 of the question because it misstates both the document
22 and his testimony.
23    A   I assume that word is chose, was chosen to
24 express my surprise that I no longer had insurance,
25 where I thought I had always had insurance.

Page 264

1 BY MR. ALLISON:
2    Q   You keep using the term you had no insurance.
3 The policy wasn't canceled, was it?
4    A   The policy was not -- well, actually, I don't
5 know.  Is that what's happening in federal court right
6 now?
7    MS. PAVEY:  That's what they're trying to do.
8    MR. ALLISON:  No, Judy, you're not here to
9 testify.  If you'd like to testify, we'll give you a
10 subpoena.
11 BY MR. ALLISON:
12    Q   Was the, was the policy canceled?
13    Do you know what it means to have an
14 insurance policy canceled?  Have you ever had that
15 happen?
16    A   No.
17    Q   Do you believe -- do you have an
18 understanding that your insurance policy has
19 limitations on what it covers?
20    A   I suppose it covers what it was purchased to
21 cover.  That's what I should be able to expect.
22    Q   Right, and what's the best source for
23 determining what is covered?
24    A   You hire a professional.
25    Q   And you've heard the term insurance policy.

66 (Pages 261 to 264)

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 265

1    Right? You've heard that term.
2      A  Yes, I have.
3      Q  Do you know what an insurance policy refers
4  to? What's a policy?
5      A  I don't know the inner workings. I just want
6  to make sure I'm covered.
7      Q  No, no, I'm not talking about the inner
8  workings. I'm just saying, what's the insurance
9  policy. Is it a document? To your understanding, is
10  an insurance policy an actual document?
11     A  I don't know.
12     Q  Well, I thought you had this binder that had
13  the actual policies in it.
14     A  Okay. Well, I have a binder.
15     Q  Right, and wouldn't the best place to go to
16  determine what is in your insurance policy is the
17  policy itself?
18     A  No. It's to the expert.
19     Q  Right. Where do you think the --
20     A  Oh, I'm sorry (cellphone ringing).
21     Q  Where do you think the expert would go? I
22  mean, wouldn't Mr. Moore look at the insurance policy
23  to determine?
24     A  I don't know where he would go.
25     Q  Well, did you think you were purchasing

Page 266

1  coverage broader than what was in the actual policy?
2     A  I was thinking I was purchasing more than
3  enough insurance to protect my business from situations
4  like this.
5     Q  Situations like Mr. Moore -- Mr. Lyons doing
6  all the things that we saw in the stipulated judgment.
7  Right? You thought you had protection for all those
8  things that Mr. Lyons did.
9     A  Product liability.
10     Q  And all those things that Mr. Lyons did?
11     A  I'm confused by all those things Mr. Lyons
12  did.
13     Q  Well, we can pull it back out and look at it.
14     A  Well, we can, but you're going to have to
15  figure out which hat he was wearing when he did those
16  things, too.
17     Q  Well, let's look at it right here, because I
18  thought we just went through it, but we'll do it again.
19  This is the document, again, that you signed. So
20  paragraph 14 --
21     MS. PAVEY: Which exhibit are you on?
22     MR. ALLISON: We're on Exhibit 46, the
23  stipulated judgment.
24  BY MR. ALLISON:
25     Q  Paragraph 14, you said this was a true

Page 267

1  statement five minutes ago. More specifically, while
2  employed by HNB, Mr. Lyons did all that.
3     A  Okay.
4     Q  15. After joining HNB in mid-2006, did all
5  that.
6     A  Cool.
7     Q  16. While an employee of HNB, he did all
8  that.
9     So did you think you were purchasing coverage
10  for all the things that are --
11     MS. PAVEY: Can you sit down, please?
12  BY MR. ALLISON:
13     Q  -- in 14, 15, 16?
14     MR. ALLISON: I'm putting it to him so he can
15  see, make it easy for him.
16     A  Okay, can you --
17  BY MR. ALLISON:
18     Q  Sure.
19     A  -- put one other document, the invoice from
20  VersaFlex that we saw earlier?
21     Q  You want to see -- sure, what ever else you
22  need.
23     A  My point was I don't know which hat he was
24  wearing. That hat shows him being the sales rep for
25  this company.

Page 268

1     Q  Right, but it was while he was employed with
2  Hawaii Nut & Bolt. Correct? 14, 15, and 16, that's
3  what they say. Right?
4     A  While he was employed, yes.
5     Q  Okay.
6     A  But when you say all those things that Tim
7  did, I said that you need to determine which hat he was
8  wearing when he did those things.
9     Q  Right, and my question is, did you have
10  insurance, did you think you had insurance coverage for
11  what Mr. Lyons did, according to that stipulated
12  judgment.
13     MS. PAVEY: In paragraphs 14, 15, and 16?
14     MR. ALLISON: We'll start there.
15     MS. PAVEY: Okay.
16     A  I believed I had insurance to cover my
17  outside salespeople.
18  BY MR. ALLISON:
19     Q  Including what Mr. Lyons is said to have done
20  in 14, 15, and 16. Right? That's what you thought.
21     A  To pass this information from VersaFlex to
22  the people who needed to make the decisions, I think
23  I'm covered for that. That's what I think Mr. Lyons
24  did.
25     Q  Well, it says far more than that, though,

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 269

1    doesn't it?  It says he, he affirmed both the
2    suitability and quality of VersaFlex products.
3        A    How did he do that?  By providing them with
4    the twenty year warranty that they requested.
5        Q    It says, "And."  "And further confirmed that
6    VersaFlex."  There's an "and" there.
7        A    He would have provided the necessary
8    literature for the people that make those decisions to
9    make those decisions.
10       Q    But that's not what it says there.  You're
11   adding that, right?
12       A    You're asking me to elaborate on this, and
13   I'm elaborating on this.
14       Q    I'm asking if you thought there was coverage
15   for that.  That was my question.
16       A    I always believed that I was covered.
17       Q    And even for the things that are mentioned
18   there.  Right?
19           MS. PAVEY:  Asked and answered.
20       A    I've always believed that I was covered.
21   BY MR. ALLISON:
22       Q    And my question was, even for those things.
23   Right?
24           MS. PAVEY:  God, that's at least the third
25   time you've asked that --

Page 270

1           MR. ALLISON:  He hasn't answered it.
2           MS. PAVEY:  Yes, he has.  He said yes.
3           MR. ALLISON:  It stinks to defend depos,
4    doesn't it, Judy?
5    BY MR. ALLISON:
6        Q    Keep going.
7        A    I've always felt like I was covered.
8        Q    For these -- and you felt you were covered
9    for 14, 15, and 16 in the stipulated judgment.
10   Correct?
11       A    For all activity that my company would do.
12   My general operations and what we did, I felt like we
13   were covered.
14       Q    And did that include those things?  Was that
15   part of your general operations, 14, 15, and 16?
16       A    To be a conduit for information for VersaFlex
17   to the general contractor, Nordic, yes, that's what we
18   do.
19       Q    Let's go back to that one over there, which
20   is 66.
21           17.  "When Fireman's Fund filed the
22   declaratory judgment action seeking to get out of
23   providing HN&B any coverage or defense right before we
24   were heading into trial, it caused me personally a lot
25   of stress and panic."

Page 271

1    Do you see that?
2        A    I do.
3        Q    What do you mean by stress and panic?
4        A    Made me feel like shit.
5        Q    Why?
6        A    Well, I thought I was going to lose
7    everything I ever worked for in my life.
8        Q    And that was because Safeway would continue
9    the lawsuit and get a judgment against you, and then
10   execute on that judgment.  Right?
11       A    I have no idea what Fireman's Fund is up to
12   right now.  I don't know what you're up to right now.
13   I'm very concerned about you.  You're causing me stress
14   and panic.
15       Q    Well, let's look at 17.  It says, "When
16   Fireman's Fund filed the declaratory action."  That's
17   not today, that was then.  "Seeking to get out of
18   providing HN&B any coverage or defense, it caused me
19   personally a lot of stress and panic."
20       A    Yeah.
21       Q    Have you seen a doctor about that stress and
22   panic?
23       A    I have.
24       Q    What's the name of that doctor?
25       A    James Spira.

Page 272

1        Q    Is he here in Honolulu?
2        A    He is.
3        Q    What type of doctor is he?
4        A    A counselor, or psychiatrist, psychologist.
5        Q    And when did you start seeing him?
6        A    Beginning part of this year.
7        Q    So early 2016.  Any other health or medical
8    professionals you've seen for this stress and panic you
9    mentioned here?
10       A    No.
11       Q    Anything else going on in your life during
12   the time frame, same time frame, that caused any stress
13   or panic besides this lawsuit?
14       A    This lawsuit is the core that stimulated
15   other areas of stress and panic in my life.
16       Q    Now, at the same time, the Safeway lawsuit
17   was still going on.  Right?
18       A    There's lots of lawsuits in my brain going on
19   all at the same time.
20       Q    Right, but the stress and panic wasn't solely
21   caused by the one lawsuit.  It was caused by the sum
22   total of them.  Right?
23       A    It was the Fireman's Fund one that really
24   pushed me over the edge.
25       Q    And the -- and when you were -- when you had

Page 273

1  that concern, and you said you still have it, hasn't it
2  caused you to want to get some reassurance that you
3  have a settlement with Safeway, that you're done there,
4  you're not going to get any, any further claims from
5  them?
6     A  I don't believe there's any such thing as
7  assurances over, when you deal with attorneys.  This
8  thing has been going on a long time.
9     Q  I understand that.  Now, paragraph 18, you
10  said, "I was never told by Fireman's Fund that it was
11  filing that action against HN&B as a settlement tactic
12  or a legal tactic."
13        Do you see that?
14     A  I see that.
15     Q  Is that a true statement?
16     A  I felt high and dry when I heard about that,
17  that I was being thrown to the wolves.  That's a true
18  statement.  And I did take, I did take it as a threat
19  posed to me, my family, and my business, and that I
20  could go bankrupt as a result.  Yeah, I totally felt
21  that way.
22     Q  Right, but you're only talking about the second
23  sentence.  I'm just talking about --
24     A  I don't think you can break it like that.
25  You can't represent it like that for me, sorry.

Page 274

1     Q  What do you mean?  It's the way, it's the way
2  it's written there.  I'm not representing it any way.
3     A  Well, I continue to read the whole thing.
4     Q  I understand that, but --
5     A  You're not going to get me to do that, sorry.
6     Q  I'm not going to get you to do what?
7     A  Okay.
8        MS. PAVEY:  Do you want to take a break?
9        THE WITNESS:  No.
10     A  I can't answer it.  I just don't understand
11  your question, and I'm not going to go --
12  BY MR. ALLISON:
13     Q  My question is really simple.
14     A  Yeah.
15     Q  It says in the declaration you signed under
16  penalty of perjury filed in this lawsuit, "I was never
17  told by Fireman's Fund that it was filing that action
18  against HNB as a settlement tactic or a legal tactic."
19        Is that a true statement?
20     A  I don't recall.
21     Q  Okay, so you signed this and you don't know
22  whether that's true?
23     A  I don't recall.  That's what you're going to
24  get out of me.
25     Q  All right, Exhibit 67.  Exhibit 67 is

Page 275

1  defendant/counterclaim plaintiff Hawaii Nut & Bolt,
2  Inc.'s answers to plaintiffs and counterclaim
3  defendants American Automobile Insurance Company's and
4  National Surety Company's first request for answers to
5  interrogatories.
6        And then there also is, in the one that's
7  clipped on there, a verification form that we, I think,
8  just got today.
9        Have you seen these responses before,
10  Mr. Hayes?
11     A  Perhaps.  It's just another blur of
12  documents.
13     Q  Okay, and at the back here -- sorry, it's
14  easier to flip it over -- there is a verification form.
15  Do you see that?
16     A  I do.
17     Q  And that was signed by you just yesterday.
18  Right?
19     A  That appears to be my signature.
20     Q  Right, and the date was yesterday.  Right?
21     A  Oh, okay.
22     Q  And so did you read these before you signed
23  that document verifying that they're true and correct?
24     A  I read a bunch of stuff.
25     Q  Well, specifically, why don't we do this.

Page 276

1     A  You've done a really good job of making me
2  kind of unsure of what true and correct is.
3     Q  Mr. Hayes, I'm not trying to do anything
4  other than understand what's in documents that you've
5  already signed.
6     A  Well, you're not helping me to understand.
7  You're making me more confused.
8     Q  Okay.  Well, let's try to make it a little
9  more clear then.
10        Let's go to page three.  There's a question
11  and then there's an answer.  So let's do it this way.
12  I'll try to do it easy.
13        Question five says, "Identify each item of
14  damage you claim in this action."  That's this case
15  right here.  "Specifying the nature, amount, basis," et
16  cetera, "for each item of damage."
17        And then you go to the next page, page four,
18  and then there's an answer.
19     A  Okay.
20     Q  Hold on.  Let me take a look at the document.
21  Yeah, there it is.  Sorry, there's two page fours,
22  because the requests are there and then the answers.
23  So there you go, okay?
24        Then there's a lengthy answer on page four to
25  five.  Why don't you take the time to read that, I know

Page 277

1  it's long and it goes to the next page, but it's an
2  answer that was prepared and sent to us on behalf of
3  your company.
4      And my first question is whether everything
5  in it is accurate. Just read it, and that's a simple
6  question. And it's just that one answer that goes on
7  that page and then up to the top of the second page.
8      MS. PAVEY: So just take your time and read
9  that.
10  BY MR. ALLISON:
11    Q  Yeah, you can take whatever time you like.
12    A  Okay.
13    Q  Okay, and so my question is, is everything in
14  here accurate?
15    A  This is a good overview of what I consider to
16  be accurate.
17    Q  And did you understand that you were, on that
18  last page, signing a document that said that things in
19  this document are accurate?
20    A  To the best of my understanding.
21    Q  Okay, and we've talked about most of this,
22  but I want to go to the second page, at the top here.
23      And, Mr. Hayes, I'm sorry I've got to ask you
24  about this. I'm really just trying to do my job on
25  behalf of my client.

Page 278

1    A  Uh-huh.
2    Q  But it's in this document, so I have to ask.
3    A  Uh-huh.
4    Q  You say, "Finally, this has been beyond
5  just" -- or it says, "Finally, it's been beyond
6  stressful for Mr. Hayes and his family."
7    A  Uh-huh.
8    Q  "He's much more than just upset with the way
9  Fireman's Fund handled the claim."
10      Okay, and then it has a couple specific
11  things. First, "His business faltered." Can you
12  please describe to me how your business has faltered as
13  a result of the coverage positions taken by Fireman's
14  Fund?
15    A  Oh. Well, my business is faltering right
16  this moment. I should be working, closing deals. I'm
17  losing money as we speak. Every document I have to
18  read, I should be working. I should be making money
19  for my company and my family. Every second I'm taken
20  out of the game, I'm losing money.
21    Q  And that was true also when Safeway sued you.
22  Correct?
23    A  It's true anytime I'm taken away from my job.
24    Q  Right. Now, you say your business has
25  faltered. I understand you lost the time you spent

Page 279

1  today. Are your, are year over year sales down in
2  2016?
3    A  My profitability is down.
4    Q  That wasn't my question. My question was are
5  your year over year sales down.
6    A  You don't go by sales in my business, you go
7  by profit.
8    Q  We'll get to profitability in a minute.
9  That's not my question. It's a lot simpler if you just
10  answer my question, which is are your sales down --
11    A  I don't know.
12    Q  -- year over year. You don't know.
13    A  I don't.
14      (Request by the reporter to speak one at a
15  time)
16    Q  Have your year over year sales gone down,
17  2016 to 2015?
18    A  I don't know.
19    Q  Now, you say your profitability has gone
20  down.
21    A  Yes.
22    Q  How much?
23    A  I don't know.
24    Q  Are there any other factors that have led to
25  your profitability going down? Have you analyzed it at

Page 280

1  all?
2    A  No.
3    Q  So your profitability has gone down, and you
4  think that's because of the day, you had to spend today
5  doing this, and the time you've had to spend
6  answering --
7    A  It's not --
8    Q  -- court documents.
9    A  Sorry.
10    Q  I'm sorry.
11    A  Sorry.
12    Q  Is that the reason why?
13    A  It can't be simplified like that. Today,
14  what happens today doesn't end today. The stress and
15  the loss of energy will last for many days from what
16  happens today. I don't walk away from here and go back
17  to my regular life. I'll carry the stress for a while.
18  And that will impact my ability to perform at work.
19    Q  Have you quantified what that's -- have you
20  figured out how much that's cost you?
21    A  I don't know if it's possible to do that.
22    Q  Is your business open today?
23    A  It is.
24    Q  You have other employees, right?
25    A  I do.

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 281

1   Q   And when you're gone from the office for
2   other reasons, your business continues.  Right?
3   A   My business does not continue.
4   Q   Well, you don't shut the store down just
5   because you can't be there.  Right?
6   A   Of course not.
7   Q   Okay.  So maybe you're not out calling on
8   customers that day, but the store is still open and
9   people can still come purchase product, and deliveries
10  can be made, et cetera.  Right?
11  A   No.
12  Q   Why not?
13  A   Because I price all of our quotes.
14  Q   Well, that's for new business.  For business
15  that's already been priced, deliveries can still be
16  made, and if there's walk-up customers, they certainly
17  can buy something.  Right?
18  A   But that's not relative to the point you were
19  making earlier about loss of profitability and sales.
20  Q   You go on to say -- but again, just to get my
21  point here, you haven't quantified that.  It's just
22  your revenue's down and you -- this is your -- you
23  attribute it to this.
24  A   To being -- to the lawsuits?
25  Q   Yes.

Page 282

1   A   Yes.
2   Q   Have your material costs gone up?  Have you
3   analyzed that?
4   A   Yes.
5   Q   And --
6   A   They have not.
7   Q   How about your other costs, rent, utilities,
8   all the other things that go into running a business?
9   A   Those are pretty much fixed.
10  Q   What about employee costs?
11  A   Pretty fixed.
12  Q   Health insurance?
13  A   Everybody's health insurance goes up a little
14  bit.
15  Q   So there's -- isn't it true that in a
16  business like yours, there's lots of factors to figure
17  profitability, not just one thing?
18  A   That's obvious, yes.
19  Q   And then it says your health has suffered.
20  Describe to me how your health has suffered, please.
21  A   Oh, I'm burned out.  I just crashed.
22  Q   Burned out in the sense of mentally burned
23  out?
24  A   Mentally, physically.  Yeah, I nose-dived.
25  Q   Okay, and when did that start?

Page 283

1   A   Like I say, it was the Fireman's Fund thing
2   that pushed me over the edge.
3   Q   And when was that?
4   A   We've already established that.
5   Q   When was it, I'm asking you.
6   A   Right around this time last year.
7   Q   And so it's at that point that your health
8   took a nosedive.  How did your health take a nosedive?
9   A   Oh, wow, I just completely lost energy,
10  drive.  I felt like, why?  I was being thrown -- my own
11  insurance company, people I paid to protect me, were
12  throwing me to the wolves.
13  Q   And other than Dr. Spira, did you see any
14  other doctor for any other symptoms related to this?
15  A   No.
16  Q   And then you say -- and again, I apologize,
17  but it's in here.  "His marriage of more than 25 years
18  has fallen apart."
19  A   Uh-huh.
20  Q   That's happened recently?
21  A   Uh-huh.
22  Q   How recently?
23  A   Starting approximately a year ago.  That's
24  when.
25  Q   And again, have you got divorced?

Page 284

1   A   Separated.
2   Q   And is there any other reason that that has
3   occurred other than this lawsuit?
4   A   No, I think it was the, it was the threat of
5   not being able to provide for my wife or my family
6   anymore that pushed it over the edge.
7   Q   Now, that hasn't actually occurred, right?
8   Your business is still operational.  Right?
9   A   It is.
10  Q   And you don't have a large judgment against
11  you, do you?
12  A   I'm not sure exactly how all this is coming
13  together.
14  Q   Has, do you have any understanding -- let me
15  strike that.
16      Are there any legal bills pending that you
17  haven't paid, unpaid legal bills?
18  A   Possibly.  There's possibly some coming.
19  Q   From whom?
20  A   Knapman, Peter Knapman.
21  Q   But you don't have those yet.  Right?
22  A   Correct.
23  Q   And there's none that are unpaid for
24  Mr. Knapman.  In other words, you don't owe him money
25  right now?

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 285

1    A   There are unpaid bills that are associated to
2    this because I had to pay Peter Knapman and I couldn't
3    pay other financial obligations.  I had to pay Peter
4    Knapman to protect me from Fireman's Fund, and that
5    sucked my cash flow pretty hard.
6    Q   And what unpaid bills do you have because you
7    didn't -- you had to pay Mr. Knapman?
8    A   It just sets you backwards, as if it was your
9    home; you miss an electric bill, and they just keep
10   coming.
11   Q   Are you currently behind on any bills?
12   A   Lots of bills.
13   Q   Like behind how much?  35 days, 60 days, 180
14   days, what --
15   A   All over the place.  Even insurance bills.
16   Q   And these are bills of Hawaii Nut & Bolt, not
17   you personally, I'm talking about.
18   A   I'm behind personally also.
19   Q   When was that lawsuit with your partners you
20   mentioned?  How long ago was that?
21   A   Long time ago.  Geez.  I forget.
22   Q   Like ten years, five years?
23   A   Six, seven, eight years.
24   Q   How long have you been married?  How long
25   have you been married?

Page 286

1    A   I'm thinking.
2    Q   Sorry.
3    A   27, 28 years.
4    Q   Almost done.  Just give me a few minutes to
5    look through my notes here.
6        MS. PAVEY:  Do you want to take a break so
7    you can do that?
8        MR. ALLISON:  We can, sure.
9        MS. PAVEY:  Up to you.
10       MR. ROBBINS:  I've got just a couple of
11   questions.
12       MR. ALLISON:  Doesn't matter to me.
13       THE WITNESS:  Let's do it.
14       MR. ROBBINS:  Judy, if I promise to ask no
15   questions to which you will object, might I borrow your
16   microphone?
17       MS. PAVEY:  Yes, you may.
18       MR. ALLISON:  Wow, that's quite a. . .
19       MS. PAVEY:  Thank you, Ken.  Take it away.
20       MR. ROBBINS:  I'll be a good boy.
21       REEXAMINATION
22   BY MR. ROBBINS:
23       Q   I'm sorry to have to ask you some follow-up
24   questions, Mr. Hayes.
25       Has any person in the insurance industry, a

Page 287

1    broker or insurance agent or otherwise, told you that
2    you can purchase insurance to cover property damage to
3    your own product?  Has anybody told you that?
4        A   I don't remember talking about that.
5        Q   Okay.  Has any lawyer ever told you that it
6    is possible to purchase insurance for damage to your
7    own product?
8        A   I thought that's what I have.
9        Q   I believe the product in this case is the
10   roofing, the waterproofing system on the roof deck of
11   Safeway that was -- I think that is considered your
12   product.
13       A   Okay.
14       Q   Okay?
15       MS. PAVEY:  Let me just object to it.  Just
16   objecting to the extent that you need to define policy
17   terms, if you're asking him for some kind of legal
18   opinion about the meaning of the policy.
19   BY MR. ROBBINS:
20       Q   Okay, go ahead and just --
21       MS. PAVEY:  I think he's testified to what he
22   thinks he was covered for.
23       MR. ROBBINS:  Okay, all right.
24   BY MR. ROBBINS:
25       Q   Have you had any discussion with any attorney

Page 288

1    specifically as to whether you can go out in the
2    marketplace and purchase insurance for damages to the
3    product that you, that you provide in the marketplace?
4    Have you had any discussions with an attorney about
5    that?
6        And I'm referring specifically to the
7    exclusion that Mr. Allison referred you to earlier in
8    the Fireman's Fund policy.
9        MS. PAVEY:  So you're asking him for
10   conversations with attorneys, which obviously would be
11   an attorney client communication.  So you broke your
12   promise to me.  I'm objecting, and instructing him not
13   to answer.
14   BY MR. ROBBINS:
15       Q   Well, of course, Mr. Hayes, you know lawyers
16   who do not represent you.  Correct?
17       A   I've met lawyers who do not represent me,
18   yes.
19       Q   Okay, so have you spoken to any lawyer -- and
20   let's assume for the purpose of Ms. Pavey's objection
21   attorneys who don't represent you.  Have you ever asked
22   any attorneys who are not your own attorneys or your
23   company's attorneys whether or not you can purchase
24   insurance for damage to a product that you put out in
25   the marketplace?

Page 298

1                    C E R T I F I C A T E.

2     STATE OF HAWAII       )
                            )
3     COUNTY OF HONOLULU    )

4              I, Kathy Pearson, CSR, do hereby certify:

5              That on Tuesday, the 13th of December, 2016,
      commencing at 9:13 a.m., appeared before me WILLIAM
6     HAYES, the witness whose deposition is contained
      herein; that prior to being examined, was by me duly
7     sworn or affirmed pursuant to Act 110 of the 2010
      Session of the Hawaii State Legislature; that the
8     proceedings were taken by me in machine shorthand and
      reduced to print by me; that the foregoing represents,
9     to the best of my ability, a true and correct
      transcript of the proceedings had in the foregoing
10    matter.

11             That a request for an opportunity to review
      and make changes to this transcript was made by the
12    deponent or a party (and/or their attorney) prior to
      the completion of the deposition.
13
               I further certify that I am not an attorney
14    for any of the parties hereto, nor in any way
      interested in the outcome of the cause named in the
15    caption.

16             This 298 page deposition of WILLIAM HAYES,
      taken on the 13th of December, 2016, was subscribed and
17    sworn to before me in the State of Hawaii.

18
               DATED:    _____
19

20                       _____

21                       Kathy Pearson, CSR No. 313

22

23

24

25