### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

AMERICAN AUTOMOBILE     ) CIVIL NO. CV15-00245
INSURANCE COMPANY, a    )   ACK/KSC
Missouri Corporation;   ) (Declaratory Judgment)
NATIONAL SURETY         )
CORPORATION, an Illinois ) Oral Deposition of:
Corporation,            ) DOUGLAS MOORE
                        )
          Plaintiffs,   )
                        )
versus                  )
                        )
HAWAII NUT & BOLT, INC. )
and SAFEWAY INC.,       )
                        )
          Defendants.   )
_____)
SAFEWAY INC.; HAWAII NUT &)
BOLT, INC.,             )
                        )
  Counterclaim Plaintiffs,)
                        )
versus                  )
                        )
AMERICAN AUTOMOBILE     )
INSURANCE COMPANY, a    )
Missouri Corporation;   )
NATIONAL SURETY         )
CORPORATION, an Illinois)
Corporation,            )
                        )
  Counterclaim Defendants,)
                        )
and                     )
                        )
DOUGLAS MOORE, MONARCH  )
INSURANCE SERVICES, INC.,)
a Hawaii Corporation, and)
INSURANCE ASSOCIATES,   )
INC., a Hawaii          )
Corporation,            )
                        )
  Additional Counterclaim)
          Defendants.   )
_____)

### Page 2

1  VIDEOTAPED DEPOSITION OF DOUGLAS MOORE
2
3  Taken on behalf of the Plaintiffs/Counterclaim
4  Defendants American Automobile Insurance Company and
5  National Surety Corporation at the law offices of
6  Bronster Fujichaku Robbins, 1003 Bishop Street, Suite
7  2300, Honolulu, Hawaii, commencing at 9:51 a.m., on
8  Wednesday, the 14th of December, 2016, pursuant to the
9  Federal Rules of Civil Procedure.
10
11  REPORTED BY: KATHY PEARSON, RPR, CRR, CSR No. 313
12
13  APPEARANCES:
14    For the Plaintiffs/Counterclaim Defendants
      American Automobile Insurance Company and
15    National Surety Corporation:
16      STEVEN D. ALLISON
        SAMRAH R. MAHMOUD
17      Crowell & Moring
        3 Park Plaza, 20th Floor
18      Irvine, California 92614
19    For the Real Party in Interest and
      Defendant/Counterclaim Plaintiff Safeway Inc.
20    and Defendant/Counterclaim Plaintiff Hawaii Nut &
      Bolt, Inc.:
21
        JUDITH ANN PAVEY
22      Starn O'Toole Marcus & Fisher
        Pacific Guardian Center, Makai Tower
23      733 Bishop Street, Suite 1900
        Honolulu, Hawaii 96813
24
25  (Appearances continued)

### Page 3

1   For the Counterclaim Defendants Douglas Moore
    and Monarch Insurance Services, Inc.:
2
      KENNETH S. ROBBINS
3     SASHA A. HAMADA
      Bronster Fujichaku Robbins
4     1003 Bishop Street, Suite 2300
      Honolulu, Hawaii 96813
5
    For the Counterclaim Defendants Douglas Moore
6   and Insurance Associates, Inc.:
7     CORLIS J. CHANG
      Goodsill, Anderson, Quinn & Stifel
8     First Hawaiian Center, Suite 1600
      999 Bishop Street
9     Honolulu, Hawaii 96813
10  Videographer:
11    Chris Lowenthal

### Page 4

1                    INDEX
2
3  EXAMINATION BY MR. ALLISON            Pg   7
4  EXAMINATION BY MS. PAVEY              Pg 122
5  REEXAMINATION BY MR. ALLISON          Pg 236
6  ****************************
7  DEPOSITION EXHIBITS:
8  EXHIBIT NUMBER 68                     Pg   9
9    (Moore professional experience/education)
10 EXHIBIT NUMBER 69                     Pg  59
11   (commercial insurance application)
12 EXHIBIT NUMBER 70                     Pg  75
13   (web form FNOL submitted information)
14 EXHIBIT NUMBER 71                     Pg  88
15   (Moore e-mail to Dobran MM 000010)
16 EXHIBIT NUMBER 72                     Pg  88
17   (Dobran e-mail to Moore MM 000009)
18 EXHIBIT NUMBER 73                     Pg  97
19   (Moore e-mail to Hayes HNB2_000000421-423)
20 EXHIBIT NUMBER 74                     Pg 113
21   (quick reference guide American Business Coverage)
22 EXHIBIT NUMBER 75                     Pg 186
23   (Hayes 8-22-09 e-mail to Moore MM 000049)
24 EXHIBIT NUMBER 76                     Pg 187
25   (Anders/Domingo/Moore e-mails MM 000045)

RALPH ROSENBERG COURT REPORTERS
808-524-2090

**EXHIBIT I**

Page 157

1  that to Fireman's Fund when you notified them of a
2  claim. Correct?
3     A   Well, they asked for a description of the
4  claim.
5     Q   Sure.
6     A   And that apparently was what was put on the
7  claim, the claim notice.
8     Q   Okay, and so I think what you're saying then
9  is this is the first faulty product claim that you've
10 ever filed for one of your clients. Is that correct?
11    A   Well, I don't know this is a faulty product
12 claim. I think that was just a description on the
13 claims notice to get it sent in to Fireman's Fund.
14    Q   Whatever it was, this is the first one that
15 you've ever filed for any of your clients like that.
16    A   This is the first claim like this claim that
17 I've ever filed, yes.
18    Q   All right, and how many clients have you had
19 that were involved in the construction world?
20        MR. ROBBINS: Objection, overly broad, vague
21 and ambiguous.
22        MS. PAVEY: It is.
23        MS. CHANG: Assumes facts not in evidence,
24 that --
25 BY MS. PAVEY:

Page 158

1     Q   Can you answer it?
2         MS. CHANG: Let me finish my objection, Judy.
3     A   Could you describe what you're talking about
4  as far as the construction industry?
5  BY MS. PAVEY:
6     Q   Well, let's -- have you represented
7  general -- I mean, have you had clients who were
8  general contractors?
9     A   No.
10    Q   Have you had clients who were subcontractors?
11    A   Yes.
12    Q   All right, and what type of subcontractors
13 have you sold insurance to?
14    A   I have, I think, two or three clients that
15 are subcontractors. Two are tile contractors and one's
16 a glazier.
17    Q   Is that it?
18    A   That's it.
19    Q   Okay, so two tile contractors, or
20 subcontractors, excuse me.
21    A   Yes.
22    Q   And one subcontractor glazier.
23    A   Yes.
24    Q   What's a glazier?
25    A   They install, like, lanai doors or shower

Page 159

1  doors.
2     Q   Okay.
3     A   Glass. Glazier are glass.
4     Q   Okay, so both or all three of those clients
5  are -- they do construction work.
6     A   They do construction work.
7     Q   All right, okay. And at least as of today
8  anyway, they've never had a claim made against them for
9  defective construction work?
10    A   That's true.
11    Q   Okay. Did you --
12        MR. ROBBINS: Well, I'd like to hire them.
13        THE WITNESS: Well, they're not, they're not
14 cheap.
15 BY MS. PAVEY:
16    Q   Did you ever tell Bill that he did not have
17 product coverage under the Fireman's Fund policies?
18    A   I would never -- I have not told him that.
19    Q   And we saw the e-mail where you told him in
20 response to his question about whether he had product
21 liability coverage that, yes, he does have product
22 coverage. Correct?
23        MR. ALLISON: Objection, misstates the
24 document. Misstates prior testimony.
25    A   The policy provides some coverage for product

Page 160

1  liability. Obviously, as you're aware, there's many
2  exclusions to that. So in general I would, first and
3  foremost, say they have defense coverage to respond to
4  lawsuits.
5         As far as any specific coverage, I have to
6  defer to the insurance company, since they're the ones
7  that determine what is covered. They look at what
8  activities occurred to get to the point of a lawsuit.
9  BY MS. PAVEY:
10    Q   Did you or did you not e-mail Bill in
11 response to his question about whether he had product
12 liability coverage, yes, products are covered?
13        MR. ALLISON: Objection, document speaks for
14 itself.
15    A   I can look at that document and explain what
16 I said if you give me the --
17 BY MS. PAVEY:
18    Q   Exhibit 64.
19    A   Okay. So on June 30th, I said yes, there is
20 product coverage.
21    Q   Yes, and that was in response to Bill's
22 question to you, So we have product liability coverage?
23    A   Right.
24    Q   Okay, thank you. Do you get any training
25 from the various insurance companies whose products you

Page 193

1  MS. CHANG: Judy, I think it misstates the
2  document. One is a November date, one's a December
3  date if I'm reading this right.
4  MS. PAVEY: Oh, thank you, you're right. So
5  it's actually before the previous one.
6  BY MS. PAVEY:
7  Q  On November 17th, did you write to Bill,
8  "Maybe you should consider a complaint to Insurance
9  Commissioner and Hawaii Bar Association. I agreed to
10 meet with your attorney to try and sort out what is
11 happening."
12 A  Yes, I did.
13 Q  Earlier I think you testified that you
14 actually never met with Bill's attorney because, I
15 think, you said you didn't feel qualified. Do you
16 remember testifying to that?
17 A  I don't know if I said I wasn't qualified. I
18 don't know what benefit they would get from me going to
19 talk to them, because I don't have any authority to do
20 anything.
21     And as you know, I'm pretty close to Bill, as
22 far as I've known him for a long time and I wanted to
23 help him out, and I was trying to find a solution for
24 him because he was distraught. And I was trying to
25 come up with options of people to help him because I

Page 194

1  felt -- I wanted to help him, you know.
2  Q  And in the November, or December 15th e-mail,
3  you told him because you felt there was some bad faith
4  on Fireman's part with their federal courts action.
5  Correct?
6  A  Yes, because he had told me they're suing him
7  in federal court, and I didn't understand why they
8  would sue him.
9  Q  Uh-huh.
10 A  And thought that if they're suing him and
11 changing their stance, which was the context I had with
12 talking to Bill, because I was out of the loop on most
13 of this. Especially since right about this time I had
14 talked to Ann Galasso, and she had already offered to
15 settle the claim for $400,000.
16     So to file the suit against Bill Hayes, I
17 didn't understand, why would they offer a settlement
18 and then all of a sudden pull coverage from him.
19 It's -- I didn't feel that was the right thing to do.
20 Personally, I didn't think that was the right thing to
21 do.
22 Q  Okay, and that's what you're referring to
23 when you say, "Some bad faith on Fireman's part"?
24 A  Yes.
25 Q  Okay.

Page 195

1  MS. PAVEY: Can you pass this down? Those
2  are the only copies I have. I don't know what happened
3  to my own copy.
4      So this will be Exhibit?
5  COURT REPORTER: Exhibit 78.
6  MS. PAVEY: Thank you.
7  (Whereupon Deposition Exhibit Number 78 was
8  marked for identification.)
9  (Brief off the record comments.)
10 BY MS. PAVEY:
11 Q  So do you have Exhibit 78 in front of you?
12 A  I'm looking at it.
13 MS. PAVEY: Okay, everybody has a copy?
14 MR. ROBBINS: We do now.
15 MS. PAVEY: Okay, thanks.
16 BY MS. PAVEY:
17 Q  So in response to one of Mr. Allison's
18 questions, I believe you said something to the effect
19 that Bill told you that he didn't even know that Tim
20 Lyons was selling VersaFlex products. Did you say
21 that?
22 A  I did.
23 Q  Okay, so I'm -- can you tell me when it was
24 that Bill said that and exactly what is it that he
25 said?

Page 196

1  MR. ALLISON: I think it was asked and
2  answered.
3      Go ahead.
4  A  I don't know the exact time frame. It would
5  have been 2009 or 2010, I guess. But he was
6  frustrated, and I said, What's going on?
7      And he goes, Yeah, well -- he told me that he
8  didn't even know what Tim was doing. He said he was
9  basically unsupervised and running, you know, doing
10 stuff on his own, without his knowledge.
11 BY MS. PAVEY:
12 Q  Okay. That's a little bit different from
13 testifying that Bill told you that he didn't know that
14 Tim Lyons was selling VersaFlex.
15 MR. ROBBINS: That's not a question. Are you
16 asking --
17 MS. PAVEY: I'm getting to the question if
18 you'll let me finish.
19 BY MS. PAVEY:
20 Q  Did Bill tell you that he did not even know
21 that Tim Lyons was selling the VersaFlex product --
22 A  Yes, he did --
23 Q  -- for Hawaii Nut & Bolt?
24 A  Yes, he did tell me that.
25 Q  So the implication there is that Bill told

49 (Pages 193 to 196)

Page 221

1  Q  Okay.
2  A  As an example. It would have to be a local
3  bank, and they set up what they call a trust account.
4  Q  Okay, so does -- are you finished?
5  A  Yes.
6  Q  Okay, so, for example, when you were at
7  Monarch, did Monarch have rules that you were required
8  to follow in order to have that relationship with
9  Monarch?
10 A  Nothing in writing.
11 Q  Okay. What about at Insurance Associates?
12 Was there anything in writing in terms of rules that
13 you were supposed to follow?
14 A  No.
15 Q  Were you ever provided a copy of the agency
16 agreements between Fireman's Fund and those two
17 companies?
18 A  No.
19 Q  Okay. Okay. So what's your company called?
20 What's the official -- not the name of the company,
21 but, like -- Monarch is a general agent. What's your
22 company?
23 A  Douglas E. Moore, Inc.
24 Q  I mean, what is -- how would you refer to it
25 generally, as a category? You're not a general agent,

Page 222

1  but you are a what?
2  A  Insurance, insurance agent.
3  Q  Okay.
4  A  Insurance producer, I guess maybe is the, as
5  far as the -- the Insurance Division has changed the
6  name. I think now the license, it's a produce -- like
7  our license, it says producer license.
8  Q  Okay, so the insurance producer regulations
9  are the regulations that apply to you or your company.
10 Is that right?
11 A  I don't know what regulations you're
12 referring to.
13 Q  The rules and regs that are set forth in the
14 Hawaii Revised Statutes or that apply to the insurance
15 business.
16 A  I don't, I don't know if there are, though,
17 if they are, if they exist.
18 Q  Okay, so as far as you know anyway, there may
19 not even be any rules in the Hawaii Revised Statutes
20 that apply to producers like yourself.
21 A  I don't know.
22 Q  Okay. You've never read them, in any event?
23 A  No, I've never read them.
24 Q  Okay, okay. So your company is an insurance
25 agent or insurance producer. What are you?

Page 223

1  A  I'm an employee of my company.
2  Q  Okay, all right. Why do you have a company
3  as opposed to just you as an individual?
4  A  For the most part, for tax reasons.
5  Q  Okay.
6  A  I'm set up as an S corporation.
7  Q  Okay. So are there other insurance products
8  that you can sell to a hardware store, for example,
9  where it's very clear that they're covered for damages
10 caused by the products that they sell? Or is this the
11 kind of policy that you would recommend to a company
12 for that purpose?
13 A  You mean as far as third party?
14 Q  Uh-huh.
15 A  The only real third party coverage in the
16 insurance industry would be a commercial general
17 liability policy.
18 Q  Okay, like the one that Hawaii Nut & Bolt
19 has?
20 A  Yes.
21 Q  If you had known that the insurance policy
22 that you were selling to Hawaii Nut & Bolt did not
23 provide coverage for defective products that it sold,
24 I'm assuming you would have let Bill know about that.
25 Is that a fair statement?

Page 224

1  MR. ROBBINS: Objection, vague and ambiguous.
2  MS. CHANG: Calls for speculation.
3  MR. ROBBINS: An incomplete hypothetical.
4  MR. ALLISON: Join.
5  BY MS. PAVEY:
6  Q  Go ahead.
7  A  I don't really understand the scope of your
8  question. I can't answer a hypothetical situation.
9  When you're saying that something's not covered, a
10 claim's not covered, I would think that you have to
11 look at the specific circumstances of the action that
12 caused the lawsuit or the claim.
13 Q  I'm speaking in a very general sense. If you
14 had known that that policy -- and I'm not saying that
15 this is true or not, but if you -- if somebody --
16    If Fireman's Fund had told you that its
17 commercial general liability policy does not cover
18 Hawaii Nut & Bolt for damages caused by a product that
19 it sells that turns out to be defective, would you have
20 told that to Bill?
21    MR. ALLISON: Objection, vague and ambiguous.
22 A  I don't, I don't see where that situation
23 would come up where they would say that.
24 BY MS. PAVEY:
25 Q  Where Fireman's Fund would say that?

```
 1                  C E R T I F I C A T E

 2    STATE OF HAWAII      )
                           )
 3    COUNTY OF HONOLULU   )

 4          I, Kathy Pearson, CSR, do hereby certify:

 5          That on Wednesday, the 14th of December,
      2016, commencing at 9:51 a.m., appeared before me
 6    DOUGLAS MOORE, the witness whose deposition is
      contained herein; that prior to being examined, was by
 7    me duly sworn or affirmed pursuant to Act 110 of the
      2010 Session of the Hawaii State Legislature; that the
 8    proceedings were taken by me in machine shorthand and
      reduced to print by me; that the foregoing represents,
 9    to the best of my ability, a true and correct
      transcript of the proceedings had in the foregoing
10    matter.

11          That a request for an opportunity to review
      and make changes to this transcript was made by the
12    deponent or a party (and/or their attorney) prior to
      the completion of the deposition.
13
            I further certify that I am not an attorney
14    for any of the parties hereto, nor in any way
      interested in the outcome of the cause named in the
15    caption.

16          This 243 page deposition of DOUGLAS MOORE,
      taken on the 14th of December, 2016, was subscribed and
17    sworn to before me in the State of Hawaii.

18
            DATED:  _____
19

20                  _____

21                  Kathy Pearson, CSR No. 313

22

23

24

25
```

RALPH ROSENBERG COURT REPORTERS, INC.
(808)524-2090