# EXHIBIT 2

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

AMERICAN AUTOMOBILE INSURANCE COMPANY, a Missouri Corporation; NATIONAL SURETY CORPORATION, an Illinois Corporation,
Plaintiffs,
versus
HAWAII NUT & BOLT, INC. and SAFEWAY INC.,
Defendants.

SAFEWAY INC.; HAWAII NUT & BOLT, INC.,
Counterclaim Plaintiffs,
versus
AMERICAN AUTOMOBILE INSURANCE COMPANY, a Missouri Corporation; NATIONAL SURETY CORPORATION, an Illinois Corporation,
Counterclaim Defendants,
and
DOUGLAS MOORE, MONARCH INSURANCE SERVICES, INC., a Hawaii Corporation, and INSURANCE ASSOCIATES, INC., a Hawaii Corporation,
Additional Counterclaim Defendants.

) CIVIL NO. CV15-00245 ACK/KSC
) (Declaratory Judgment)
) Oral Deposition of:
) WILLIAM HAYES

VIDEOTAPED DEPOSITION OF WILLIAM HAYES
AS 30(b)(6) REPRESENTATIVE OF HAWAII NUT & BOLT, INC.
AND IN HIS PERSONAL CAPACITY

Taken on behalf of the Counterclaim Defendants Douglas Moore and Monarch Insurance Services, Inc. at the law offices of Bronster Fujichaku Robbins, 1003 Bishop Street, Suite 2300, Honolulu, Hawaii, commencing at 9:13 a.m., on Tuesday, the 13th of December, 2016, pursuant to the Federal Rules of Civil Procedure.

REPORTED BY: KATHY PEARSON, RPR, CRR, CSR No. 313

APPEARANCES:

For the Plaintiffs/Counterclaim Defendants American Automobile Insurance Company and National Surety Corporation:

STEVEN D. ALLISON
SAMRAH R. MAHMOUD
Crowell & Moring
3 Park Plaza, 20th Floor
Irvine, California 92614

For the Real Party in Interest and Defendant/Counterclaim Plaintiff Safeway Inc. and Defendant/Counterclaim Plaintiff Hawaii Nut & Bolt, Inc.:

JUDITH ANN PAVEY
MAILE S. MILLER
Starn O'Toole Marcus & Fisher
Pacific Guardian Center, Makai Tower
733 Bishop Street, Suite 1900
Honolulu, Hawaii 96813

For the Counterclaim Defendants Douglas Moore and Monarch Insurance Services, Inc.:

KENNETH S. ROBBINS
SASHA A. HAMADA
Bronster Fujichaku Robbins
1003 Bishop Street, Suite 2300
Honolulu, Hawaii 96813

For the Counterclaim Defendants Douglas Moore and Insurance Associates, Inc.:

CORLIS J. CHANG
Goodsill, Anderson, Quinn & Stifel
First Hawaiian Center, Suite 1600
999 Bishop Street
Honolulu, Hawaii 96813

Videographer:
Alan Nielsen

Also Present:
Douglas Moore

INDEX

EXAMINATION BY MR. ROBBINS Pg 7
EXAMINATION BY MS. CHANG Pg 139
EXAMINATION BY MR. ALLISON Pg 147
REEXAMINATION BY MR. ROBBINS Pg 286
REEXAMINATION BY MR. ALLISON Pg 292

*************************

DEPOSITION EXHIBITS:

EXHIBIT NUMBER 46 Pg 26
(stipulated judgment and order)
EXHIBIT NUMBER 47 Pg 68
(Domingo 10-20-09 letter to Knapman)
EXHIBIT NUMBER 48 Pg 76
(declaration of William Hayes III Safeway case)
EXHIBIT NUMBER 49 Pg 78
(settlement and mutual release agreement)
EXHIBIT NUMBER 50 Pg 147
(30(b)(6) notice of deposition)
EXHIBIT NUMBER 51 Pg 154
(Moore/Soulsby e-mails FFIC-HNB013198-208)
EXHIBIT NUMBER 52 Pg 159
(Cerchie/Lyons/Hayes e-mails HNB00000530/A000530)
EXHIBIT NUMBER 53 Pg 163
(Moore/Bonak/Bronson e-mails FFIC-HNB013094-108)

**Exhibit 2**

(Index continued)
EXHIBIT NUMBER 54 Pg 165
(Hayes 4-10-08 letter to Bronson)
EXHIBIT NUMBER 55 Pg 172
(insurance policy no. AZC 80828365)
EXHIBIT NUMBER 56 Pg 183
(VersaFlex invoice 211404 to HNB)
EXHIBIT NUMBER 57 Pg 188
(sales documents re VersaFlex/Safeway project)
EXHIBIT NUMBER 58 Pg 196
(Ducote/Lyons/Hayes e-mails A 000539-542)
EXHIBIT NUMBER 59 Pg 201
(Hayes/Johnson/Whitson e-mails A 000493-94)
EXHIBIT NUMBER 60 Pg 212
(Moore/Anders/Domingo e-mails A 000270-273)
EXHIBIT NUMBER 61 Pg 216
(Hayes/Moore e-mails MM 000033)
EXHIBIT NUMBER 62 Pg 219
(Hayes/Moore e-mails HNB2_00000022-23)
EXHIBIT NUMBER 63 Pg 220
(Hayes/Moore e-mails HNB2_00000223-24)
EXHIBIT NUMBER 64 Pg 223
(Hayes/Moore/Bonak e-mails HNB2_00000487-489)
EXHIBIT NUMBER 65 Pg 230
(Bonak/Moore/Hayes e-mails HNB2_00000496-498)

(Index continued)
EXHIBIT NUMBER 66 Pg 248
(declaration of William Hayes III AAIC case)
EXHIBIT NUMBER 67 Pg 248
(answers to interrogatories)

RECORD OF PROCEEDINGS

THE VIDEOGRAPHER: This is the deposition of William Hayes and 30(b)(6) in the matter of American Automobile Insurance Company, et al. versus Hawaii Nut & Bolt, Inc. and Safeway Inc. We are located at Bronster Fujichaku Robbins, 1003 Bishop Street, Suite 2300, Honolulu, Hawaii. My name is Alan Nielsen, video specialist for Certified Legal Video Services.

Will the counsel please state your names?

MR. ROBBINS: Okay, for HNB, Ken Robbins and Sasha Hamada. And present with us today also is Mr. Moore, and we represent Mr. Moore along with Ms. Chang.

MS. PAVEY: I believe you misspoke, Ken. You said for HNB. I think you meant for Monarch Insurance.

MR. ROBBINS: Oh, let's start over again. Okay, Ken Robbins on behalf of Monarch Insurance Services and Doug Moore, and with me is Sasha Hamada.

MS. PAVEY: There we go. Judy Pavey and Maile Miller on behalf of HNB and Safeway.

MS. CHANG: Corlis Chang on behalf of Mr. Moore, co-counseling with Mr. Robbins, as well as for Insurance Associates, Incorporated.

MR. ALLISON: Good morning, Steven Allison, and with me is Samrah Mahmoud, and we represent

American Automobile Insurance Company and National Surety Corporation.

MR. ROBBINS: Good morning, Mr. Hayes.

THE WITNESS: Good morning.

THE VIDEOGRAPHER: Stand by, counsel. We're not quite there yet. Today is December 13th, 2016. We are on the record at 9:14 a.m.

Will the court reporter please swear in our deponent?

(Whereupon WILLIAM HAYES, called as a witness on behalf of the Counterclaim Defendants Douglas Moore and Monarch Insurance Services, Inc., having been first duly sworn, was examined and testified as follows)

EXAMINATION

BY MR. ROBBINS:

Q Good morning.

A Good morning.

Q Mr. Hayes, my name is Ken Robbins. I represent Mr. Moore along with Ms. Chang, who also represents Mr. Moore, and I also represent Monarch Insurance Services. We're taking your deposition here today in connection with the claims that you have made against my clients, against Fireman's Fund Insurance Company, and also against Insurance Associates.

Are you familiar with what those claims are,

Page 13

Q Okay. Well, if you don't understand a question, I suggest you not answer it and ask me to, or whoever is asking you the questions, to explain the question. Okay?
A Fair enough.
Q Okay, and if you don't understand a question you will, as I'm asking you questions now, you will tell me, I'm sorry, Mr. Robbins, but I don't understand the question. Okay?
A I'll try, yeah.
Q All right. So if you do not say, "I do not understand the question," and answer the question, may we assume that you understood the question?
A No. I might not even have the knowledge to -- like I said, this is really technical. It's not my field, I'm not an attorney, I'm not in the insurance industry.
Q Okay, so if you answer a question, we may not assume that you understood the question. Is that what you're saying?
A I'm a bit confused. I don't know why we're assuming anything.
Q Okay. Do you understand, Mr. Hayes, that -- well, let's back up. Okay, let's start in a less contentious note.

Page 14

How long has HNB been in business?
A Since approximately 1980.
Q And who started the business?
A My father.
Q And when did you take over the business?
A As owner, in 2003.
Q And historically, what types of products has HNB sold?
A A broad scope of products.
Q Okay, such as?
A Oh, boy. Construction related.
Q Could you be more specific? Historically, what kind of, historically, what kind of construction related products your company has sold?
A It's always evolving, always changing. It depends. I guess the best way to describe it is we fill customer needs, and our customers tend to be in the construction industry.
Q Okay, so do you sell all kinds of construction products?
A Yes.
Q You sell nuts?
A We do sell nuts.
Q You sell bolts?
A We do sell bolts.

Page 15

Q You sell fasteners?
A Correct, yes.
Q Does your company provide construction services and advice?
A We provide technical information as requested by our customers. They'll ask for a catalog and we'll provide a catalog. Those catalogs contain technical info.
Q Historically, does HNB attend construction meetings and offer construction advice?
A Can you break that into two questions?
Q Sure. Historically, in providing services to your clients, do you or any other representatives of HNB customarily and ordinarily sit down with your customers and offer construction advice? Quite apart from what products they should use, but how to use them.
A No.
Q Does your company have a policy against doing that?
A I don't think the industry allows that. We're more of a conduit. We connect people with the information they need to make the decisions.
Q Okay, so apart from offering such things as catalogs to your clients, HNB does not offer

Page 16

construction advice such as sitting in a construction meeting and saying, well, you should use this type of product as opposed to that type of product.
A Not -- use is not the right word for our role.
Q Okay. Did Tim Lyons do that in connection with the Safeway project?
A Tim's role was also to be a conduit, to connect people with catalogs, brochures, specifications, printed specifications from the manufacturers that we, we would represent.
Q In the many years that you lived with the lawsuit, this litigation, did you ever see any, anything at all which indicated that Tim Lyons was actually meeting with folks who were involved in construction, who were involved with the roofing project at Safeway and offering advice?
A I hang up on the word advice. Tim Lyons was also involved on that project when he was not working for me, so I can't qualify on everything Tim did.
Q Okay. Well, let's back up. When did you meet Tim Lyons?
A I've known Tim for a while, back when he worked with previous employers, Wire Products Hawaii and G.W. Killebrew. He had his own independent rep

Page 85

Safeway?

MS. PAVEY: Just objection, asked and answered. Instruct him not to answer. You've asked him that question, like, three or four times in the last two minutes.

BY MR. ROBBINS:

Q As you sit here now, do you know how Safeway and HNB can be represented by the same attorney if Safeway is still pursuing you for a judgment?

MS. PAVEY: I'm sorry, I'm sorry, can you read that back?

MR. ROBBINS: I'll restate the question.

BY MR. ROBBINS:

Q If you're not sure whether Safeway is still pursuing you or not, do you have some understanding as to how Ms. Pavey can represent both Safeway and HNB at this time?

MS. PAVEY: Objection. It sounds like you're asking him for a legal opinion.

But if you can answer, you can go ahead and answer, but don't speculate.

A All I can say is I'm not an attorney. This isn't my field. I don't know how or why attorneys can do what they do.

BY MR. ROBBINS:

Page 86

Q Do you recall being told that for a deal to be worked out with Safeway so as not to pursue HNB or you individually, that one of the things you would have to do would be to sign a declaration?

MS. PAVEY: Objection. You're asking him, I assume, for an attorney client communication.

MR. ROBBINS: That's right.

MS. PAVEY: In which case I'll instruct him not to answer.

MR. ROBBINS: Judy, we're going to be taking his deposition again.

BY MR. ROBBINS:

Q Anyway, look, would you please take a look at Exhibit 48, which is entitled Declaration of William Hayes III? Do you remember signing this document, sir?

A No.

Q Do you remember seeing this document before?

A Not specifically.

Q Do you recall being told by anybody that for a settlement to be worked out between HNB and Safeway, you would have to sign a declaration?

MS. PAVEY: Same objection. I assume that you're asking him for an attorney client communication, in which case I will instruct him not to answer. You're welcome to ask him about the content of the

Page 87

declaration. It is his declaration, so.

BY MR. ROBBINS:

Q Do you recall, Mr. Hayes, that you signed this document two days before you signed the stipulated judgment and the settlement and mutual release agreement?

A I don't recall specifics.

Q Turn to the substance of the declaration. You state that --

A Excuse me, I'm sorry. Which document is that?

MS. PAVEY: That is --

BY MR. ROBBINS:

Q 48.

MS. PAVEY: -- this one.

A Okay.

BY MR. ROBBINS:

Q Turn to page three, please. You state there in paragraph four, "HN&B has obtained its business insurance from insurance agent Doug Moore for approximately 20 years. Although the company he worked for has changed at least once, we have consistently followed Mr. Moore as our agent."

Do you see that?

A I do.

Page 88

Q Is that a correct statement?

A I believe so.

Q Then you go on to say that "HN&B is a product distributor, whose business primarily consists of supplying construction materials to clients."

Is that a correct statement?

A I believe it to be.

Q Okay. Number six, "Mr. Moore knew that HN&B was a distributor of construction products, and I relied on Mr. Moore to recommend insurance that would adequately cover me for losses relating to my business."

Is that a correct statement?

A Yes.

Q Number seven. "I made it clear to Mr. Moore that I wanted HN&B to be adequately insured for any liability the company might possibly face in connection with selling the products we carried."

Did I read that correctly?

A I believe so, yes.

Q Is that a correct statement?

A Yes.

Q Okay. Now, do you know that a claim you are being, that you are making against Mr. Moore, is that he failed to provide adequate insurance for you in

give to Safeway," or "assign to Safeway all of its claims against the insurance companies referenced herein and HNB's insurance agents and brokers by and through whom the Fireman's Fund insurance policies referenced herein were purchased and obtained."

You understand that you purchased insurance from Fireman's Fund through Doug Moore and the companies he worked for. Correct?

A I purchased insurance from Doug for many years.

Q Okay, great. Okay, and you thought that you had purchased a Fireman's Fund policy which would cover you for the Safeway claims. Correct?

A It was my belief I was covered.

Q Okay, good. So so far, we understand what the paragraph means. Correct?

A No, I --

MS. PAVEY: Well, that's -- yeah, go ahead.

A I understand what the small pieces you say meant.

BY MR. ROBBINS:

Q Okay, good, and that's -- taking the entire paragraph at one reading may be difficult for you to understand, but that's why I'm breaking it down into bits and pieces, to see if you understand what the bits

and pieces mean. Okay? Do you understand that's what I'm trying to do with you?

MS. PAVEY: Improper question. It calls for speculation. He doesn't know --

MR. ROBBINS: Okay.

MS. PAVEY: -- what you're trying to do.

BY MR. ROBBINS:

Q All right. Well, I'm trying to make it as easy --

MS. PAVEY: Objection.

BY MR. ROBBINS:

Q -- for you as I can, Mr. Hayes.

"And as a result of Fireman's Fund's refusal to make a reasonable settlement offer." Do you understand what those words mean?

A I'm assuming people are disagreeing amongst each other.

Q Right, and that Fireman's Fund is refusing to make a reasonable settlement on your behalf. You understand that. Correct?

A I understand that things are going on that people are disagreeing about.

Q That's right, and one of them is that in view of Fireman's Fund's refusal to make a reasonable settlement offer, settle its claims against HNB.

You're aware of that, correct?

A There's disagreements going on. I'm aware of that.

Q Okay. In fact, didn't you go so far as to write an e-mail to Doug Moore saying that all they're offering is $400,000, and that's not nearly enough to settle the claims against me? Do you recall that?

A No.

Q Does that sound like something you would say?

A Could be.

Q Yeah? In fact, throughout this process, throughout the pendency of the underlying case, the case in which Safeway was making claims against you, you had a variety of communications with Doug about insurance coverage. Correct?

A We communicated about insurance coverage.

Q Yeah, and you were aware of the fact that Fireman's Fund was saying to you, basically, that it wasn't going to provide the insurance coverage for you. You knew that, you acknowledged that in e-mails to Mr. Moore. Correct?

MS. PAVEY: Just objection on the grounds that there's a lack of foundation for that question in terms of the timing of it.

BY MR. ROBBINS:

Q After the lawsuit --

MS. PAVEY: And that knowledge.

BY MR. ROBBINS:

Q After the lawsuit was filed against you, you were aware at some point along the line that Fireman's Fund was refusing to provide insurance for you.

MS. PAVEY: Which lawsuit are you talking about?

MR. ROBBINS: The underlying case.

MS. PAVEY: The Safeway case?

MR. ROBBINS: That's the only case I'm talking about right now.

MS. PAVEY: Okay, so your question is after the Safeway case, did he know that Fireman's Fund was saying it wasn't going to cover him?

MR. ROBBINS: Yes.

BY MR. ROBBINS:

Q You knew that, correct?

A I felt like I was insured throughout the Safeway case.

Q But you wrote to Doug Moore, saying that Fireman's Fund was refusing to provide insurance for you. Correct?

A I felt like I was insured throughout the Safeway case.

Page 105

Q But you acknowledged to Mr. Moore that you knew that Fireman's Fund was refusing to provide coverage for you. No matter how you felt about whether or not you were or were not insured, you knew that that was the position Fireman's Fund was taking.
A I still felt like I was insured.
Q Right, that's how you feel. You feel that you're still insured. Correct? Right?
A It's my belief that I was insured.
Q Okay, but you also understand that Fireman's Fund is saying sorry, Hawaii Nuts & Bolts, we don't insure you for these claims brought against you by Safeway. Correct?
MS. PAVEY: You're talking about before they filed their dec action?
MR. ROBBINS: Yeah.
A What is the dec action?
MS. PAVEY: Fireman's Fund versus you, saying we don't --
BY MR. ROBBINS:
Q Mr. Hayes, all I'm asking you -- don't worry about the dec action. As you sit here now you know, although you think you're insured, Fireman's Fund is saying you're not insured.
A Yeah.

Page 106

Q You know that, correct?
A That sucks.
Q Sorry?
A That sucks. Yeah, that, that --
Q That's correct, right? You know that.
A I think Fireman's Fund doesn't want to insure me and that's why they took me to court.
Q Okay, so my question simply is this, Mr. Hayes. As you sit here now, you know that Fireman's Fund's position, whether you think you're insured or not, their position is no, we don't think that we insure you. You're aware that that's what Fireman's Fund is saying. Correct?
A I'm not sure what Fireman's Fund is up to.
Q So is it your position as you sit here now that Fireman's Fund is saying, sure, Hawaii Nuts & Bolts, we do insure you? Is that your understanding?
A No. I'm here today to answer your questions the best I can. The rest of it is what you guys do. I don't get it.
Q So, Mr. Hayes, I trust you're a good businessman. Are you a good businessman?
A That's kind of subjective. I've been in business for a long time.
Q Right. So are you, are you seriously saying

Page 107

as you sit here now, you do not know what Fireman's Fund's position is with respect to whether or not it does or does not insure you for the claims brought by Safeway against you?
MS. PAVEY: Object to the form.
BY MR. ROBBINS:
Q Is that, is that what you're saying?
MS. PAVEY: Object to the form, argumentative.
A I would not be surprised if Fireman's Fund is not being completely straight up with anybody. They're looking after their own best interest. I really don't know. You're asking me to speculate.
BY MR. ROBBINS:
Q So you don't know whether Fireman's Fund is saying we do insure Hawaii Nuts & Bolts for the claims brought against that company by Safeway or that we do not. You don't know one way or the other what Fireman's Fund's position is?
A It feels like a moving target to me. I don't know where --
Q By moving target, are you saying that Fireman's Fund has said we will insure you, and they're saying at some other point we're not going to insure you, and they're saying at another point, well, we're

Page 108

not going to insure you? Is that what you mean by moving target?
A I mean the process evolves and moves and changes in ways that I could never anticipate or even imagine. It's pretty trippy for me to be a part of.
Q Okay, so besides your being here to answer questions, what you understand -- strike that.
Okay, so we understand that, so far, that HNB hereby agrees to give to Safeway all of its claims against the insurance companies. You understand that in this paragraph. Correct?
MS. PAVEY: You're back to Exhibit 49?
MR. ROBBINS: Yeah, 49 --
MS. PAVEY: Paragraph --
MR. ROBBINS: -- paragraph three.
MS. PAVEY: -- three, okay.
A I see where it says that.
BY MR. ROBBINS:
Q Okay. All right, good. And you understand those words?
A I don't understand what's going on in this context. That's why I have lawyers.
Q All I'm doing is asking you what this, what your understanding of these words is. Because I think it's important for the jury to know what you believe

Page 113

Greg Takase signed this document, approved as to form, on behalf of Hawaii Nut & Bolt.

BY MR. ROBBINS:

Q Did you meet with them individually or with them together when you were discussing the terms of the settlement?

A I don't remember specifically, but in the past, I've met with them together and individually.

Q Okay, and they both recommended, all the documents we've reviewed so far that you have signed are documents that you should sign. Correct? Correct?

MS. PAVEY: Without waiving the attorney client privilege, I'll allow him to answer that question, which he's already actually answered the question at least ten times.

A My attorney has said that this was in my best interest, which is why I signed it.

BY MR. ROBBINS:

Q And what did you understand your best interest to be at the time they told you that?

A I'm still not sure what's going on here.

Q Have you ever thought to ask Ms. Pavey what's going on here?

A I don't know if I would understand, and I don't understand why I would need to understand if I

Page 114

have experts representing me.

Q Is Mr. Moore a truthful man?

A I believe him to be.

Q Have you relied upon advice he has given you with respect to insurance purchases?

A I give him my business, so that would be a good indicator that I rely on him.

Q Okay, fair enough. If you felt that Mr. Moore let you down, would you continue to utilize his services as your insurance agent?

A We would talk, and I would make a decision after that.

Q Okay. Mr. Moore still represents you as your insurance agent. Correct?

A He does.

Q And as a businessman, does that, should that tell the world something about how you feel about Mr. Moore and these services that he provides to you, the fact that you still go to him for your insurance needs?

A I don't want to tell the business world anything about my insurance needs.

Q Excuse me? Can you repeat that, please?

A I don't want to tell the business world anything about my insurance needs. It's none of their

Page 115

business.

Q Okay. Well, let me rephrase the question then. The fact that you still go to Mr. Moore as your insurance agent and rely upon the advice that he gives you, does that mean that you have confidence in him?

A That's between he and I.

Q No, I'm asking you the question. You have to answer the question.

A Okay. I'm okay right now.

Q Tell me about the yearly meetings you had with Mr. Moore, and perhaps you still do. Do you still have yearly meetings with him?

A We have meetings. I'm not sure of the time frame, but we do have meetings.

Q Okay. Well, in your declaration, it says on page three, "Mr. Moore and I met at least yearly to go over HN&B's insurance needs."

A Okay.

MS. PAVEY: You're referring to Exhibit 48?

MR. ROBBINS: Thank you, Judy.

MS. PAVEY: And what paragraph?

MR. ROBBINS: Eight, on page three.

MS. PAVEY: Okay.

A Okay, I've read that.

BY MR. ROBBINS:

Page 116

Q Okay, and was that something that you and Mr. Moore did as a matter of course every year? You'd get together and discuss your insurance needs?

A We would discuss insurance periodically.

Q Okay.

A That's what we discussed when we communicate, is insurance.

Q Okay, and did he occasionally visit you at your, at your work site?

A Yes.

Q And did you guys discuss anything besides insurance needs? Did you discuss what was going on in your life, families, stuff of that nature?

A We discussed, we small-talked, sure.

Q Okay. Paragraph nine on page four. "When Mr. Moore personally visited HN&B's former Kailua facility and/or current Kapolei and Honolulu facilities, he has seen firsthand how our business operated and the products we carry."

Okay? Do you see that?

A I do see that.

Q All right, and by the way, do you know that this is a sworn declaration? That this is something that you signed under oath?

A I don't know how it works, sir.

Page 117

Q Take a look at page six.
A Okay.
Q "I declare under penalty of perjury that the foregoing is true and correct."
A Okay.
Q Do you know what that means?
A I know that I signed this on the advice of my attorneys.
Q Okay, and do you know what under penalty of perjury means? Do you know what perjury is?
A Not exactly.
Q Do you know that perjury is, means that you're not telling the truth while under oath? Do you know that?
A Okay.
Q Okay? So did anybody tell you that you were under oath when you signed this document?
A I wouldn't expect to be misled by my attorneys to lie.
Q Okay. Now, when you say, "He has seen firsthand how our business operated." How much time did he spend with you during these annual meetings?
MS. PAVEY: Well, just object to the form of the question because you're limiting their meetings to annual, which he doesn't do in this declaration and

Page 118

hasn't done in his testimony.
BY MR. ROBBINS:
Q Okay. Well, how long did your meetings which occurred at least yearly last?
A I can say that I would guess that they lasted as long as they needed to last.
Q Which was how long?
A As long as Doug needed them to last.
Q Which was how long?
A As long as he needed them to last. I don't know his needs.
Q Well, was he there to discuss his needs or was he there to discuss your needs?
A He was there as my insurance agent to make sure that I was insured.
Q Okay. Is he providing services to you or were you providing services to him?
A He sold insurance, I bought insurance.
Q Okay, so going back to page three. "Mr. Moore and I met at least yearly to go over HN&B's insurance needs."
A Okay.
Q What did you mean by that?
A That's what we did.
Q What did you mean by go over HNB's insurance

Page 119

needs?
A That we got together to go over HNB's insurance needs.
Q Okay, and what does that mean? Those are the words. You're just repeating the same words in the declaration. In other words, what you're -- okay, strike that.
Okay, so did Mr. Moore visit you for half a day, a full day?
A Less than a full day.
Q More than half a day?
A No.
Q More than three hours?
A Speculating, guessing?
Q Yeah.
A Probably not more than three hours.
Q Okay, but about an hour, you're approximately correct?
A You know, if we're trying to get, like, a guessing answer, more than an hour.
Q Okay, so when Mr. Moore met with you, where at your facilities did you and he meet with each other?
A Throughout the facility.
Q You walked through the facility?
A Yes.

Page 120

Q And when you said here, "He has seen firsthand how our business operated," what was he able to observe during his meetings with you which allowed him to see how your business operated?
A Whatever entered through his eyes. I don't understand the question. He was there doing his job.
Q Did he ever meet Tim Lyons?
A I don't recall.
Q Did you ever tell Mr. Moore that Tim Lyons was giving advice to your customers on whether such things as membranes should or should not be used?
A I don't recall.
Q Is it likely that's the sort of thing you would tell your insurance agent?
A Likely I would answer my insurance agent's questions.
Q Okay, so did Mr. Moore ever ask you, do you have any employees out in the workplace meeting with consultants of your clients and your customers, offering advice as to whether such things as membranes should be used? Did he ever ask you that question?
A He would ask whatever questions he needs to ask.
Q Is it likely, knowing Mr. Moore for some twenty years now, that that's the sort of question he

pigment.

Q Okay. At the time -- were there any times when you gave Mr. Moore a tour of the warehouse?

A Yes.

Q Okay, and for what purpose was that?

A I'm not sure. He -- it was what we'd do.

Q What sorts of things? Would you, would you look at products together?

A Yes. We'd walk past all the products that we had.

Q Did you ever specifically discuss VersaFlex with Mr. Moore?

A We would have walked past it. Kind of would catch your eye, I would think, in the big drums.

Q Do you recall any specific, other than catching, possibly catching his eye because they were big drums, do you recall any specific conversations you had with Mr. Moore about the VersaFlex waterproofing systems?

A I don't recall specific conversation.

Q What clear needs did you express, Mr. Hayes, to Mr. Moore in terms of what you wished to have in terms of insurance?

A I felt that that was defined with my dad years before.

Q Okay, so is what you're telling me your father and Doug, as you understand it, had a discussion and an understanding of what the insurance needs of HNB were, and basically that was in place when you took over the business in 2003?

A Yes.

Q And has remained in place ever since?

A I think so.

Q And what lines of insurance did Mr. Moore sell to HNB?

A Gosh. Everything we were supposed to have, I believe.

Q Worker's compensation?

A Yeah.

Q What about health care --

A No.

Q -- insurance?

A Auto.

Q Auto? Okay. And general liability, premises liability?

A I think so, yeah.

Q Okay. What clear needs did you express to Mr. Hayes as to what HNB required in terms of insurance?

A Well, again, I believe that initial

conversation was had with my dad, and we would talk about what's going on in the business, and I feel pretty confident that he took care of my needs for my business.

Q Do you recall any written communications or any oral communications, for that matter, in which you advised Mr. Moore that in connection with VersaFlex, Mr. Lyons was giving recommendations and advice to Safeway? Do you recall any specific discussions or written communications with Mr. Moore regarding VersaFlex?

A We would have talked about the projects we were working on, and that could have been one of the projects we discussed.

Q You don't recall one way or the other?

A Specifically?

Q Yes.

A I don't recall specifics of the meetings. I would answer his questions mostly, I think, so he could do what he's always done for us.

Q Have you ever represented to Mr. Moore that you were not totally aware what Mr. Lyons was doing when unsupervised?

A Mr. Lyons would be an outside salesperson, so I think there's a general understanding amongst

reasonable people that outside salespeople don't have supervision.

Q Do you have any, any reason to believe that Mr. Moore knew anything more about Mr. Lyons other than the fact that Mr. Lyons was a salesperson?

A No.

Q Do you have any reason to believe that Mr. Moore had any reason to know that Mr. Lyons was providing advice to Safeway with respect to which membranes to use and not use?

A I don't even know if he did that, or when, or what. I mean, that's. . .

Q Your attorneys have alleged on your behalf that the brokers, including Mr. Moore, Monarch, and IAI, breached their contract with you. And I realize you're not a lawyer, but as a business person, in what manner do you believe that the brokers breached their agreement with you?

A As a business person, I defer to experts, which I would have done in that condition.

Q Such as an attorney?

A Such as an attorney, an insurance agent, a plumber.

Q Do you, have you ever spoken to any insurance agent who has represented to you that Mr. Moore, IAI,

Page 133

or Monarch, in their opinion, breached their contract or breached their agreement with you?

A No.

Q Do you know what -- perhaps you don't. I think Ms. Pavey objected to my use of this phrase before, but do you know what the phrase fiduciary duty means?

MS. PAVEY: I don't think you used that before, but I could be wrong.

A I assume it means responsibility, obligation.

BY MR. ROBBINS:

Q In your complaint, or actually it's defendant/counterclaim plaintiff Safeway Inc. and defendant/counterclaim plaintiff Hawaii Nut & Bolt, Inc.'s second amended counterclaim and jury demand. That's technically what the document, the document is called in which you have joined the Safeway in asserting claims against Mr. Moore, Monarch, and IAI and Fireman's Fund.

Because it's such a mouthful, I've chosen not to use that phrase, but simply to refer to your claims.

But do you have any facts to support in what manner Mr. Moore and Monarch and IAI breached their fiduciary obligations to HNB?

A I have whatever my attorneys have.

Page 134

Q Other than what your attorneys have asserted on your behalf and what you've been relying on them for them to do for you, have you given them any facts with respect to how, in your opinion, breach of contract has occurred or breach of fiduciary duty has occurred with respect to the brokers?

A I believed that I was insured. I don't know how that's all put together as breach of contract. That's not my thing.

Q After you were sued, you were exchanging e-mails with Mr. Moore with respect to the suit and issues of insurance coverage. In any of those communications that you had with Mr. Moore, or e-mail specifically, did you ever mention to him the fact that Safeway alleged that Tim Lyons was claimed to have given construction recommendations and advice to Safeway and its consultants?

A That term is really broad, construction. Would I have said that he gave them a catalog? Possibly.

Q And I believe you testified -- if I asked you this question this morning, I apologize for it, but as I understand it, this is the one and only instance in which -- the only lawsuit in which HNB has been sued for a product liability failure. Is that correct? Or

Page 135

a product failure.

A VersaFlex being the only product that we've been sued regarding?

Q Yes.

A Yes, only VersaFlex.

Q Okay. Until this lawsuit came along, did you consider the products that you sold products that were likely to create liability for you?

I know you're not a lawyer, but as a businessman, was there anything in your line of products that you sold that you thought to yourself, gee, I wonder if I'm adequately insured in the event of a product failure of anything that I'm selling?

A I'm sorry, I got lost.

Q Sure, okay.

A What was your question?

Q Prior to VersaFlex, or since VersaFlex, have there ever been any lawsuits against HNB subsequent to this lawsuit, the VersaFlex lawsuit or the lawsuit involving VersaFlex, in which HNB has been sued for product failure?

A Only VersaFlex.

Q Okay. As someone who inherited the business from your dad, and I gather worked for your dad for some years before you took over the business, did you

Page 136

ever consider the line of products that HNB sold to be the kinds of products that were likely to be the basis of a lawsuit or a basis of a claim of liability in the event of their failure as a product?

Again, this is from the standpoint of a businessman, not from the standpoint of a lawyer.

A I guess so. I wanted to make sure what we sold, we were insured to sell.

Q Was there anything in particular that was of concern to you, that you thought could likely create a liability for HNB in the event the product failed?

A Things that I would worry about?

Q Yeah.

A Geez, I worry about installer error. I worry about that a lot.

Q Would installer error be your responsibility? Again, you're not a lawyer, but as a businessman running a business. You don't employ installers, do you?

MS. PAVEY: I don't think he was finished with his answer about the things that he was worried about in terms of product failure. So can you let him finish --

MR. ROBBINS: Sure.

MS. PAVEY: -- his answer?

Page 233

MS. PAVEY: In your footnote, I believe you said that Fireman's Fund might come after him for all the defense costs that they paid in the case.
MR. ALLISON: A footnote? I don't know what you're talking about. Judy, it's not my deposition, I'm not taking a deposition of you --
MS. PAVEY: No, you just made a representation to Bill, and I want to know if you're making that with authority from Fireman's Fund.
MR. ALLISON: I'm not making any representation with an authority from Fireman's Fund, Judy. If you want to take my deposition, send a notice.
MS. PAVEY: Don't make a representation then.
MR. ALLISON: I can say whatever I want whenever I want, Judy.
BY MR. ALLISON:
Q Now, my question to you is, do you have an understanding as to whether Fireman's Fund is seeking money from you in this lawsuit? You do or you don't. Simple.
A Well, I feel that way now after hearing what I just heard.
Q Well, you feel that way because of what Ms. Pavey said?

Page 234

A I've been worried about that for a while. This just kind of adds to it.
Q Okay. So your concern that Fireman's Fund is seeking money from you is based on what Ms. Pavey just said?
A No, my concern about Fireman's Fund is based on Fireman's Fund suing me.
Q Okay. You said that you were out money. Can you explain to me what you meant by that? I want to get back to that.
A Sure. I had to hire Peter Knapman to defend me, to protect me from the people who were supposed to be protecting me at Fireman's Fund.
Q And how much did you pay to Mr. Knapman?
A I believe I disclosed that. I don't have that on me right now.
Q Do you have an estimate? Is it $10,000? 5, 15?
A I'm going to say 15, $20,000.
Q Now, Mr. Knapman is no longer defending you in this lawsuit. Correct?
A He's still involved. I believe he has to do a deposition, so I'm still bleeding.
Q Well, let me ask it this way. Is your counsel in the lawsuit now Ms. Pavey and her law firm?

Page 235

A I don't know how it all works, but I know Peter Knapman is still involved and I know Ms. Pavey is involved.
Q Okay. Are you paying bills from Ms. Pavey's firm?
A No.
Q Is it your understanding that Safeway is paying those bills?
A I don't know who is paying those bills.
Q But you just know you're not?
A Yes.
Q Now, at some point in time, did you attend a mediation session in the Safeway lawsuit at the court?
A That was the meeting at the federal court building?
Q Correct.
A Yes, I did.
Q Okay, and we'll talk about that in a minute. Other than that and the deposition that you took in the Safeway lawsuit, were there any other meetings that you went to with all the lawyers in that Safeway lawsuit?
A All the lawyers being from all parties?
Q Right, to try to resolve the case. Did you go to any other meetings like that other than the one in federal court?

Page 236

A We went on a road trip after that and we walked to another courthouse that same day.
Q Got it. Let's take it apart from that day. Was there any other point in time where you went to a meeting where there was an attempt to settle the lawsuit in a courtroom or in a conference room like this, where the lawyers and their clients were there?
A I don't think so.
Q Okay. Even if you didn't go to any of those, do you remember being informed that those had occurred?
A I don't recall the nature of all the meetings.
Q Okay. Now, let's talk about the one you went to at the federal courthouse. Do you recall, first off, the rough time frame of when that was?
A Maybe around this time last year.
Q So October 2015-ish or late 2015 sound fair?
A Yeah, the last quarter.
Q Okay, and how did you find out about it?
A Attorneys.
Q Mr. Takase and others?
A Yes.
Q Okay, and who did you go with to the mediation? So in other words, did you meet people there, did you drive with somebody? How did you get

I, WILLIAM HAYES, hereby acknowledge that I have read the foregoing typewritten pages 1 through 298, inclusive, and corrections, if any, were noted by me and the same is now a true and correct transcript of my testimony.

DATED: ___________________

_____________________________________

WILLIAM HAYES

Signed before me this _____

day of______________, 20__

Witnessed by:

____________________________

American Automobile Insurance Company, et al vs Hawaii Nut & Bolt, Inc., et al, Civil No. CV15-00245 ACK/KSC, taken on the 13th of December, 2016, by K. Pearson

CERTIFICATE

STATE OF HAWAII )
)
COUNTY OF HONOLULU )

I, Kathy Pearson, CSR, do hereby certify:

That on Tuesday, the 13th of December, 2016, commencing at 9:13 a.m., appeared before me WILLIAM HAYES, the witness whose deposition is contained herein; that prior to being examined, was by me duly sworn or affirmed pursuant to Act 110 of the 2010 Session of the Hawaii State Legislature; that the proceedings were taken by me in machine shorthand and reduced to print by me; that the foregoing represents, to the best of my ability, a true and correct transcript of the proceedings had in the foregoing matter.

That a request for an opportunity to review and make changes to this transcript was made by the deponent or a party (and/or their attorney) prior to the completion of the deposition.

I further certify that I am not an attorney for any of the parties hereto, nor in any way interested in the outcome of the cause named in the caption.

This 298 page deposition of WILLIAM HAYES, taken on the 13th of December, 2016, was subscribed and sworn to before me in the State of Hawaii.

DATED: ___________________

___________________________

Kathy Pearson, CSR No. 313