# EXHIBIT 3

### Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

AMERICAN AUTOMOBILE ) CIVIL NO. CV15-00245
INSURANCE COMPANY, a )   ACK/KSC
Missouri Corporation; ) (Declaratory Judgment)
NATIONAL SURETY )
CORPORATION, an Illinois ) Oral Deposition of:
Corporation, ) DOUGLAS MOORE
      )
   Plaintiffs, )
      )
versus )
      )
HAWAII NUT & BOLT, INC. )
and SAFEWAY INC., )
      )
   Defendants. )
_____)
SAFEWAY INC.; HAWAII NUT &)
BOLT, INC., )
      )
   Counterclaim Plaintiffs,)
      )
versus )
      )
AMERICAN AUTOMOBILE )
INSURANCE COMPANY, a )
Missouri Corporation; )
NATIONAL SURETY )
CORPORATION, an Illinois )
Corporation, )
      )
   Counterclaim Defendants,)
      )
and )
      )
DOUGLAS MOORE, MONARCH )
INSURANCE SERVICES, INC., )
a Hawaii Corporation, and )
INSURANCE ASSOCIATES, )
INC., a Hawaii )
Corporation, )
      )
   Additional Counterclaim )
   Defendants. )
_____)

### Page 2

1      VIDEOTAPED DEPOSITION OF DOUGLAS MOORE
2
3      Taken on behalf of the Plaintiffs/Counterclaim
4      Defendants American Automobile Insurance Company and
5      National Surety Corporation at the law offices of
6      Bronster Fujichaku Robbins, 1003 Bishop Street, Suite
7      2300, Honolulu, Hawaii, commencing at 9:51 a.m., on
8      Wednesday, the 14th of December, 2016, pursuant to the
9      Federal Rules of Civil Procedure.
10
11   REPORTED BY: KATHY PEARSON, RPR, CRR, CSR No. 313
12
13   APPEARANCES:
14      For the Plaintiffs/Counterclaim Defendants
         American Automobile Insurance Company and
15       National Surety Corporation:
16          STEVEN D. ALLISON
            SAMRAH R. MAHMOUD
17          Crowell & Moring
            3 Park Plaza, 20th Floor
18          Irvine, California 92614
19      For the Real Party in Interest and
         Defendant/Counterclaim Plaintiff Safeway Inc.
20       and Defendant/Counterclaim Plaintiff Hawaii Nut &
         Bolt, Inc.:
21
            JUDITH ANN PAVEY
22          Starn O'Toole Marcus & Fisher
            Pacific Guardian Center, Makai Tower
23          733 Bishop Street, Suite 1900
            Honolulu, Hawaii 96813
24
25   (Appearances continued)

### Page 3

1      For the Counterclaim Defendants Douglas Moore
       and Monarch Insurance Services, Inc.:
2
          KENNETH S. ROBBINS
3         SASHA A. HAMADA
          Bronster Fujichaku Robbins
4         1003 Bishop Street, Suite 2300
          Honolulu, Hawaii 96813
5
       For the Counterclaim Defendants Douglas Moore
6      and Insurance Associates, Inc.:
7         CORLIS J. CHANG
          Goodsill, Anderson, Quinn & Stifel
8         First Hawaiian Center, Suite 1600
          999 Bishop Street
9         Honolulu, Hawaii 96813
10    Videographer:
11       Chris Lowenthal

### Page 4

1                INDEX
2
3   EXAMINATION BY MR. ALLISON          Pg 7
4   EXAMINATION BY MS. PAVEY            Pg 122
5   REEXAMINATION BY MR. ALLISON        Pg 236
6   *****************************
7   DEPOSITION EXHIBITS:
8   EXHIBIT NUMBER 68                   Pg 9
9      (Moore professional experience/education)
10  EXHIBIT NUMBER 69                   Pg 59
11     (commercial insurance application)
12  EXHIBIT NUMBER 70                   Pg 75
13     (web form FNOL submitted information)
14  EXHIBIT NUMBER 71                   Pg 88
15     (Moore e-mail to Dobran MM 000010)
16  EXHIBIT NUMBER 72                   Pg 88
17     (Dobran e-mail to Moore MM 000009)
18  EXHIBIT NUMBER 73                   Pg 97
19     (Moore e-mail to Hayes HNB2_00000421-423)
20  EXHIBIT NUMBER 74                   Pg 113
21     (quick reference guide American Business Coverage)
22  EXHIBIT NUMBER 75                   Pg 186
23     (Hayes 8-22-09 e-mail to Moore MM 000049)
24  EXHIBIT NUMBER 76                   Pg 187
25     (Anders/Domingo/Moore e-mails MM 000045)

RALPH ROSENBERG COURT REPORTERS
808-524-2090

**Exhibit 3**

Page 5

1  (Index continued)
2  EXHIBIT NUMBER 77                        Pg 191
3    (Hayes/Moore e-mails MM 000002-3)
4  EXHIBIT NUMBER 78                        Pg 195
5    (Hayes/Moore e-mails MM 000021)
6  EXHIBIT NUMBER 79                        Pg 232
7    (Clark e-mail to Moore MM 000013)
8  EXHIBIT NUMBER 80                        Pg 232
9    (Galasso e-mail to Moore MM 000008)
10 EXHIBIT NUMBER 81                        Pg 232
11   (FF agency agreement with Monarch)
12 EXHIBIT NUMBER 82                        Pg 232
13   (FF agency agreement with Insurance Associates)

Page 6

1  RECORD OF PROCEEDINGS
2      THE VIDEOGRAPHER: This is the deposition of
3  Douglas Moore in the matter of American Automobile
4  Insurance Company, et al. versus Hawaii Nut & Bolt,
5  Incorporated, and Safeway Incorporated. We're located
6  at Bronster Fujichaku Robbins, 1003 Bishop Street,
7  Suite 2300, Honolulu, Hawaii. My name is Chris
8  Lowenthal, video specialist for Advanced Depositions.
9      Will counsel please state your names?
10     MR. ALLISON: Steven Allison, representing
11 the defendants American and National Surety.
12     MS. MAHMOUD: Samrah Mahmoud representing the
13 plaintiffs American Automobile Insurance Company and
14 National Surety Corporation.
15     MR. ALLISON: Thank you for the correction.
16 We're the plaintiffs and the counter-defendants.
17     MR. ROBBINS: Ken Robbins and Sasha Hamada on
18 behalf of Douglas Moore as co-counsel with Ms. Chang,
19 and also on behalf of Monarch Insurance Services.
20     MS. CHANG: Corlis Chang, Goodsill Anderson
21 Quinn and Stifel, co-counsel with Mr. Robbins and Sasha
22 Hamada for Mr. Moore, and also for Insurance
23 Associates, Incorporated, third party defendants in
24 this action.
25     MS. PAVEY: And Judy Pavey for Hawaii Nut &

Page 7

1  Bolt and Safeway, Starn O'Toole.
2      THE VIDEOGRAPHER: Today is December 14th,
3  2016. We're on the record at 9:52 a.m. Will the court
4  reporter please swear in the deponent?
5      (Whereupon DOUGLAS MOORE, called as a witness
6  on behalf of the Plaintiffs/Counterclaim Defendants
7  American Automobile Insurance Company and National
8  Surety Corporation, having been first duly sworn, was
9  examined and testified as follows)
10          EXAMINATION
11 BY MR. ALLISON:
12     Q  Good morning. Could you state your name for
13 the record, please?
14     A  Douglas Moore.
15     Q  And are you okay if I call you Doug?
16     A  That's fine.
17     Q  Great. Have you had your deposition taken
18 before, Doug?
19     A  No, I have not.
20     Q  So because you haven't had it taken -- well,
21 you were here yesterday for the deposition, though,
22 weren't you?
23     A  I was.
24     Q  So you have a little familiarity with how
25 this works, but I'll give you just a couple rules that

Page 8

1  make it easier for, most importantly, for the court
2  reporter.
3      A  Okay.
4      Q  But also maybe for the rest of us.
5          So as you can see, she's taking everything
6  down that we say, so it's important that we do a couple
7  of things to make it easier for her. Number one, that
8  we not talk over each other. So I'll do my very best
9  to let you finish your answer before I start my next
10 question. Likewise, if you could do your best to let
11 me finish my question before you start your answer. It
12 just makes everything go smoother.
13         The second thing is that you have to give
14 verbal answers. So even though we have a videographer,
15 and even though in normal conversation we often use
16 nods and shakes of the head and gestures, for the court
17 reporter to get it down, it's got to be a verbal
18 answer.
19     A  Okay.
20     Q  The only other thing that I'll say, and there
21 may be some other things that come up, but we don't
22 want you to guess. So if you have a basis to give me
23 an answer, I'm entitled to that, and you should please
24 give that.
25         But if it would require you to simply guess

Page 37

1  would -- it's a standard practice to meet with a
2  customer within, like, say sixty to ninety days before
3  their policies come up, because they're annual
4  contracts.
5      Q  Uh-huh.
6      A  And we would find out if there's any changes
7  to be made so we could identify to the underwriter;
8  there's going to be increases in payroll, there's going
9  to be increases in sale, they're going to be changing
10 their auto fleet, such as that.
11     Q  So you would set your annual meeting sort of
12 to dovetail with the renewal dates?  Is that fair?
13     A  Yes, absolutely.
14     Q  Okay.  And how are you paid for your work, in
15 general?  I don't want specific numbers, but what's the
16 process in which you get paid?
17     A  Well, we, we get paid, a general insurance
18 agent and myself would get paid a percentage of the
19 commission that is paid to the general agent.
20     Q  So in other words, the insurance company pays
21 a commission to the general agency, and then you have
22 an agreement with them as to how much of that
23 commission is then yours.  Is that a fair way to put
24 it?
25     A  They tell us what they're going to -- the

Page 38

1  general agent would let us know what they're willing to
2  give us.
3      Q  Right, and does that vary insurance company
4  to insurance company and policy to policy?
5      A  Yes.
6      Q  So in other words, your commission on a
7  worker's comp policy from State Farm may be different
8  than the, than a commission on a general liability
9  policy from Fireman's Fund.  Is that fair to say?
10     A  Well, State Farm doesn't write worker's
11 compensation.
12     Q  Well, I know.  I realize I used a really bad
13 example.
14     A  They're a direct market.  But normally, like
15 if I give you an example, worker's compensation
16 commission is usually, generally five percent, whereas
17 an automobile policy might be ten percent.
18     Q  Got it.  All right, so now let's talk about
19 Hawaii Nut & Bolt.  When did you start working with
20 Hawaii Nut & Bolt?
21     A  I'm not exactly sure, but it was probably,
22 probably around 2000, year 2000 or thereabout.
23     Q  Let's back up.  When did you first meet Bill
24 Hayes, Jr.?
25     A  I first met him when Monarch Insurance

Page 39

1  assigned me the account.
2      Q  So that was one that you got referred to by
3  Monarch.
4      A  It was an in-house account by an agent that
5  left the office.  That he was an agent at Monarch, was
6  there for about two years, wrote the insurance, and
7  then decided to get out of the business.
8      Q  And what was his, is his name?
9      A  Aaron Okinaka.
10     Q  And you said he's out of the business, to
11 your knowledge?
12     A  He is.
13     Q  Do you have any knowledge of where he is or
14 how to locate him, or ever see him around?
15     A  He, his dad was a bank president, and passed
16 away and he inherited a lot of money, and didn't have
17 to work.  So last time I saw him, he was at Ala Moana
18 Beach Park, he was 38, and never going to work again in
19 his life.
20     Q  Pretty good deal.
21     A  Well, he didn't seem that happy.
22     Q  Oh.
23     A  No.  There's no fulfilment in his life, so.
24     Q  That's too bad.  So Monarch through
25 Mr. Onaka, did you say?

Page 40

1      A  Okinaka.
2      Q  Okinaka.  Already had a relationship with
3  Hawaii Nut & Bolt when you met him.
4      A  Yes.
5      Q  And so when did -- did you first meet
6  Mr. Bill Hayes, Jr. at one of these -- at the meeting
7  that you set up whenever the transition occurred?
8      A  Well, when Aaron left, they divided up his
9  accounts, and I got some of the smaller, less
10 desirable -- not desirable as opposed to the quality of
11 the account, but small, small dollar --
12     Q  Right.
13     A  -- accounts.  And so they were, the owner at
14 Monarch Insurance divided up the accounts however he
15 decided to, since he was the owner of the company.
16     Q  Got it.
17     A  And when they handled my account, I think
18 Monarch sent out a letter to say, hey, Aaron's left,
19 Doug's going to be the new guy.  And so I called the
20 guy to introduce myself.
21     Q  And did you then set up a meeting with Bill
22 Hayes, Jr.?
23     A  Absolutely.
24     Q  And where did you meet with Mr. Hayes, Jr.,
25 Mr. Bill Hayes, Jr., when you first met him?

## Page 41

1  A  At his Mapunapuna location.
2  Q  And you said this was around the year 2000,
3  you believe?
4  A  That would be my best guess.
5  Q  Okay.
6  A  But I'm not supposed to guess, so.
7  Q  Well, you can give an approximation.
8  A  Approximation.
9  Q  Right. And so, so that was at his
10 store/warehouse that you met?
11 A  It's not a warehouse. It's a, it's a store.
12 Q  Okay, and what did you and Mr. Hayes discuss,
13 Mr. Hayes, Jr. discuss?
14 A  Well, I wanted to meet him and find out what
15 his concerns were, if any, and how I could best work
16 with him and keep him, keep him happy with purchasing
17 insurance through Monarch Insurance.
18 Q  So he had, Hawaii Nut & Bolt had existing
19 insurance policies that had been placed through Monarch
20 at that time. Is that right?
21 A  Absolutely.
22 Q  And do you recall whether Fireman's Fund was
23 one of the insurance carriers that issued any of the
24 policies that Hawaii Nut & Bolt had at that time?
25 A  They issued them all.

## Page 42

1  Q  Right. So in other words, they were already
2  the insurance carrier when you came onto that account.
3  A  Yes, sir.
4  Q  Okay, and did Mr. Hayes, Jr. describe his
5  business at that time to you?
6  A  Not a lot. He basically was a nice
7  gentleman, and he just wanted to know who I was,
8  really. He was happy with his insurance policies and
9  he was happy with Monarch Insurance.
10 Q  Did he show you around the store facility
11 there, though?
12 A  It's very small. I don't remember him
13 showing me around.
14 Q  Do you remember how long you met with
15 Mr. Hayes, Jr. on that occasion?
16 A  Anytime I met with most of my customers,
17 you're lucky to get an hour.
18 Q  Right. Was there any changes that he wanted
19 to his insurance in that first meeting that you had
20 with him?
21 A  No.
22 Q  Was Monarch, to your understanding, Hawaii
23 Nut & Bolt's exclusive broker at that time?
24 A  No.
25 Q  So do you think that they were using other

## Page 43

1  brokers or shopping the policies? Or what was your
2  understanding?
3  A  Well, we just, we just handle one niche of
4  insurance. We're not -- we just work with property
5  casualty insurance. We don't do, you know, we don't
6  work with health insurance and we don't do life
7  insurance.
8     So there's -- the insurance industry is
9  fairly split in the business. You're usually either a
10 property casualty agent or a life and health agent.
11 The life and health agents would also sell financial
12 products.
13 Q  You weren't selling financial products, were
14 you?
15 A  No, I was not.
16 Q  Okay. Did Mr. Hayes, Jr., in that first
17 conversation, describe at all what he believed his
18 insurance needs were as far as property casualty?
19 A  No. I remember him specifically saying that,
20 before he started running his business, which he
21 started, that he tried to be an insurance agent and he
22 failed, and he told me that he felt it was a very
23 challenging business to be successful in.
24    And he came about an opportunity to run this
25 wholesale hardware business, I think it was maybe

## Page 44

1  starting it in the seventies, and a lot of construction
2  in Hawaii. And he said he just got a good, good timing
3  on running his company, and he was able to get it up
4  and running and was very successful at it.
5  Q  And so -- by the way, did you review the file
6  that you guys, that was at Monarch before you went and
7  met with him? You took a look at what coverages he had
8  and sort of what the program was before you went to
9  meet with him?
10 A  Sure.
11 Q  And based on looking at that file, we'll call
12 it, and talking to Mr. Hayes, Jr., what was your
13 impression of what Hawaii Nut & Bolt's business was at
14 that time?
15 A  They were very, very specific in being a
16 wholesale hardware store.
17 Q  And was the store that you walked into, was
18 it sort of like an open store, like anybody could just
19 walk in and start looking around and buy something if
20 they wanted?
21 A  Yes, but it was very specific in that you --
22 it was on the corner over in Mapunapuna where a lot of
23 contractors are, and you walk up and there's kind of a
24 desk.
25 Q  Uh-huh.

Page 45

1  A  An order desk. So I got the impression that
2  most of the people that go there, go there on a
3  repeated basis. It's not a store like Home Depot,
4  where they'd have aisles where you can pick stuff.
5  Q  Right.
6  A  You only place an order --
7  Q  Got it.
8  A  -- or they would show you a product brochure
9  right at the front desk.
10 Q  And did Mr. Hayes, Jr. say whether he had any
11 other locations or not?
12 A  He did not have any other locations.
13 Q  At that time?
14 A  At that time.
15 Q  Got it, okay. Did you meet Bill Hayes III
16 during that first meeting? Was he there?
17 A  He was not in Hawaii at that time.
18 Q  Got it. Okay, and so that time you met with
19 Bill Hayes, Jr., was that a renewal meeting or was that
20 just because of the transition?
21 A  Well, the first time, yeah, because Aaron had
22 left and so, you know, one of the concerns would be
23 that the agent -- that the clients would scatter.
24 Q  Right.
25 A  Because Aaron was only in the business for a

Page 46

1  few years, and like most insurance agents, they're
2  doing business because of the person, not because of
3  the agency per se.
4  Q  Right. So then did you, when the renewal
5  came up on Hawaii Nut & Bolt, did you have your annual
6  meeting then again?
7  A  Absolutely.
8  Q  And how long did you deal with Mr. Bill
9  Hayes, Jr.?
10 A  I believe approximately five years.
11 Q  And then at some point did he retire or turn
12 over his business to his son?
13 A  He moved to Montana and he sold his business
14 to his son.
15 Q  Got it. And did you -- so when did you first
16 meet Bill Hayes III?
17 A  Soon after he bought the business.
18 Q  Okay, and so I'm going to focus on the time
19 before he bought the business. Was there any
20 conversations you had with Bill Hayes, Jr. about him
21 changing his insurance program in any significant
22 fashion?
23 A  No.
24 Q  Was there any conversation you had with Bill
25 Hayes, Jr. about his, what he perceived to be what his

Page 47

1  insurance needs were? That this is what I want or this
2  is what I need.
3  A  No.
4  Q  Was it a good account?
5  A  It was low service. It was a cookie cutter
6  type business that required very little, very little
7  work.
8  Q  And the renewal applications that you would
9  do for Hawaii Nut & Bolt, describe for me how that
10 process worked.
11 A  We did not have to do renewal applications
12 because they were not required by the insurance
13 company.
14 Q  What did you have to give them for renewals?
15 A  We would just simply let them know if the
16 property values, the inventory values changed, and if
17 the payrolls changed.
18 Q  Was Fireman's Fund writing the worker's comp
19 at that time as well?
20 A  I believe so.
21 Q  Okay, and do you ever recall Mr. Bill Hayes,
22 Jr. telling you about any significant changes in his
23 business?
24 A  No.
25 Q  And then do you remember -- so what's the

Page 48

1  approximate time frame, to your understanding or
2  knowledge, that Bill Hayes III took over the company?
3  A  To the best of my knowledge, 2005.
4  Q  Okay, and from here on out, I'm going to just
5  refer to him as Bill Hayes, since we're now in the Bill
6  Hayes III era, if that's okay, not too confusing?
7  A  Yes.
8  Q  Okay. And when Bill Hayes III took over, did
9  you have a conversation with him about the insurance --
10 well, let me strike that.
11    Did you have a meeting with him to introduce
12 yourself since he was the new owner?
13 A  Yes.
14 Q  And where did you meet with him, Bill Hayes,
15 when you had that meeting?
16 A  Mapunapuna.
17 Q  Same store that you had met --
18 A  His office.
19 Q  Yeah.
20 A  His dad's office.
21 Q  Yeah. And what did you discuss with Bill in
22 that meeting?
23 A  I wanted to find out who he was, what was
24 going on. I believe he was running a similar business
25 in Idaho and sold it, and wanted to move back to Hawaii

12 (Pages 45 to 48)

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 49

1  and live in Hawaii. And his dad was -- had bought a
2  ranch in Montana.
3      Q   And did Bill indicate any changes that he was
4  going to make to the business at all?
5      A   No, he did not.
6      Q   Did he talk about opening additional
7  locations or doing anything like that?
8      A   No, he did not.
9      Q   Did he talk about any changes he wanted to
10 his insurance program at all?
11     A   No, he did not.
12     Q   Did he discuss with you at all any specifics
13 about his view of the insurance needs of the company?
14     A   No, he did not.
15     Q   Did he indicate that he wanted to continue
16 with you as his agent?
17     A   He did.
18     Q   And did really anything change, from your
19 perspective, in your relationship with Hawaii Nut &
20 Bolt when Bill Hayes III took over?
21     A   No change.
22     Q   Okay, so you had the annual meetings just
23 like you had in the past.
24     A   Yes.
25     Q   And up until the time when the Safeway

Page 50

1  lawsuit happened, we'll use that time frame, do you
2  remember any discussions with Bill about his
3  perspective on his insurance needs?
4      A   No.
5      Q   Did he ever say that he wanted changes to his
6  insurance program?
7      A   No.
8      Q   Did he ever tell you about any changes to his
9  business?
10     A   Well, every year we would, we would say, hey,
11 what's going on, you know, because really, they don't
12 really look at as, insurance as something they want to
13 have. It's something, you know, they are required to
14 have.
15         His lease of the Mapunapuna location is
16 through -- he doesn't own the, he doesn't own the land.
17 So he owns the building and he's got a long-term lease.
18 And so I know that at that time Damon Estate was
19 selling their, selling their business, selling all
20 their land, and so -- you know, he would talk about we
21 got the new lease with the new owner.
22     Q   Uh-huh.
23     A   And/or it transferred. He would tell me
24 things like that that would generally be important to
25 know, because we have to provide evidence of insurance

Page 51

1  to the new, to the new property owner.
2      Q   Right. Did he ever tell you about anything
3  that he was doing to expand his business, open new
4  locations, anything of that nature?
5      A   Well, that would be something that he would
6  normally tell me when it, when it happened. It
7  wouldn't necessarily be -- you know, you wouldn't wait
8  for the meeting. It would be if something happened,
9  like if he leased a new location --
10     Q   Right.
11     A   -- they would need the certificate of
12 insurance.
13         So probably the only one I can think of is
14 he, because of all the military construction in Kaneohe
15 at the military base, he opened a warehouse
16 specifically for a couple of contractors that were
17 doing work out there.
18     Q   And did he ever say, other than this new
19 location, that he was changing the fundamentals of his
20 business? In other words, I've always been in the
21 wholesale hardware business, but I'm going to do
22 something different, or I'm adding something that I
23 haven't done in the past.
24     A   He never did.
25     Q   Did he ever indicate to you that he was going

Page 52

1  to start offering construction advice or construction
2  services?
3      A   I don't know that he ever did that.
4      Q   Did he ever tell you that he was hiring
5  salespeople who would offer advice, be on site and
6  offer advice about what type of products and things of
7  that nature?
8      A   He never did.
9      Q   Did he ever mention to you that he was hiring
10 a gentleman by the name of Tim Lyons?
11     A   He never did.
12     Q   Did you ever meet Mr. Lyons?
13     A   No, I have not.
14     Q   Now, when the renewal time would come up for
15 Hawaii Nut & Bolt, would you ever shop their business
16 to see if you could find quotes that would be cheaper,
17 better premiums, things of that nature?
18     A   At times we would with Hawaii Nut & Bolt.
19 There was never a reason to, because he had a very
20 competitive program with Fireman's Fund.
21     Q   Did you ever offer him any other alternatives
22 to Fireman's Fund in those renewal meetings? In other
23 words, come and say just to let you know I've shopped,
24 and this is what it is.
25     A   No.

13 (Pages 49 to 52)

Page 53

1  Q  Did he ever ask you to do that?
2  A  No.
3  Q  Prior to the Safeway lawsuit, are you aware
4  of whether Hawaii Nut & Bolt had made claims against
5  any of their Fireman's Fund policies?
6  A  Yes.
7  Q  And what claims do you recall prior to the
8  Safeway VersaFlex issues?
9  A  Well, there is, there is three lawsuits
10 related to VersaFlex.
11 Q  Right, and I'm going to get to those. I'm
12 talking about before that. Were there any other, are
13 you aware of other claims against the Fireman's Fund
14 policies?
15 A  Just maybe a worker's compensation or auto
16 claim.
17 Q  And did you ever hear any complaints or
18 concerns from Mr. Hayes about how those were handled?
19 A  No, he, he -- we had a very positive opinion
20 of Fireman's Fund.
21 Q  Again, we're talking prior to the VersaFlex
22 issues. Did you have occasion to talk with the
23 Fireman's Fund underwriters about Hawaii Nut & Bolt?
24 A  Could you repeat that?
25 Q  Sure. Prior to the VersaFlex issues, Safeway

Page 54

1  VersaFlex issues, did you have occasion to talk to the
2  underwriters at Fireman's Fund about Hawaii Nut & Bolt?
3  A  I don't recall.
4  Q  So in the renewals, you don't recall having
5  any conversations with Fireman's Fund where you would
6  talk about Hawaii Nut & Bolt when they were getting for
7  that renewal underwriting?
8  A  No.
9  Q  Would it be normal for you to talk to the
10 underwriters on a renewal of an account like this?
11 A  With the Fireman's Fund program, they would
12 routinely issue the policies automatically, unless we
13 told them to change, to make a change.
14 Q  Right, but if there had been a change in
15 Mr. Hayes' or Hawaii Nut & Bolt's business, you would
16 have informed the underwriter. Correct?
17 A  Absolutely.
18 Q  Okay. We'll take a break. We've got to
19 change the tape.
20     THE VIDEOGRAPHER: The time is 10:47. We're
21 going off the record.
22     (Off the record at 10:47 a.m., deposition
23 resumed at 11:02 a.m.)
24     THE VIDEOGRAPHER: The time is 11:02. We're
25 back on the record.

Page 55

1  BY MR. ALLISON:
2  Q  All right. Doug, I put in front of you there
3  what we marked as Exhibit 51, so. This is, it's one
4  from the depo yesterday. And Exhibit 51 is an e-mail
5  between you and a David Soulsby, I believe is at, who's
6  at Fireman's Fund, and it has an attached application.
7      So if you can take a look at the application,
8  please. And go ahead and take a flip through it, and I
9  guess my first question for you is whether -- you see
10 the date up there is January 14th, 2004, up at the
11 top -- is whether you were involved in preparing this
12 commercial insurance application for Hawaii Nut & Bolt.
13 A  Yes, I was.
14 Q  And is that your signature down there under
15 producer's signature?
16 A  I don't recall. It does not look like my
17 signature.
18 Q  Would that be -- could someone else from
19 Monarch sign as the producer? Would that be normal,
20 appropriate?
21 A  Someone, an assistant could have put together
22 the application for me.
23 Q  Got it, okay. And I want to -- you see here
24 the application is for Hawaii Nut & Bolt. Correct?
25 A  Yes.

Page 56

1  Q  That's the insured, or the applicant, excuse
2  me. And under nature of business it says, about
3  halfway down, "Wholesale hardware supply - mainly
4  contractors/owners builders." Do you see that?
5  A  Yes.
6  Q  And to your knowledge, was that an accurate
7  statement of Hawaii Nut & Bolt's business in 2004?
8  A  Absolutely.
9  Q  And would you have been the one that would
10 have provided the information even if you weren't the
11 one that actually typed it in --
12 A  Yes.
13 Q  -- for this application?
14 A  Yes, I would.
15 Q  And what was your understanding that that was
16 the nature of Hawaii Nut & Bolt's business based on?
17 A  Their business registration with the State of
18 Hawaii.
19 Q  And also by then, you had both been out there
20 and you had talked to Bill Hayes as well. Right?
21 A  Yes.
22 Q  Bill Hayes, Jr. at that time.
23 A  At this time, mostly like -- we called him
24 Pops, but, yes, Bill Hayes, Jr.
25 Q  Got it.

14 (Pages 53 to 56)

Page 97

1    Q   Has --
2        MR. ROBBINS: You mean with respect to the
3    lawsuit, you mean?
4    BY MR. ALLISON:
5    Q   I mean at all.
6    A   With respect to his insurance coverage, to,
7    most likely to a small degree.
8    Q   Okay, and -- but has he talked to you about
9    the lawsuit at all since his company sued you?
10   A   No, he has not.
11   Q   And has he indicated at all that because of
12   the lawsuit against you, he wants to move his insurance
13   to a different insurance agency?
14   A   He has not told me that.
15       MR. ALLISON: Why don't we let you go ahead
16   and change tapes. I'm going to get a new document out
17   anyway.
18       THE VIDEOGRAPHER: The time is 11:58. We're
19   going off the record.
20       (Off the record at 11:58 a.m., deposition
21   resumed at 12:50 p.m.)
22       (Whereupon Deposition Exhibit Number 73 was
23   marked for identification.)
24       THE VIDEOGRAPHER: The time is 12:50. We're
25   back on the record.

Page 98

1    BY MR. ALLISON:
2    Q   All right. Good afternoon, Doug. I've put
3    in front of you what we've marked as Exhibit 73. It's
4    a May 21st, 2015 e-mail from you to Bill Hayes. It
5    says, "Would you be able to meet next week to review
6    the attached coverage for 2015," and it has one, two
7    attached pages.
8        And my question is for you, is you had talked
9    earlier about providing sort of a summary of the
10   insurance. Is this, is this an example of the sort of
11   summaries that you would provide?
12   A   It is.
13   Q   Okay, and this one was for Hawaii Nut & Bolt
14   in whatever time frame this was, May of 2015. Right?
15   A   Yes, sir.
16   Q   Okay, and so while the information might
17   change because of the year and the carriers, the format
18   was pretty much -- was it pretty consistently the same?
19   A   Identical.
20   Q   Okay, great. That was my only question on
21   that one.
22       Did Mr. Hayes, Mr. Bill Hayes III, ask you
23   questions during the Safeway lawsuit about what was
24   going on with the insurance coverage?
25   A   No, he did not.

Page 99

1    Q   Let me show you what we marked as Exhibit 64
2    and just see if it refreshes your memory at all. There
3    it is.
4    A   Okay.
5    Q   All right, this is Exhibit 64, which is an
6    e-mail chain in June of 2015, largely between Mr. Hayes
7    and yourself, Doug, but also a few e-mails earlier
8    between you and Dawn Bonak at Fireman's Fund.
9        You see there the third e-mail down, one,
10   two, three, where Bill Hayes writes to you on June
11   30th, 2015, at 5:05 p.m. Do you see that one?
12   A   Yes, I do.
13   Q   He asks a question at the end that says,
14   "This is all very confusing to me. Do we have product
15   liability insurance?"
16       Do you see that question?
17   A   Yes, I do.
18   Q   And then your response above is, "Yes, there
19   is product coverage."
20       Can you explain to me what you meant by that?
21   A   Well, in general that, under the commercial
22   general liability policy, that there is some coverage
23   for third party damages based on his sale of hardware
24   products that he sells.
25   Q   Were you making a general comment there as

Page 100

1    opposed to specifically trying to determine whether
2    there was coverage for the Safeway lawsuit and all of
3    its parts?
4    A   It would have to be general, a general
5    response, because I'm not a claims adjustor or an
6    attorney.
7    Q   And did you have any conversations with
8    Mr. Hayes about this question he had and then your
9    response, other than what's in this e-mail?
10   A   Not to my knowledge.
11   Q   And did you ever discuss with anybody at
12   Fireman's Fund whether there was product coverage under
13   Mr. -- Hawaii Nut & Bolt's insurance policy?
14   A   Not to my knowledge. I don't think that they
15   would even respond to me if I asked them that kind of a
16   question.
17   Q   So you're just saying in general you don't
18   think you would get a response. You don't recall
19   actually asking and them saying I'm not going to give
20   you an answer?
21   A   That is not a question I would ask to ask
22   about.
23   Q   Got it. And then you say, "I think Safeway
24   is going after your policy limits." Do you see that
25   part --

Page 153

1  Fireman's Fund, and not to Fireman's Fund directly?
2     A   I've no knowledge that Bill would talk to
3  Fireman's Fund directly.
4     Q   Okay. Is that, is it typical for your
5  clients -- do you call them clients?
6     A   Customer, client.
7     Q   Okay.
8     A   Either one is fine.
9     Q   Okay, so would it be typical for your clients
10 to never have any direct contact with the insurance
11 companies that were actually insuring them?
12        MR. ROBBINS: You mean after a claim is
13 brought or under any circumstance -- well, it's overly
14 broad, Judy.
15 BY MS. PAVEY:
16    Q   Go ahead.
17    A   The only time that the customer would talk to
18 the insurance company would be a claim or a, what they
19 call loss control or safety inspection.
20    Q   Okay, all right. So the typical relationship
21 between, between you and your clients is that you
22 basically are the middle person between them and the
23 actual insurance company. Right?
24    A   Yes.
25    Q   All right, so they rely on you to get them

Page 154

1  the coverage that they need or that they want. They
2  don't rely on the, their conversations with the
3  insurance carrier. Is that a fair statement?
4     A   What conversations are you talking about?
5     Q   Well, somebody comes to you, they need
6  insurance for their business and, I'm assuming anyway,
7  that they rely on you to provide them with what they
8  need or what's available, however you describe that.
9  Not on the insurance company itself.
10    A   Yes.
11    Q   Okay, all right. And as I understood your
12 testimony anyway, you never actually went over the
13 insurance policies with Bill. Is that correct?
14    A   That's not correct.
15    Q   So did you go over the policies with him?
16    A   I went over the different various coverages
17 with him on the insurance summary.
18    Q   Okay, but beyond the various coverages you,
19 did not go over the policy itself with him. Is that
20 correct?
21    A   That is correct.
22    Q   Okay. So, for example, you did not go
23 through the nine pages of exclusions in the policies
24 that were issued to Hawaii Nut & Bolt with Bill.
25 Correct?

Page 155

1     A   I don't think I would have been able to even
2  if I wanted to. I don't know any customer that would
3  barely have the time for me to go over the insurance
4  summary, much less go through the whole policy itself.
5     Q   Okay. But in any event, you never did that
6  with Bill. Correct?
7     A   I, I did go through the insurance coverages,
8  but not the policies themselves, specific to individual
9  pages in the policy.
10    Q   Right, and you did not go over the exclusions
11 with Bill. Correct?
12    A   I don't -- I've never done that with any
13 client.
14    Q   Okay. I wasn't clear on what you said about
15 claims that you've filed for your customers, product
16 liability claims for your customers. Have you ever
17 filed a product liability claim for any of your
18 customers?
19    A   I don't remember you even asking that
20 question before. And if you're asking in general, have
21 I filed products liability claims?
22    Q   Uh-huh.
23    A   I can't say that I have knowledge to, to
24 specifically tell the, tell the claims people what kind
25 of a claim it is. I just -- if it's a liability claim

Page 156

1  and it's a lawsuit, I just send in the lawsuit. I
2  don't get into the details of the claim itself.
3     Q   Okay, all right. One of the -- have you ever
4  filed a product liability, or notice of a product
5  liability lawsuit, or a claim for any of your clients
6  except, or in addition to Hawaii Nut & Bolt?
7     A   Well, by product liability --
8     Q   Faulty product?
9     A   Faulty product?
10    Q   Uh-huh.
11    A   I have not.
12    Q   Okay, so this is the only one that you've
13 ever been involved with for a claimant?
14    A   I don't even know this is a faulty product
15 claim.
16    Q   Well, the exhibit that you testified to
17 earlier that was represented to be, anyway, the notice
18 of this claim to Fireman's Fund described it as a
19 faulty product.
20    A   That might have been on the page, but that's
21 not, that's not relevant to the claim itself. It was
22 just to, to get the claim sent in to Fireman's Fund,
23 and it was probably something that Bill had told me.
24    Q   Uh-huh, okay. So you had information that
25 the lawsuit was about a faulty product, and you told

Page 157

1  that to Fireman's Fund when you notified them of a
2  claim. Correct?
3      A  Well, they asked for a description of the
4  claim.
5      Q  Sure.
6      A  And that apparently was what was put on the
7  claim, the claim notice.
8      Q  Okay, and so I think what you're saying then
9  is this is the first faulty product claim that you've
10 ever filed for one of your clients. Is that correct?
11     A  Well, I don't know this is a faulty product
12 claim. I think that was just a description on the
13 claims notice to get it sent in to Fireman's Fund.
14     Q  Whatever it was, this is the first one that
15 you've ever filed for any of your clients like that.
16     A  This is the first claim like this claim that
17 I've ever filed, yes.
18     Q  All right, and how many clients have you had
19 that were involved in the construction world?
20         MR. ROBBINS: Objection, overly broad, vague
21 and ambiguous.
22         MS. PAVEY: It is.
23         MS. CHANG: Assumes facts not in evidence,
24 that --
25 BY MS. PAVEY:

Page 158

1      Q  Can you answer it?
2         MS. CHANG: Let me finish my objection, Judy.
3      A  Could you describe what you're talking about
4  as far as the construction industry?
5  BY MS. PAVEY:
6      Q  Well, let's -- have you represented
7  general -- I mean, have you had clients who were
8  general contractors?
9      A  No.
10     Q  Have you had clients who were subcontractors?
11     A  Yes.
12     Q  All right, and what type of subcontractors
13 have you sold insurance to?
14     A  I have, I think, two or three clients that
15 are subcontractors. Two are tile contractors and one's
16 a glazier.
17     Q  Is that it?
18     A  That's it.
19     Q  Okay, so two tile contractors, or
20 subcontractors, excuse me.
21     A  Yes.
22     Q  And one subcontractor glazier.
23     A  Yes.
24     Q  What's a glazier?
25     A  They install, like, lanai doors or shower

Page 159

1  doors.
2      Q  Okay.
3      A  Glass. Glazier are glass.
4      Q  Okay, so both or all three of those clients
5  are -- they do construction work.
6      A  They do construction work.
7      Q  All right, okay. And at least as of today
8  anyway, they've never had a claim made against them for
9  defective construction work?
10     A  That's true.
11     Q  Okay. Did you --
12        MR. ROBBINS: Well, I'd like to hire them.
13        THE WITNESS: Well, they're not, they're not
14 cheap.
15 BY MS. PAVEY:
16     Q  Did you ever tell Bill that he did not have
17 product coverage under the Fireman's Fund policies?
18     A  I would never -- I have not told him that.
19     Q  And we saw the e-mail where you told him in
20 response to his question about whether he had product
21 liability coverage that, yes, he does have product
22 coverage. Correct?
23        MR. ALLISON: Objection, misstates the
24 document. Misstates prior testimony.
25     A  The policy provides some coverage for product

Page 160

1  liability. Obviously, as you're aware, there's many
2  exclusions to that. So in general I would, first and
3  foremost, say they have defense coverage to respond to
4  lawsuits.
5         As far as any specific coverage, I have to
6  defer to the insurance company, since they're the ones
7  that determine what is covered. They look at what
8  activities occurred to get to the point of a lawsuit.
9  BY MS. PAVEY:
10     Q  Did you or did you not e-mail Bill in
11 response to his question about whether he had product
12 liability coverage, yes, products are covered?
13        MR. ALLISON: Objection, document speaks for
14 itself.
15     A  I can look at that document and explain what
16 I said if you give me the --
17 BY MS. PAVEY:
18     Q  Exhibit 64.
19     A  Okay. So on June 30th, I said yes, there is
20 product coverage.
21     Q  Yes, and that was in response to Bill's
22 question to you, So we have product liability coverage?
23     A  Right.
24     Q  Okay, thank you. Do you get any training
25 from the various insurance companies whose products you

Page 161

1  sell to people about what is and isn't actually covered
2  under those policies?
3      A  No, we do not.
4      Q  Could you yourself read one of these
5  commercial general liability policies and figure out on
6  your own what is and is not covered?
7      A  Only to a layman, layman's extent, but I'm
8  not qualified as a legal expert to interpret a policy.
9      Q  Okay. And aside from the summary that you
10 provide to your client, you really don't give them any
11 understanding of exactly what it is they're being
12 covered for. Is that a fair statement?
13         MS. CHANG: Objection, argumentative. Not a
14 fair statement.
15     A  I don't, I don't agree with your statement.
16 BY MS. PAVEY:
17     Q  Do you know what Hawaii law requires in order
18 for a company to be allowed to call an insurance policy
19 a general liability policy?
20     A  I do not.
21     Q  The two tile setters and the glazier that you
22 represent or that are your clients, how long have you
23 had them as clients?
24     A  Probably fifteen years.
25     Q  Okay. In connection with representing those

Page 162

1  three businesses, were you made aware of the Group
2  Builders decision?
3      A  Not, not, not specific to those customers.
4      Q  Okay. Well, were you made aware of the Group
5  Builders decision and the impact of it on commercial
6  general liability coverage for contractors?
7      A  Yes.
8      Q  Okay. How did you become aware of that?
9      A  Some of the insurance companies would send
10 memos out. And specific to my situation, ACW Group
11 would share information because there was updated forms
12 that were being used by various insurance companies to
13 address that claim.
14     Q  Okay. What was your understanding of what
15 Group Builders said?
16         MR. ALLISON: Objection, calls for a legal
17 conclusion.
18         MS. CHANG: Join in that.
19     A  The only understanding I have is that it had
20 something to do with the definition of an occurrence.
21 BY MS. PAVEY:
22     Q  Okay, and did you understand that it applied
23 to situations where there were claims of defective
24 construction work?
25     A  Not in particular. Because I don't work with

Page 163

1  the construction industry very much, it wasn't, it
2  wasn't something that I could have really delved into
3  or understood.
4      Q  Okay, so at Monarch Insurance, for example,
5  or Insurance Associates, were you folks educated about
6  the impact of the Group Builders decision on your job
7  as sellers of insurance?
8      A  At the time I was at Monarch Insurance, I
9  don't believe that there was any understanding by the
10 industry in itself.
11     Q  Uh-huh.
12     A  Because --
13     Q  The decision hadn't been issued yet.
14     A  The decision hadn't been issued yet.
15 Probably the one time I really had any grasp of the
16 construction defect issue was this last year, where I
17 attended a seminar at Island Insurance that was put on
18 by one of the local law firms.
19     Q  Okay, all right. You said that some of the
20 insurance companies sent out information after that
21 Group Builders decision was issued. Do you remember
22 what the nature of the information was?
23     A  Just that they had a new form that they were
24 adding onto the liability policy that amended the
25 definition of an occurrence.

Page 164

1      Q  Okay, and the purpose for that was to make
2  sure that people who had thought they had coverage
3  before Group Builders really did have coverage after
4  Group Builders.
5          MR. ALLISON: Objection, calls for
6  speculation.
7  BY MS. PAVEY:
8      Q  Correct?
9          MS. CHANG: Join. Calls for a legal
10 conclusion as well.
11     A  Yeah, I didn't, I didn't really understand it
12 to that degree.
13 BY MS. PAVEY:
14     Q  Did you understand that it was supposed to
15 take care of the problem that was created for the
16 construction industry by Group Builders?
17         MR. ALLISON: Calls for speculation, lacks
18 foundation.
19 BY MS. PAVEY:
20     Q  Go ahead.
21         MS. CHANG: Join.
22 BY MS. PAVEY:
23     Q  Just asking for your understanding.
24     A  My understanding, that it addressed the
25 issue.

Page 165

1  Q  Okay, and do you know whether any of the
2  Allianz or Allianz companies sent out this amended
3  definition of occurrence to make sure that their
4  insureds were protected to the extent they thought they
5  were before Group Builders?
6  A  I don't have any knowledge that they have
7  done that.
8  Q  Okay. All right. Do you know whether any of
9  the Allianz companies that issue CGL policies lowered
10 their premiums for those policies after the issuance of
11 the Group Builders decision?
12 A  My, my experience with Allianz, Fireman's
13 Fund, is not construction related specific. Most of
14 the customers that I work with them are property
15 related risks.
16 Q  Okay.
17 A  Or premises. Premises, office exposures.
18 Q  Okay. Do you know whether the adjustors that
19 you were dealing with on the HNB claim were in the
20 general liability division at Fireman's Fund?
21     MR. ALLISON: Objection --
22 BY MS. PAVEY:
23 Q  As opposed to the construction defect
24 division? Go ahead.
25 A  They don't tell us. To me, it's a claims

Page 166

1  department.
2  Q  Okay, so you don't really look at what it
3  says on their communications to you in terms of whether
4  they're identified as somebody from the general
5  liability division as opposed to the construction
6  defect division?
7     MS. CHANG: Objection, it's argumentative,
8  the form.
9  A  I don't get regular communications from them.
10 Like I said, the only time I would is if I, if I called
11 and inquired. And I don't believe they put that on
12 their, on their -- I don't know what you call it.
13 Their, their -- under their name.
14     If you gave me an example of a certain
15 exhibit that I could look at, then I could respond.
16 BY MS. PAVEY:
17 Q  I will. We're going to go over some of
18 those.
19     But it seems like, one way or another, you
20 never noticed. Is that a fair statement?
21     MS. CHANG: Well, I'm going to object. It's
22 argumentative.
23 A  I'm going to give you an example. Here's
24 Geoffrey Dobran. It just says claim adjustor three.
25 BY MS. PAVEY:

Page 167

1  Q  Okay.
2  A  I don't know what claim adjustor three is.
3  Q  Okay.
4  A  I have no clue.
5  Q  Okay.
6  A  All I know is that they're told -- I'm told
7  who the contact is, and sometimes I have to go call
8  around to find out who's handling. And I just try to
9  ask them, can you advise the customer to what the
10 status is, because most of the time when I'm calling,
11 it's because they call me and say, hey, what's going
12 on.
13 Q  So you were never informed that Hawaii Nut &
14 Bolt's claim was transferred from the general liability
15 division to the construction defect division in 2015?
16 Or the end of 2014?
17 A  That's not something they would tell me.
18 Q  Okay, all right. Which companies took steps
19 to make sure that there was -- that the definition of
20 occurrence was amended so that the Group Builders
21 problem was avoided, if you remember?
22     MR. ALLISON: Lacks foundation.
23     MR. ROBBINS: Or if he ever knew.
24     MS. PAVEY: Well, he got notices from them.
25 I'm asking which --

Page 168

1  A  Well, the local companies are the ones that
2  probably communicate more so with us, Fireman's -- not
3  Fireman's Fund. First Insurance, Fairmont Insurance,
4  Island Insurance. And they don't do it all at the same
5  time.
6  BY MS. PAVEY:
7  Q  Okay.
8  A  I know Island Insurance was probably one of
9  the trailers in that, in that area. Fairmont
10 Insurance, I think, was one of the first to, to --
11 because they were trying to get into the construction
12 industry, underwriting, they used that as an
13 opportunity to build their book of business for, with
14 construction risks.
15 Q  Is Fairmont a local company?
16 A  It's not locally owned, but it's a local
17 office, part of Crum and Forster group.
18 Q  Okay, all right. Do you specifically avoid
19 selling insurance to contractors?
20 A  No, I don't avoid them.
21 Q  Okay, so it's just that, for whatever reason,
22 you have just never had a contractor as a client.
23     MR. ROBBINS: You mean a general contractor?
24     MS. PAVEY: Yeah.
25 A  There are certain agencies in town that niche

Page 169

1  on that market, and I guess being a normal person, I
2  try to work with the easiest course to work with
3  customers. I don't have the knowledge and experience
4  such as someone like an agency of King & Neel or Atlas
5  Insurance, that specialize and have construction groups
6  that work with that industry.
7  BY MS. PAVEY:
8      Q  Okay, so are those the two, Atlas and -- what
9  was the other one you said?
10     A  King & Neel.
11     Q  King & Neel. Are those the two companies
12 that operate in Hawaii that represent a lot of
13 contractors?
14     A  Well, there's two -- there are, there are
15 others, but I don't really know and keep up to date
16 with all my, quote, competitors.
17     Q  Okay. What about subcontractors? You're not
18 trying specifically to avoid representing them. That's
19 not why you only have three of those clients. Right?
20     A  I don't avoid them.
21     Q  Okay.
22     A  They're service oriented. They take a lot of
23 service, and I'm, I'm just one guy and I work pretty
24 lean. So I work with other, other org -- other trade
25 groups, organizations.

Page 170

1      Q  I'm not sure what you mean by that. What are
2  you talking about?
3      A  Well, niche, niche organizations, such as I
4  work with technology companies for their insurance
5  needs, restaurants. I do fiduciary insurance for
6  pension funds.
7      Q  Okay. So are those sort of your specialty
8  niches?
9      A  Yes.
10     Q  Okay. As opposed to subcontractors?
11     A  Yes.
12     Q  And what about as opposed to small business
13 operations that are sold those ABC policies?
14     A  Well, I work with companies that are referred
15 to me, and I don't, don't really exclude them, but I
16 will work with companies that I think I can create a
17 relationship with.
18        One industry that I would specifically not
19 work with would be trucking or transportation.
20     Q  Okay. The reason being what?
21     A  They're bad pay.
22     Q  What does that mean?
23     A  They don't pay their bills.
24     Q  Oh, okay.
25     A  So I don't want, as an insurance, as an

Page 171

1  independent insurance agent, we have financial credit
2  risk. If they don't pay, if it's -- we bill them -- if
3  we don't bill direct, we bill them through our agency,
4  and they don't pay their bills, I'm responsible for
5  uncollectible debt.
6      Q  I see. So in the case of Hawaii Nut & Bolt,
7  because they pay directly to the insurance company,
8  you're not responsible for debt, their debt?
9      A  Yes.
10     Q  Correct?
11     A  That's correct.
12     Q  Okay. Do you represent any other small
13 businesses who have those ABC policies?
14     A  Yes, I do.
15     Q  What kinds of businesses?
16     A  I would have to go down the list, but most of
17 them are retail or office exposure.
18     Q  Okay. Do you represent any other hardware
19 operations like Hawaii Nut & Bolt?
20     A  No.
21     Q  Okay. Whether retail or wholesale?
22     A  None.
23     Q  Have you ever?
24     A  No.
25     Q  Do you still have Exhibit 64 in front of you,

Page 172

1  by any chance?
2      A  Yes, ma'am.
3      Q  When you said that Fireman's Fund was
4  grasping for some reason, in your e-mail to Bill, what
5  did you mean by that?
6      A  What, what section is that in?
7      Q  In your 6-30-15 e-mail, you say -- after you
8  say, "There's product coverage," then you say, "FF,"
9  Fireman's Fund, "is grasping for some reason. Actually
10 six million reasons, which was your coverage limits."
11     A  Oh, I see on the bottom. Okay.
12     Q  What did you mean when you said that
13 Fireman's Fund was grasping for some reason?
14     A  I don't know. Good reason -- I don't really
15 know. It was 5:00 p.m. Maybe I was just -- my
16 response, it was late in the afternoon.
17     Q  Were you intending to convey to Bill that
18 Fireman's Fund was just looking for a reason to get out
19 of covering him?
20     A  No. I just think that my only response to
21 that would be that they were concerned about paying out
22 a large claim.
23     Q  Okay.
24     A  I do know that the claims person handling --
25 at that time, in 2015, it had, it had gone through two

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 177

1  Q  All right. If there's a change in the extent
2  of the policy coverage by an insurance company, do you
3  expect as the seller of the policy to be notified of
4  that change?
5      MR. ROBBINS: Objection, vague and ambiguous
6  as to the word extent of coverage.
7      MR. ALLISON: Incomplete hypothetical as
8  well.
9      MS. CHANG: Join in both.
10  A  Could you give me an example?
11  BY MS. PAVEY:
12  Q  Yeah. Let's say you sold a policy to Hawaii
13  Nut & Bolt, and there was the same policy language year
14  after year after year after year. And then the
15  insurance company decided at some point that that
16  policy language does not mean what it had always meant
17  before that, and they are eliminating certain kinds of
18  coverage without changing the policy language.
19      Would you expect to be told of that change by
20  the carrier?
21      MR. ALLISON: Objection, still incomplete
22  hypothetical.
23      MR. ROBBINS: Calls for speculation, lack of
24  foundation.
25      MS. CHANG: Join in both.

Page 178

1      MR. ROBBINS: You may answer.
2  A  I think in general, I can just speak in
3  general, that personally I would want to be informed,
4  but the companies are big and I think that they will
5  distribute changes on a bulk basis. I don't know if
6  they would distribute them individually. I don't know
7  how the inner workings of the insurance companies
8  handle those changes.
9      But if it was a specific change to an
10  insured's policy, just for one insured, I think they
11  have a 45 day prior notice to renewal to provide that
12  information directly to the customer.
13  BY MS. PAVEY:
14  Q  Okay, so -- and I'm not talking about change
15  to the policy language. I'm talking about a change by
16  the company in their interpretation of the policy
17  language.
18  A  I don't think they ever send anything like
19  that out. I've never seen anything as far as any
20  interpretation.
21  Q  Okay. Have you ever had a client -- well,
22  have you ever had a client that was involved in a
23  lawsuit besides Hawaii Nut & Bolt?
24  A  Yes.
25  Q  Okay. Have you ever had a client defended by

Page 179

1  an insurance company for over five years, and then have
2  the insurance company file a dec action to say there's
3  no duty to cover and no duty to defend?
4  A  I don't know if that's what they did.
5  Q  I'm not asking you that. I'm asking you
6  whether you've ever had that situation.
7  A  I -- fortunately, no. Fortunately, no.
8  Q  In the cases, or for the clients that you've
9  represented that have been sued, have the insurance
10  carriers ever filed a declaratory relief action against
11  the insureds?
12  A  I don't even really know what the declaratory
13  action is.
14  Q  It's a lawsuit to get the court to say that
15  there's no coverage at all under the policy.
16      MR. ALLISON: Objection, misstates the
17  evidence as to what a declaratory judgment action is,
18  but go ahead.
19  BY MS. PAVEY:
20  Q  You can answer.
21  A  I don't know what it does and I've never seen
22  it before.
23  Q  Okay. So you've never had a client make a
24  claim under an insurance policy and then have the
25  insurance policy sue the client to say that it doesn't

Page 180

1  owe that client any coverage or any defense. You've
2  never been in that situation?
3  A  I've never been in the situation.
4      MR. ROBBINS: And when you said insurance
5  policy, I'm sure you meant to say insurance company.
6      MS. PAVEY: I'm sorry?
7      MR. ROBBINS: I said I'm sure when you said
8  insurance policy, you meant to say insurance company.
9  You said the insurance policy has never sued.
10      MS. PAVEY: Yeah, thank you.
11      MR. ROBBINS: Okay, fair enough.
12      MS. PAVEY: Thank you, Ken.
13      MR. ROBBINS: Sure. I'm sure that's how he
14  understood the question.
15      MS. PAVEY: Yeah, thank you.
16  BY MS. PAVEY:
17  Q  What did you do to prepare for your
18  deposition today?
19  A  The only thing I did was I met with
20  Mr. Robbins and Ms. Chang to go over what the
21  expectations were.
22  Q  Okay. Have you talked to anybody before the
23  actual deposition today from Steve Allison's office?
24  A  No, I just met him yesterday.
25  Q  Were you provided with any questions that

Page 241

1  A  I do not, no.
2  Q  And did Mr. Hayes ever come back and tell you
3  whether that ever occurred?
4  A  No, he didn't.
5  MR. ALLISON: That's all I have. Anyone
6  else?
7  MR. ROBBINS: Doug, you have the right to
8  review your deposition transcript, and if you wanted
9  to, make any corrections that you think are
10 appropriate. And I would recommend and advise you that
11 you do.
12 So if you could arrange that, Madam Court
13 Reporter, through our office, I would appreciate that.
14 MR. ALLISON: Great, that sounds perfect.
15 THE VIDEOGRAPHER: The time is 4:12. This
16 concludes the deposition.

Page 242

1  I, DOUGLAS MOORE, hereby acknowledge that I
2  have read the foregoing typewritten pages 1 through
3  243, inclusive, and corrections, if any, were noted by
4  me and the same is now a true and correct transcript of
5  my testimony.

7  DATED: _____

11 _____
   DOUGLAS MOORE

14 Signed before me this _____
15 day of _____, 20__
16 Witnessed by:
17 _____

23 American Automobile Insurance Company, et al vs Hawaii
24 Nut & Bolt, Inc., et al, Civil No. CV15-00245 ACK/KSC,
25 taken on the 14th of December, 2016, by K. Pearson

Page 243

1           CERTIFICATE
2  STATE OF HAWAII  )
                    )
3  COUNTY OF HONOLULU )
4  I, Kathy Pearson, CSR, do hereby certify:
5  That on Wednesday, the 14th of December,
   2016, commencing at 9:51 a.m., appeared before me
6  DOUGLAS MOORE, the witness whose deposition is
   contained herein; that prior to being examined, was by
7  me duly sworn or affirmed pursuant to Act 110 of the
   2010 Session of the Hawaii State Legislature; that the
8  proceedings were taken by me in machine shorthand and
   reduced to print by me; that the foregoing represents,
9  to the best of my ability, a true and correct
   transcript of the proceedings had in the foregoing
10 matter.
11 That a request for an opportunity to review
   and make changes to this transcript was made by the
12 deponent or a party (and/or their attorney) prior to
   the completion of the deposition.
13
   I further certify that I am not an attorney
14 for any of the parties hereto, nor in any way
   interested in the outcome of the cause named in the
15 caption.
16 This 243 page deposition of DOUGLAS MOORE,
   taken on the 14th of December, 2016, was subscribed and
17 sworn to before me in the State of Hawaii.
18
   DATED: _____
19
20 _____
21 Kathy Pearson, CSR No. 313