# EXHIBIT 4

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF HAWAII

AMERICAN AUTOMOBILE      ) CIVIL NO. CV15-00245
INSURANCE COMPANY, a     )         ACK/KSC
Missouri Corporation;    ) (Declaratory Judgment)
NATIONAL SURETY          )
CORPORATION, an Illinois ) Oral Deposition of:
Corporation,             ) JOHN FOSTER
                         )
        Plaintiffs, )
                         )
versus                   )
                         )
HAWAII NUT & BOLT, INC.  )
and SAFEWAY INC.,        )
                         )
        Defendants. )
_____ )
SAFEWAY INC.; HAWAII NUT &)
BOLT, INC.,               )
                          )
  Counterclaim Plaintiffs,)
                          )
versus                    )
                          )
AMERICAN AUTOMOBILE       )
INSURANCE COMPANY, a      )
Missouri Corporation;     )
NATIONAL SURETY           )
CORPORATION, an Illinois  )
Corporation,              )
                          )
  Counterclaim Defendants,)
                          )
and                       )
                          )
DOUGLAS MOORE, MONARCH    )
INSURANCE SERVICES, INC., )
a Hawaii Corporation, and )
INSURANCE ASSOCIATES,     )
INC., a Hawaii            )
Corporation,              )
                          )
  Additional Counterclaim )
  Defendants.             )
_____ )

Page 2

1          VIDEOTAPED DEPOSITION OF JOHN FOSTER
2    30(b)(6) REPRESENTATIVE OF MONARCH INSURANCE SERVICES
3
4    Taken on behalf of the Plaintiffs/Counterclaim
5    Defendants American Automobile Insurance Company and
6    National Surety Corporation at the law offices of
7    Bronster Fujichaku Robbins, 1003 Bishop Street, Suite
8    2300, Honolulu, Hawaii, commencing at 9:08 a.m., on
9    Friday, the 16th of December, 2016, pursuant to the
10   Federal Rules of Civil Procedure.
11
12   REPORTED BY:  KATHY PEARSON, RPR, CRR, CSR No. 313
13
14   APPEARANCES:
15     For the Plaintiffs/Counterclaim Defendants
       American Automobile Insurance Company and
16     National Surety Corporation:
17       SAMRAH R. MAHMOUD
         Crowell & Moring
18        3 Park Plaza, 20th Floor
          Irvine, California  92614
19
       For the Real Party in Interest and
20     Defendant/Counterclaim Plaintiff Safeway Inc.
       and Defendant/Counterclaim Plaintiff Hawaii Nut &
21     Bolt, Inc.:
22       JUDITH ANN PAVEY
         Starn O'Toole Marcus & Fisher
23       Pacific Guardian Center, Makai Tower
         733 Bishop Street, Suite 1900
24       Honolulu, Hawaii  96813
25   (Appearances continued)

Page 3

1    For the Counterclaim Defendants Douglas Moore
     and Monarch Insurance Services, Inc.:
2
       DONNA C. MARRON
3      SASHA A. HAMADA
       Bronster Fujichaku Robbins
4      1003 Bishop Street, Suite 2300
       Honolulu, Hawaii  96813
5
     For the Counterclaim Defendants Douglas Moore
6    and Insurance Associates, Inc.:
7      MARISSA L.L. OWENS
       Goodsill, Anderson, Quinn & Stifel
8      First Hawaiian Center, Suite 1600
       999 Bishop Street
9      Honolulu, Hawaii  96813
10   Videographer:
11     Keoni Sallas
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                  I N D E X
2
3    EXAMINATION BY MS. MAHMOUD          Pg 6
4    EXAMINATION BY MS. PAVEY            Pg 55
5    EXAMINATION BY MS. OWENS            Pg 77
6    REEXAMINATION BY MS. MAHMOUD          Pg 79
7    * * * * * * * * * * * * * * * * * * * * * * * * *
8    DEPOSITION EXHIBITS:
9    EXHIBIT NUMBER 86              Pg 8
10.    (30(b)(6) notice of deposition)
11   EXHIBIT NUMBER 87              Pg 48
12     (Hawaii Nut & Bolt insurance policy)
13   EXHIBIT NUMBER 88              Pg 59
14     (American Southern Home policy)
15   EXHIBIT NUMBER 89              Pg 60
16     (Foster LinkedIn web pages)
17
18
19
20
21
22
23
24
25

RALPH ROSENBERG COURT REPORTERS
808-524-2090

**Exhibit 4**

Page 5

1        RECORD OF PROCEEDINGS
2        THE VIDEOGRAPHER: This is the deposition of
3    30(b)(6) witness John Foster in the matter of American
4    Automobile Insurance Co., et al. versus Hawaii Nut &
5    Bolt, Inc. and Safeway Inc.  We are located at Bronster
6    Fujichaku Robbins, 1003 Bishop Street, Suite 2300,
7    Honolulu, Hawaii.  My name is Keoni Sallas, video
8    specialist for Advanced Depositions.
9        Will the counsel please state your names?
10       MS. MARRON: This is Donna Marron.  I'm
11   representing Monarch Insurance Company.
12       MS. MAHMOUD: Samrah Mahmoud from Crowell and
13   Moring for plaintiffs and counterclaim defendants
14   American Automobile Insurance Company and National
15   Surety Corporation.
16       MS. PAVEY: Judy Pavey on behalf of Safeway
17   and Hawaii Nut & Bolt.
18       MS. OWENS: Marissa Owens on behalf of
19   Insurance Associates, Incorporated.
20       MS. HAMADA: I'm Sasha Hamada, also on behalf
21   of Monarch Insurance Services.
22       MS. MARRON: And I'll also correct that.
23   We're also, Sasha and I are also here on behalf of Doug
24   Moore.
25       MS. OWENS: And, I'm sorry, this is Marissa.

Page 6

1    I'm also here on behalf of Doug Moore as well.
2        THE VIDEOGRAPHER:  Today is December 16th,
3    2016.  We are on the record at 9:09 a.m.
4        Will the court reporter please swear in the
5    deponent?
6        (Whereupon JOHN FOSTER, called as a witness
7    on behalf of the Plaintiffs/Counterclaim Defendants
8    American Automobile Insurance Company and National
9    Surety Corporation, having been first duly sworn, was
10   examined and testified as follows)
11           EXAMINATION
12   BY MS. MAHMOUD:
13       Q   Good morning, Mr. Foster.  Would you please
14   state your full name for the record?
15       A   John Gilbert Foster.
16       Q   And is it okay if I call you John today?
17       A   Yes.
18       Q   Great.  Have you ever been deposed before?
19       A   No.
20       Q   So I will go over a few instructions for
21   today.
22       First, the court reporter is taking down
23   everything that you and I say, so if you could please
24   verbally respond to any of my questions, no nods of the
25   heads or other nonverbal answers.

Page 7

1        It's difficult for the court reporter to take
2    down everything we're saying if two people are talking
3    at once, so I will do my best to wait until you finish
4    your answer to ask my next question.  If you could do
5    the same for me, that would be great.
6        If you don't understand a question I've
7    asked, please let me know.  It's my job to ask clear
8    questions, so I will rephrase.
9        If you need a break at any point, please let
10   me know, and we can take a break.
11       And then I'm looking for an answer based on
12   your sort of reasoned, factual basis.  Please don't
13   guess or speculate if you don't know the answer.  Feel
14   free to let me know that as well.
15       Is there anything that might affect your
16   ability today to give truthful, accurate, and complete
17   testimony?
18       A   No.
19       Q   And you understand that you're under oath, as
20   if you were in a court of law?
21       A   Yes.
22       Q   What have you done to prepare for your
23   deposition today?
24       A   Reviewed the complaint and reviewed documents
25   related to the complaint.

Page 8

1        Q   Do you remember what documents those are?
2        A   The complaint itself.
3        Q   And you said documents related to the
4    complaint?
5        A   I reviewed an e-mail that I sent to Fireman's
6    Fund.
7        Q   Do you know if that e-mail has been produced?
8        A   It's been sent to you.
9        Q   Okay.  Okay, and where do you currently work?
10       A   Monarch Insurance Services, Inc.
11       Q   Do you understand why you're here today?
12       A   Representing Monarch Insurance Services.
13       MS. MAHMOUD: Okay.  I'd like to mark as an
14   exhibit, I believe -- are we at 86?
15       COURT REPORTER:  86.
16       MS. MAHMOUD: Okay, and this is the
17   deposition notice.
18       (Whereupon Deposition Exhibit Number 86 was
19   marked for identification.)
20   BY MS. MAHMOUD:
21       Q   And have you seen this notice before?
22       A   Yes.
23       Q   And if you could please flip to, I believe
24   it's pages four -- or five, six, and seven, and there's
25   a list of categories of examination.

Page 25

1  definitely covered under this policy?
2      A   Agents tend not to want to talk in definite
3  terms, but more in general terms.  So I think in
4  general terms, they do frequently try their best to
5  communicate to the client what is covered and what is
6  not covered.
7          But when you have an actual claim, that it's
8  the policy, not the agent's words, that determine
9  whether or not there's coverage, and agents are very
10  clear to make that clear to the client.
11          Does that answer your question?
12      Q   It does, thank you.  How do agent, insurance
13  agents at Monarch establish relationships with clients?
14  Is there, is there a standard process?
15      A   There's no standard process.
16      Q   Okay.  So insurance agents can develop
17  relationships with clients in different ways at
18  Monarch?
19      A   Yes.
20      Q   Is there a standard process that a Monarch
21  insurance agent would go through to get insurance for a
22  client, to procure a policy for a client?
23      A   Not a standard process.
24      Q   Do you know the steps a Monarch insurance
25  agent might take to get an insurance policy for a

Page 26

1  client?
2      A   Yes.
3      Q   And what would those steps be?
4      A   Meet with the client, understand the client's
5  exposure.  Evaluate possible carriers that would have
6  an appetite to insure that exposure.  Communicate with
7  underwriters at various carriers to further determine
8  their level of interest in insuring those exposures.
9  Complete applications, communicate the information back
10  to the underwriters to obtain bindable insurance
11  quotes.
12          That's the high level explanation of how the
13  process works.
14      Q   And when an agent meets with a client, what
15  are they typically meeting with them to find out?
16      A   What does the client do.
17      Q   And do you know what types of questions they
18  would ask to sort of understand the exposure?
19      A   There are standard application forms that
20  have standard questions in them, and so following
21  obtaining those answers to those standard questions,
22  which are located on the ACORD application forms, is
23  the standard process to follow.
24          So ACORD is the company that's developed
25  standard application forms for all the lines of

Page 27

1  property casualty insurance.  So there will be standard
2  general liability questions, standard property
3  questions, standard worker's compensation questions, et
4  cetera, and so we obtain answers to those questions.
5      Q   What about if an agent is renewing a policy?
6  Is there a process that they would go through to do
7  that?
8      A   The carriers dictate the process on renewals.
9      Q   After getting a policy for a client, do
10  insurance agents typically check in with the client
11  regarding their business and their insurance needs?
12      A   Depending on the type of client, it can be a
13  little bit or a lot, but usually there's going to be,
14  there will be continued contact throughout the years of
15  the relationship.
16      Q   And when would they get in contact?
17      A   Well, whenever anything comes up that's
18  material, there should be contact.
19      Q   And who usually initiates that contact?
20      A   Well, if the carrier has made a change, then
21  we would communicate with the client.  If the client
22  makes a change, then they should communicate with their
23  agent.
24          We at Monarch typically aren't creating
25  changes.  Carriers or clients typically create the

Page 28

1  change, the situation that gives rise to the need to
2  have contact.
3      Q   Are there client files at Monarch for each
4  client?
5      A   Yes.
6      Q   How are those kept?
7      A   On-line in a system called -- the computer
8  system is Applied TAM, T A M, which is a standard
9  insurance related software platform that I believe
10  thousands of agencies use in the United States.
11      Q   And how far back does that database go?
12      A   Probably -- I'm actually not sure.
13      Q   Is it fairly recent, or are we -- I mean, are
14  we speaking early 2000s?
15      A   There's a few years of information in there,
16  so.
17      Q   Okay, and who has access to that database?
18      A   I'm not, I'm not sure if people have
19  different levels of access to it.  I would think that
20  there are different levels.  So different personnel
21  have different levels of access to information.
22      Q   To what extent is Monarch familiar with
23  coverage issues in Hawaii regarding CGL policies?
24      A   Familiar enough to know that, that there's
25  few precise answers in this area.

7  (Pages 25 to 28)

Page 29

1    Q   And are you aware of the Burlington or Group
2    Builders line of cases in Hawaii dealing with
3    occurrences?
4        A   Only at a high level.
5        Q   Does Monarch make its insurance agents aware
6    of the issue?
7        A   They're aware of the issue, so there's no
8    need to make them aware.
9        Q   Okay.  How do they become aware of it?
10       A   By reading the newspaper or reading insurance
11   related material, or Googling CGL, construction defect
12   issues.  It's a, it's a regular topic.
13       Q   What is Monarch's relationship with Fireman's
14   Fund?
15       A   They have a multi-decade relationship with
16   Fireman's Fund.  They place in the millions of dollars
17   of premium over the years with Fireman's Fund.
18       Q   Is this a nonexclusive relationship between
19   Monarch and --
20       A   Yes.
21       Q   How frequently does Monarch or its agents
22   procure policies from Fireman's Fund?
23       A   Well, are you talking about new business or
24   renewal business, or both?
25       Q   Both.

Page 30

1        A   So there's always existing business renewing.
2    Then new business is going to be on a monthly basis,
3    there will probably be either a quote or a new business
4    written with Fireman's Fund.  So regular monthly
5    interaction with Fireman's Fund.
6        Q   Who at Monarch interacts with Fireman's Fund?
7    Is there a designated person?
8        A   So there's just a, there's just a few
9    employees that focus on personal lines, which Fireman's
10   Fund does not do.  So I would say the majority of staff
11   at Monarch have some level of interaction with people
12   at Fireman's Fund.
13       Q   And is there anyone in particular at
14   Fireman's Fund that Monarch interacts with?
15       A   No.
16       Q   How does an insurance agent at Monarch go
17   about procuring a policy from Fireman's Fund for a
18   client?
19           MS. PAVEY:  Any kind of policy?
20   BY MS. MAHMOUD:
21       Q   Any kind of policy.
22       A   The first step would be to ascertain who
23   would be the appropriate individual to discuss the
24   exposure in question at Fireman's Fund, and there might
25   be thirty different people or more at Fireman's Fund,

Page 31

1    depending on the type of policy that we're seeking.
2    So.
3        Q   And what about a CGL policy?
4        A   So there's a, they have a local office here,
5    and there's a head of that office.  And a phone call to
6    him to describe the client's operation would most, most
7    likely provide information about who would be the
8    appropriate person and whether or not they would be
9    interested in pursuing underwriting that, that
10   exposure.
11       Q   And who is the head of that office?
12       A   I think it's Mike Mitsuka.
13       Q   And so that's the process now.  Do you know
14   what the process was before you joined Monarch?
15       A   No.
16       Q   And can agents, any agent reach out to
17   Fireman's Fund --
18       A   Yes.
19       Q   -- if they have a question on a policy?
20       A   (Witness nods head).
21           MS. MAHMOUD:  I'm going to show the witness
22   what has been previously marked as Exhibit 81.
23   BY MS. MAHMOUD:
24       Q   Do you recognize this document?
25       A   I do.  This is the agency agreement between

Page 32

1    Monarch Insurance Services and Fireman's Fund.
2            MS. MAHMOUD:  Donna, do you have a copy?
3            MS. MARRON:  I do.  I think it's in the
4    stack.
5    BY MS. MAHMOUD:
6        Q   Does it look fairly similar to other agency
7    agreements you've seen with other insurance companies?
8        A   I'm not an expert to compare differences, but
9    it does contain an indemnity agreement that I would
10   think is central to most of these types of agreements.
11       Q   And you mentioned earlier that the, sort of
12   the substantive provisions of the contracts are fairly
13   similar across insurance agencies and Monarch?  Is
14   that, did I -- tell me if I misunderstood or misstated.
15       A   Restate that, please.
16       Q   Sure.  We were talking earlier and I think
17   you mentioned that these sort of agency agreements are
18   fairly typical, standard across --
19       A   Yes.
20       Q   Can you turn to page six of the agreement?
21   And do you know whose signature that is for the
22   producer?  Do you recognize the signature?
23       A   I don't recognize the signature.
24       Q   Okay.
25       A   I'm guessing it's Mark Polivka, but that's a

Page 53

1  look at is paragraph 50. And it says, "In promoting
2  its services, Monarch represented that it, its
3  personnel and affiliates specialize in construction
4  risk services for clients throughout North America,
5  recognizing the importance of industry specific
6  expertise to assist our clients in solving problems
7  unique to the construction industry."
8      Did I read that correctly?
9      A  You read it correctly. Whose quote is that?
10     Q  It's in the second amended counterclaim from
11 Hawaii Nut & Bolt and Safeway.
12         And so my next question was going to be, do
13 you know if Monarch advertises that?
14     A  I don't believe we would advertise throughout
15 North America. And I'm not, I'm not clear who, whose
16 words these are that are in quotes. If you could let
17 me know whose words they are, I can try to confirm for
18 you whether or not they said it.
19     Q  I don't know either, so I think that's enough
20 for me.
21     A  Okay.
22     Q  And then the next sentence says, "Further,
23 Monarch represented that its team of construction risk
24 professionals enjoys a nationwide reputation as experts
25 in focused construction specialties."

Page 54

1      Did I read that accurately?
2      A  You did.
3      Q  And do you know if Monarch advertises that?
4      A  Clarify what you mean by "advertises that."
5      Q  Has Monarch ever made this statement?
6      A  We tell our clients that we are
7  professionals, and -- yeah, that we are professionals
8  and we have focus in construction.
9      Q  And do you know if Monarch has ever sort of
10 put out to the public this exact statement?
11     A  I'm not sure whether or not we put out that
12 exact statement to the public.
13     Q  Got it, okay. Are you aware that Fireman's
14 Fund requested certain documents from Monarch in this
15 action?
16     A  Yes.
17     Q  And have you produced everything in the, that
18 was responsive to the requests?
19     A  We produced everything that we had, that we
20 could provide to Fireman's Fund per the request.
21     Q  And where, where did you look for those
22 documents?
23     A  In our computer systems.
24     Q  Would there be any hard files?
25     A  No.

Page 55

1      Q  Okay, I think I have no further questions at
2  this time.
3          MS. PAVEY: Do you guys want me to go next?
4          MS. MARRON: Yes.
5              EXAMINATION
6  BY MS. PAVEY:
7      Q  So did you find out who the person was at
8  Fireman's Fund that was handling this claim?
9      A  Eventually I got to Mr. Allison.
10     Q  Ah, okay. Nobody operate Fireman's Fund?
11     A  I spoke to various people. None of them
12 were, were ultimately, I felt, responsible for the
13 claim until I got to Mr. Allison, and then I felt like
14 he was the person that was working on the claim for
15 Fireman's Fund.
16     Q  Who was it at Fireman's Fund that referred
17 you to Mr. Allison?
18     A  I can't recall their name.
19     Q  Okay. Not somebody that you regularly work
20 with?
21     A  Having only been at Monarch for a year and
22 not being a Fireman's Fund person, I don't, I haven't
23 really regularly worked with any Fireman's Fund people
24 in the course of my insurance career.
25     Q  Okay. You said you're basically a business

Page 56

1  getter now for Monarch. That's your job, to develop
2  new business.
3      A  Yes.
4      Q  Okay, do you have an existing book of
5  business?
6      A  Did I bring a book of business with me to
7  Monarch?
8      Q  I guess that's a better question.
9      A  No.
10     Q  Do you know how much annually Monarch writes
11 with Fireman's Fund or Fireman's Fund related companies
12 in terms of premiums?
13     A  No.
14     Q  Do you have an approximate?
15     A  More than a million dollars.
16     Q  Well, I know that. You don't know how much
17 more?
18     A  No.
19     Q  All right. Is that one of the companies that
20 Monarch writes the most business with?
21     A  I would say it's in the top ten out of fifty
22 carriers.
23     Q  Okay, and how much annually in terms of
24 premiums does Monarch write?
25     A  Over seventy million.

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 57

1    Q   When you were with Fairmont and First
2  Insurance, did they handle clients to whom the Group
3  Builders line of cases applied?
4    A   They may have, but I was not focused in that
5  area.
6    Q   Okay, so you didn't have any contractors or
7  subcontractors as clients?
8    A   No.
9    Q   Do you know how they handled the situation
10  with the Group Builders decision?
11    A   I know it's been in flux since then as
12  carriers have grappled with how to handle it, and I
13  don't believe that they have ever fully come to a
14  position where they feel that they -- that there's no
15  more questions to be resolved.  So it continues to be
16  something, and my understanding is that it's something
17  that remains unresolved.
18    Q   Somebody testified, and I think it was, may
19  have been Doug Moore, that Fairmont and First issued
20  endorsements after the Group Builders decision to make
21  sure that their clients had the same coverage they
22  thought they had before the Group Builders decision.
23  Are you aware of that?
24          MS. MAHMOUD:  Objection, misstates the
25  testimony.

Page 58

1          MS. MARRON:  And I'll further object that
2  it's outside the scope of any deposition --
3          MS. OWENS:  I'll join in the --
4          MS. MARRON:  -- 30(b)(6) topic.
5          MS. OWENS:  I'll join in the objection.
6    A   I don't know.
7  BY MS. PAVEY:
8    Q   Have you ever seen the endorsements written
9  by Fairmont and First Insurance that dealt with the
10  Group Builders decision?
11          MS. MARRON:  Same objection.
12          MS. MAHMOUD:  Same objection.  Assumes facts
13  not in evidence.
14    A   I have not seen the Fairmont one.  I've
15  probably seen the First one, but can't recall the
16  specifics of it.
17  BY MS. PAVEY:
18    Q   Okay.  Do you know whether Fairmont did have
19  such an endorsement, whether you saw it or not?
20    A   I can't recall whether they did or didn't.  I
21  know that First does.
22    Q   Okay.  Did First -- or did Fireman's Fund
23  accept your tender of the defense of this case?
24    A   They did not.
25    Q   Your insurance, Monarch's insurance company

Page 59

1  is which company?  I don't know if you call it errors
2  and omission or liability insurance for your company.
3    A   Yeah, we call it professional liability or an
4  errors and omission policy.  For Monarch, it's with
5  American Southern Home.
6    Q   And are they the ones that are providing you
7  the defense to this case?
8    A   Yes.
9    Q   And with a reservation of rights?
10    A   I'm not sure.
11    Q   Okay, hold on a second.  I thought I brought
12  that policy with me.
13          MS. PAVEY:  Can we have this marked as next
14  exhibit in order?  I'm sorry, I don't have a copy.
15  What number will that be?
16          COURT REPORTER:  That is 88.
17          (Whereupon Deposition Exhibit Number 88 was
18  marked for identification.)
19          MS. MAHMOUD:  Can we pause to make copies of
20  this, though, if we don't have any copies?
21          MS. MARRON:  Let's go off the record.
22          THE VIDEOGRAPHER:  Going off the record at
23  10:31 a.m.
24          (Off the record at 10:32 a.m., deposition
25  resumed at 10:38 a.m.)

Page 60

1          (Whereupon Deposition Exhibit Number 89 was
2  marked for identification.)
3          THE VIDEOGRAPHER:  Back on the record at
4  10:38 a.m.
5          MS. MARRON:  And I'll just note for the
6  record that the questioning regarding Monarch's
7  liability insurance is not in any deposition topic.
8  BY MS. PAVEY:
9    Q   So, John, Exhibit 88 is what we were
10  provided, anyway, by you folks in response to our
11  request for production, I guess.  Your insurance policy
12  that, I guess for the carrier that's defending you in
13  this case.  Is that true?
14    A   Yes.
15    Q   Okay, so if the terms, or the kinds of, kinds
16  of acts that are covered by this policy, Exhibit 88.
17  If the insurance company changed the coverage, would
18  you expect them to notify Monarch as the insured of
19  that change?
20          MS. MARRON:  Objection, outside the scope of
21  any deposition topic.  Also calls for speculation.
22          MS. MAHMOUD:  Incomplete hypothetical,
23  objection as well, and join in Ms. Marron's.
24  BY MS. PAVEY:
25    Q   Go ahead.

RALPH ROSENBERG COURT REPORTERS
808-524-2090

Page 69

1   premises only policy.
2        So in general, the products are covered for
3   the product liability, what they sell. And if the
4   product is not covered, that would be, there would be a
5   reason for that, and it would be communicated to the
6   client.
7        Q   Okay.
8        A   Does that answer your question?
9        Q   Yeah, it does. So for a business owner who's
10  insured under a CGL policy and the business owner sells
11  products to the public, they would expect that their
12  policy --
13       A   That there is coverage for products
14  liability, correct.
15       MS. MAHMOUD: Objection, incomplete
16  hypothetical, calls for speculation.
17  BY MS. PAVEY:
18       Q   How would you describe Monarch's duties or
19  obligations to the clients, being the insureds?
20       A   To understand what type of business they
21  operate, to capture that information accurately on
22  paper, and then to determine which carriers can provide
23  them with insurance to insure their operations.
24       Q   And would included in those duties also be
25  the responsibility to let them know if Monarch learns

Page 70

1   that an insurance company, for example Fireman's Fund,
2   was eliminating coverage that they had previously
3   provided under the same policy?
4        MS. MARRON: Object. Compound, ambiguous,
5   and lack of foundation.
6        MS. MAHMOUD: Join, and incomplete
7   hypothetical.
8        A   If the carrier does not communicate changes
9   to the agent, then the agent cannot communicate the
10  changes to the client.
11  BY MS. PAVEY:
12       Q   Of course, but if the agent knew that the
13  carrier was eliminating coverage under the same policy,
14  it would be the, part of the duty of the agent and the
15  agency to let the insured know about that. Right?
16       A   Yes.
17       MS. MAHMOUD: Objection. Same objections.
18  BY MS. PAVEY:
19       Q   Do you know whether Fireman's Fund ever let
20  anybody at Monarch know that they were eliminating
21  product liability coverage for insureds like Hawaii Nut
22  & Bolt?
23       MS. MAHMOUD: Objection.
24       MS. MARRON: Objection. Calls for
25  speculation and states facts not in evidence.

Page 71

1        MS. MAHMOUD: Join. Incomplete hypothetical.
2        A   I'm not aware of Fireman's Fund eliminating
3   coverage for product liability.
4   BY MS. PAVEY:
5        Q   Okay. One of the agents, or one of the
6   adjustors, I should say, for Fireman's Fund testified
7   that Fireman's Fund doesn't write any policies anymore,
8   it hasn't for several years. But you are, have been
9   testifying about the fact that you're still doing
10  business with Fireman's Fund and they are still writing
11  policies.
12       What's your understanding of the, I guess the
13  status of Fireman's Fund as an insurance company?
14       MS. MAHMOUD: Objection. Misstates the
15  testimony, calls for speculation and a legal
16  conclusion.
17       MS. MARRON: And I'll further state that it's
18  outside the scope of any deposition topic.
19       A   So Fireman's Fund was acquired by Allianz and
20  people who -- the divisions were eliminated, but the
21  current company has a new name, Allianz Global
22  Insurance Company or something, HEIC, or something
23  along those lines, but the people are still the people
24  who formerly were Fireman's Fund people.
25       So Fireman's Fund is more -- has become an

Page 72

1   Allianz company. And so I use the terms
2   interchangeably, and perhaps that's confusing, but
3   Fireman's Fund and Allianz, to me, are the -- Fireman's
4   Fund has become Allianz.
5   BY MS. PAVEY:
6        Q   Okay. Do the communications that you have
7   with Fireman's Fund/Allianz today reference or in some
8   way still indicate that they are Fireman's Fund?
9        A   What they reference is that the policies that
10  were issued back in '01, '02, '03, '04, '05 were all
11  Fireman's Fund policies.
12       Q   And now what are they?
13       A   They're still Fireman's Fund policies from
14  the past.
15       Q   Okay, so when those policies that were
16  written before 2005, I think you said, were Fireman's
17  Fund policies, they're still renewed as Fireman's Fund
18  policies?
19       A   When they left us in 2007 or '8, and that
20  policy period, I believe, was the last period they were
21  with us, they were still Fireman's Fund policies. And
22  then after they left Monarch, we didn't renew any more
23  policies for Hawaii Nut & Bolt.
24       Q   Okay, I was asking actually more generally.
25  When old Fireman's Fund policies are being renewed, do

18   (Pages 69 to 72)

Page 81

1        I, JOHN FOSTER, hereby acknowledge that I

2    have read the foregoing typewritten pages 1 through 82,

3    inclusive, and corrections, if any, were noted by me

4    and the same is now a true and correct transcript of my

5    testimony.

6

7        DATED: _____

8

9

10

           _____

11         JOHN FOSTER

12

13

14    Signed before me this _____

15    day of _____, 20___

16    Witnessed by:

17    _____

18

19

20

21

22

23    American Automobile Insurance Company, et al vs Hawaii

24    Nut & Bolt, Inc., et al, Civil No. CV15-00245 ACK/KSC,

25    taken on the 16th of December, 2016, by K. Pearson

Page 82

1           C E R T I F I C A T E

2    STATE OF HAWAII  )

                    )

3    COUNTY OF HONOLULU  )

4        I, Kathy Pearson, CSR, do hereby certify:

5        That on Friday, the 16th of December, 2016,

    commencing at 9:08 a.m., appeared before me JOHN

6    FOSTER, the witness whose deposition is contained

    herein; that prior to being examined, was by me duly

7    sworn or affirmed pursuant to Act 110 of the 2010

    Session of the Hawaii State Legislature; that the

8    proceedings were taken by me in machine shorthand and

    reduced to print by me; that the foregoing represents,

9    to the best of my ability, a true and correct

    transcript of the proceedings had in the foregoing

10   matter.

11        That a request for an opportunity to review

    and make changes to this transcript was made by the

12   deponent or a party (and/or their attorney) prior to

    the completion of the deposition.

13

        I further certify that I am not an attorney

14   for any of the parties hereto, nor in any way

    interested in the outcome of the cause named in the

15   caption.

16        This 82 page deposition of JOHN FOSTER, taken

    on the 16th of December, 2016, was subscribed and sworn

17   to before me in the State of Hawaii.

18

        DATED: _____

19

20

           _____

21         Kathy Pearson, CSR No. 313

22

23

24

25

21 (Pages 81 to 82)