# EXHIBIT 5

Page 1

```
IN THE UNITED STATES DISTRICT COURT
       FOR THE DISTRICT OF HAWAII
AMERICAN AUTOMOBILE   ) CIVIL NO. CV15-00245
INSURANCE COMPANY, a  )     ACK/KSC
Missouri Corporation;  ) (Declaratory Judgment)
NATIONAL SURETY       )
CORPORATION, an Illinois ) Oral Deposition of:
Corporation,          ) SUE SAVIO
                      )
       Plaintiffs,    )
                      )
versus                )
                      )
HAWAII NUT & BOLT, INC )
and SAFEWAY INC.,     )
                      )
       Defendants.    )
_____)
SAFEWAY INC.; HAWAII NUT &)
BOLT, INC.,           )
                      )
   Counterclaim Plaintiffs,)
                      )
versus                )
                      )
AMERICAN AUTOMOBILE   )
INSURANCE COMPANY, a  )
Missouri Corporation;  )
NATIONAL SURETY       )
CORPORATION, an Illinois )
Corporation,          )
                      )
   Counterclaim Defendants,)
                      )
and                   )
                      )
DOUGLAS MOORE, MONARCH )
INSURANCE SERVICES, INC., )
a Hawaii Corporation, and )
INSURANCE ASSOCIATES, )
INC., a Hawaii        )
Corporation,          )
                      )
   Additional Counterclaim )
   Defendants.        )
_____)
```

Page 2

1   VIDEOTAPED DEPOSITION OF SUE SAVIO
2   30(b)(6) REPRESENTATIVE OF INSURANCE ASSOCIATES, INC.
3
4   Taken on behalf of the Plaintiffs/Counterclaim
5   Defendants American Automobile Insurance Company and
6   National Surety Corporation at the law offices of
7   Goodsill Anderson Quinn & Stifel, 999 Bishop Street,
8   Suite 1600, Honolulu, Hawaii, commencing at 12:02 p.m.,
9   on Thursday, the 15th of December, 2016, pursuant to
10  the Federal Rules of Civil Procedure.
11
12  REPORTED BY: KATHY PEARSON, RPR, CRR, CSR No. 313
13
14  APPEARANCES:
15      For the Plaintiffs/Counterclaim Defendants
        American Automobile Insurance Company and
16      National Surety Corporation:
17          SAMRAH R. MAHMOUD
            Crowell & Moring
18          3 Park Plaza, 20th Floor
            Irvine, California 92614
19
        For the Real Party in Interest and
20      Defendant/Counterclaim Plaintiff Safeway Inc.
        and Defendant/Counterclaim Plaintiff Hawaii Nut &
21      Bolt, Inc.:
22          JUDITH ANN PAVEY
            MAILE S. MILLER
23          Starn O'Toole Marcus & Fisher
            Pacific Guardian Center, Makai Tower
24          733 Bishop Street, Suite 1900
            Honolulu, Hawaii 96813
25

Page 3

1   (Appearances continued)
2       For the Counterclaim Defendants Douglas Moore
        and Monarch Insurance Services, Inc.:
3
            SASHA A. HAMADA
4           Bronster Fujichaku Robbins
            1003 Bishop Street, Suite 2300
5           Honolulu, Hawaii 96813
6       For the Counterclaim Defendants Douglas Moore
        and Insurance Associates, Inc.:
7
            CORLIS J. CHANG
8           MARISSA L.L. OWENS
            Goodsill, Anderson, Quinn & Stifel
9           First Hawaiian Center, Suite 1600
            999 Bishop Street
10          Honolulu, Hawaii 96813
11  Videographer:
12      Keoni Sallas

Page 4

1              I N D E X
2
3   EXAMINATION BY MS. MAHMOUD          Pg 6
4   EXAMINATION BY MS. PAVEY            Pg 52
5   REEXAMINATION BY MS. MAHMOUD        Pg 117
6   *****************************
7   DEPOSITION EXHIBITS:
8   EXHIBIT NUMBER 83                   Pg 8
9       (notice of 30(b)(6) deposition)
10  EXHIBIT NUMBER 84                   Pg 49
11      (second amended counterclaim, jury demand)
12  EXHIBIT NUMBER 85                   Pg 96
13      (IAI web pages)

## Page 5

1   RECORD OF PROCEEDINGS
2   THE VIDEOGRAPHER: This is the deposition of
3   30(b)(6) witness Sue Savio in the matter of American
4   Automobile Insurance Co., et al. versus Hawaii Nut &
5   Bolt, Inc. and Safeway Inc. We're located at Goodsill
6   Anderson Quinn and Stifel, 999 Bishop Street, Suite
7   1600, Honolulu, Hawaii. My name is Keoni Sallas, video
8   specialist for Advanced Depositions.
9       Will the counsel please state your names?
10      MS. MAHMOUD: Samrah Mahmoud from Crowell and
11  Moring for plaintiffs and counterclaim defendants
12  American Automobile Insurance Company and National
13  Surety Corporation.
14      MS. HAMADA: I'm Sasha Hamada, on behalf of
15  Monarch Services, Monarch Insurance Services and Doug
16  Moore.
17      MS. PAVEY: Judy Pavey and Maile Miller for
18  Hawaii Nut & Bolt and Safeway.
19      MS. CHANG: Corlis Chang on behalf of
20  Insurance Associates, Incorporated, and co-counsel for
21  Douglas Moore with the law firm of Bronster Fujichaku
22  and Robbins.
23      MS. PAVEY: So I just wanted to put on the
24  record that I was pretty sure, and Sue Savio, the
25  witness, confirmed that for me, that she is the

## Page 6

1   insurance agent for my condo building.
2       But you and I have never discussed anything
3   about this case. Correct?
4       THE WITNESS: Not at all, correct.
5       MS. PAVEY: Okay.
6       THE VIDEOGRAPHER: Today is December 15th,
7   2016. We're on the record at 12:04 p.m.
8       Would the court reporter please swear in the
9   deponent?
10      (Whereupon SUE SAVIO, called as a witness on
11  behalf of the Plaintiffs/Counterclaim Defendants
12  American Automobile Insurance Company and National
13  Surety Corporation, having been first duly sworn, was
14  examined and testified as follows)
15          EXAMINATION
16  BY MS. MAHMOUD:
17  Q   Good morning, Ms. Savio.
18  A   Good morning.
19  Q   You probably just heard, my name is Samrah
20  Mahmoud, and I'll be taking your deposition first.
21      Would you please state your full name for the
22  record?
23  A   My full name is Surita Savio Steinfeld.
24  Q   And do you mind if I call you Sue today?
25  A   That would be perfect.

## Page 7

1   Q   Great. Have you been deposed before?
2   A   Yes.
3   Q   Approximately how many times?
4   A   Two.
5   Q   Okay. So you're probably familiar with the
6   rules, but I'll just go over them briefly.
7   A   Fine.
8   Q   The court reporter to our left is taking down
9   everything you and I say today, so if you could please
10  respond with verbal responses; no nods of the heads or
11  other nonverbal communication.
12      It's difficult for her to record everything
13  if two people are talking at one time, so I will do my
14  best to wait until you finish an answer to ask my next
15  question, and if you could do the same for me, that
16  would be great.
17      If you don't understand a question I've
18  asked, please feel free to let me know, and I will --
19  it's my job to ask clear questions, so I will rephrase.
20      If you need a break at any time, please let
21  me know, and we can take a break.
22      Now, is there anything today that might
23  affect your ability to truthfully and accurately
24  testify?
25  A   No.

## Page 8

1   Q   And you just took the oath. You understand
2   that you're under oath, as if you were in a court of
3   law?
4   A   Yes.
5   Q   What have you done to prepare for your
6   deposition today?
7   A   I met with my attorney.
8   Q   Did you review any documents?
9   A   No documents were reviewed.
10  Q   Okay. Where do you currently work?
11  A   The address is 800 Bethel Street, downtown
12  Honolulu.
13  Q   And what is the company?
14  A   Insurance Associates.
15  Q   And do you understand why you're here today?
16  A   Yes, I do.
17  Q   And why is that?
18  A   Because there's a lawsuit involving Hawaii
19  Nut & Bolt, Safeway, and they've included my agency.
20      MS. MAHMOUD: And I'd like to mark what I
21  think will be Exhibit 83.
22      (Whereupon Deposition Exhibit Number 83 was
23  marked for identification.)
24  BY MS. MAHMOUD:
25  Q   And I've marked what is the deposition notice

Page 57

1  Doug Moore had a good reputation, but then you said
2  that Ron McQuaid was the only agent at Transpac that
3  you really knew. So how do you know about Doug Moore's
4  reputation?
5      A  I think there was a misunderstanding on that.
6      Q  Okay.
7      A  When I said Ron -- when he came to see me, I
8  did not know who was going to be working for Ron.
9  Because he was saying he was going to go start his
10 business, and he wanted to know if I could help him
11 with -- because I had helped others in the past. And I
12 said I would gladly do that, and, you know, all I want
13 to do is cover my accounting costs.
14     Who he hired after he started the agency, I
15 did not know. I knew Doug Moore from the many years
16 that we had been in the insurance industry together.
17     Q  Okay.
18     A  But I don't know who he worked for, if you
19 ask me before he went to Doug Moore -- I mean, before
20 he went to Transpac.
21     Q  In your mind, what is it that makes an
22 insurance agent have a good reputation?
23     A  It's the way the clients talk about them.
24     Q  And had you talked to Doug's clients?
25     A  I had brought -- because we're competing for

Page 58

1  the same types of business, we run into each other's
2  customers. And somebody will say, Oh, you're an
3  insurance agent, would you look at my risk.
4     Yeah, they sometimes ask us to look at their
5  policies. And I'll sometimes say, Well, who's your
6  agent? And they'll say so and so. I'll say, Well, are
7  you having issues with him? He's a pretty good agent,
8  he does a good job. Oh, I'm just looking for cheaper,
9  yeah. Then I'll say, You know what? Stay where you
10 are.
11     If it's somebody that I know doesn't have a
12 good rep, that doesn't do things the way I think they
13 should be done, then I would have no problems looking
14 at a client, his policies, and seeing if we can do
15 better.
16     But Doug, Ron, they had good reps, so I would
17 not -- and there are certain other agents that I would
18 not even bother to go look at their policies, but
19 others that, drop of a hat, I know that it's not done
20 right.
21     Q  Well, that's what I'm trying to find out.
22     A  Yeah.
23     Q  So what is it about what Doug did or didn't
24 do that made him --
25     A  Oh.

Page 59

1      Q  -- a good agent?
2      A  He's very thorough.
3      Q  Okay.
4      A  He's not the type just renews. He's the type
5  that would meet with the client. He's the type that
6  knew the business.
7      Q  Okay.
8      A  Let's take the condo world.
9      Q  Okay.
10     A  There are certain agents, when I know they
11 write a condo policy, and some property manager will
12 say, Will you look at this, Sue? And I'll say, Oh,
13 yes, I know it's not right. I know that they've missed
14 things.
15     Others, I'll say, you know, They're -- that's
16 a good agent. She knows what she's doing when it comes
17 to condos. I'm sure she did you well, but if you want
18 me to just review it. So that's --
19     You know, I'm sure there's good lawyers and
20 bad lawyers, and you know who they are.
21     Q  Well, when you say an agent could miss
22 something, for example, what are you talking about?
23 What could an agent miss?
24     A  I've had agents on a condo miss the fact that
25 there was a pool.

Page 60

1      Q  Okay, all right.
2      A  And then somebody -- yeah, people miss
3  things.
4      Q  Okay. Would you expect a thorough agent like
5  Doug to understand the nature of the policy coverage in
6  the policies that he's selling to people, his clients?
7      A  I would expect that of all agents.
8      Q  Okay, and are you -- I wanted to ask you
9  about Group Builders. Do you know whether the
10 information about Group Builders was transmitted
11 internally to the Transpac subagents like Doug?
12     A  I do not know.
13     Q  Okay. Did you ever specifically advise all
14 of the agents working for Insurance Associates that
15 they need to familiarize themselves with whatever it
16 was that you were talking about that's in your
17 computers on the Group Builders situation?
18     A  Our agents don't handle contractors.
19     Q  Okay.
20     A  So it's there for their knowledge or if they
21 run into it, but it's not the kind of a thing -- I
22 mean, if it were something was coming in on
23 restaurants, because we have a restaurant division. If
24 something was coming in on homeowners, yes.
25     But on something that's just here's the

Page 61

1   latest in the insurance industry. There was a lot of
2   buzz about it. A lot of companies were changing their
3   endorsements because of it. That kind of general
4   information got disbursed to the whole office, yes.
5   Q   Okay, but Insurance Associates doesn't handle
6   contractors or subcontractors?
7   A   Very -- we have a few little -- one guy has a
8   few little babies.
9   Q   Like what kind of --
10  A   Like a --
11  Q   -- babies?
12  A   Like an electrician, you know.
13  Q   Okay.
14  A   I mean, that type.
15  Q   Okay, and do you -- can you tell me what you
16  do know about Group Builders?
17  A   Myself?
18  Q   Uh-huh.
19  A   Very little.
20  Q   Okay, because you yourself don't sell
21  insurance to contractors or subcontractors.
22  A   Correct. I would give it to somebody who
23  specializes in that.
24  Q   Okay, but you do have material in your system
25  on that issue?

Page 62

1   A   On the Group Builders, yes.
2   Q   Okay, all right. Do you know whether that
3   information would apply to a distributor like Hawaii
4   Nut & Bolt, or does it only apply to general
5   contractors and subcontractors?
6       MS. MAHMOUD: Objection, calls for a legal
7   conclusion.
8       MS. CHANG: Join in that.
9   BY MS. PAVEY:
10  Q   Go ahead.
11  A   You're asking me something I don't really
12  know about.
13  Q   Okay.
14  A   It's not my expertise.
15  Q   All right. In responding to the request for
16  production of documents in this case, did you think
17  that the material that's on your computer system having
18  to do with Group Builders was responsive in any way to
19  the request?
20  A   I'm not sure I'm understanding what you're
21  asking me.
22  Q   Did you produce your material on the Group
23  Builders situation in this case?
24  A   On the Group Builders?
25  Q   Uh-huh. That issue. You said you have --

Page 63

1   A   No. No one asked me for anything about Group
2   Builders.
3   Q   Okay, so --
4   A   They --
5   Q   -- whatever you have on Group Builders, you
6   didn't feel it was responsive to the request in this
7   case. Correct?
8   A   No.
9   Q   Okay. Can you describe for me what material
10  you have in your computer system related to the Group
11  Builders issue?
12  A   I can remember that First Insurance sent out
13  a note about changing their policies so they would
14  cover things like that. I know it involved Island
15  Insurance Company, so I know they sent something out.
16  But that was so long ago.
17  Q   Okay.
18  A   That's the best I can do.
19  Q   Okay. You said that you're still procuring
20  insurance policies from Fireman's Fund. Correct?
21  A   Correct.
22  Q   So, to the best of your understanding anyway,
23  Fireman's Fund is still writing insurance policies.
24  Correct?
25  A   Oh, yes.

Page 64

1   Q   All right. So do you know what their
2   corporate status is right now? Do they still exist as
3   an independent insurance company?
4   A   Well, they've been bought out by Allianz. Is
5   that what you're asking me?
6   Q   Yeah. I'm --
7   A   Oh.
8   Q   -- asking you for your knowledge, because one
9   of the Fireman's Fund employees, or one of the Allianz
10  employees, it wasn't clear to me, testified that
11  Fireman's Fund doesn't write insurance policies
12  anymore --
13      MS. MAHMOUD: Objection.
14  BY MS. PAVEY:
15  Q   -- at all, period.
16      MS. MAHMOUD: Objection, misstates testimony.
17  BY MS. PAVEY:
18  Q   But that's not your understanding, as you
19  just said. Correct?
20  A   Correct.
21  Q   Okay, and when you contact Fireman's Fund
22  about them issuing a policy, you're actually calling
23  Fireman's Fund. You're not calling Allianz.
24  A   The name just changed, so I probably am
25  calling Allianz, and their e-mail just changed the word

## Page 105

1  with your role as an agent?
2       MS. CHANG: Well, I'm going to object as
3  calling for a legal conclusion.
4       MS. MAHMOUD: Join.
5       MS. HAMADA: Join.
6  BY MS. PAVEY:
7     Q  Go ahead.
8     A  There's lots of different duties as an agent,
9  you know, from --
10    Q  I was talking specifically about fiduciary
11 duties as opposed to other kinds of duties.
12      MS. MAHMOUD: Same objection.
13      MS. CHANG: Yeah, same objection.
14      MS. HAMADA: Same.
15    A  There are --
16 BY MS. PAVEY:
17    Q  And do you know which ones are considered by
18 you as a fiduciary duty?
19      MS. CHANG: You want to know what she
20 considers --
21      MS. PAVEY: Yeah.
22      MS. CHANG: -- fiduciary duty?
23    A  What I consider?
24 BY MS. PAVEY:
25    Q  Yeah.

## Page 106

1     A  I consider fiduciary duty, in broad terms.
2     Q  Uh-huh.
3     A  Not having to list things. To be a good
4  partner.
5     Q  Okay.
6     A  To place quality business that has been
7  researched out, that I understand. That I'm not
8  cheating, lying, not reporting something on an app,
9  trying to hide something. Listing all the losses that
10 I know of. That type of situation.
11    Q  Okay, and that would be a duty that would run
12 to both the insurance company and to the client?
13      MS. MAHMOUD: Objection, calls for a legal
14 conclusion.
15 BY MS. PAVEY:
16    Q  Or just to the insurance company?
17      MS. CHANG: Join in that.
18      MS. MAHMOUD: Sorry, Judy.
19      MS. HAMADA: Join.
20    A  My duty would be to the client and to the
21 company.
22 BY MS. PAVEY:
23    Q  Okay.
24    A  Is that what you're asking me?
25    Q  Yes.

## Page 107

1     A  Okay. I feel my duty is to the client, to
2  make sure I get the correct information, and make
3  sure -- and if I think a client is a little
4  (indicating), then I like to say good-bye to them.
5     Q  Okay, all right, and do you -- well, I think
6  we already talked about it. Never mind.
7       Is there a standard of care in the industry
8  applicable to the duty to procure insurance for a
9  particular client?
10      MS. CHANG: I'm going to object as calling
11 for a legal conclusion.
12      MS. MAHMOUD: Join.
13      MS. CHANG: Lacks foundation.
14      MS. HAMADA: Join.
15    A  I think it's similar to what we were just
16 talking about, Judith. I mean, I have a duty to get as
17 much information as I can from my client, make sure as
18 much as possible the client is not lying to me.
19 BY MS. PAVEY:
20    Q  Sure.
21    A  But let's be honest. Clients lie.
22    Q  Okay.
23    A  You know, you put something down wrong on an
24 application and send it to the company wrong.
25      But I, you know, I think all agents try

## Page 108

1  to do, all ethical agents try to do a good job. And I
2  think an agent, to have a good reputation, over the
3  years that we've been in this business, has done those
4  things repeatedly, you know, 99 and 9/10 percent of the
5  time, unless he gets fooled by a client.
6     Q  Okay, so would you agree that we could say
7  that you're required to exercise reasonable care,
8  skill, and diligence in procuring insurance for your
9  clients?
10      MS. MAHMOUD: I'll object --
11 BY MS. PAVEY:
12    Q  Is that fair?
13      MS. CHANG: I'm going to object to the extent
14 that you're using those terms as legal terms of art and
15 calling for a legal conclusion.
16      Based on your understanding, you can answer.
17      MS. MAHMOUD: Also join, and vague and
18 ambiguous as well.
19      MS. HAMADA: Join in both.
20    A  As I understand the terms, and I'm not an
21 attorney.
22 BY MS. PAVEY:
23    Q  Sure.
24    A  Thank you. I would say that, yes.
25    Q  Okay, and it would be a violation of that

Page 109

1  general duty to a client to procure insurance for them
2  that does not cover their risks? Would you agree with
3  that?
4        MS. CHANG: Well, I'm going to object again
5  as calling for a legal conclusion, incomplete
6  hypothetical, assuming facts not in evidence, and lack
7  of foundation.
8        MS. MAHMOUD: Join.
9        MS. HAMADA: Join.
10  BY MS. PAVEY:
11     Q  Go ahead. Go ahead, you can answer.
12     A  And I think, Judith, on that question, I
13  think you have to understand an insurance agent tries
14  his best or her best to learn the business that they're
15  filling out an application for.
16     Q  Right.
17     A  If the client doesn't tell you something, you
18  can't put it on the app.
19     Q  Of course.
20     A  If the client didn't have a pool, take the
21  condo, and then they put a pool in because they got
22  everybody to agree, and they don't tell the agent, and
23  I just happened to go to a board meeting and find a
24  pool there. When in the hell did you put this pool in?
25     Q  Right.

Page 110

1     A  Okay, so I think --
2     Q  Sure.
3     A  -- the ethical agent, someone who -- people
4  who have good reputations in our industry, yeah, they
5  try their best.
6     Q  Okay, so assuming --
7     A  We do get tripped up by clients every now and
8  then.
9     Q  I understand what you're saying. Assuming
10  that the client accurately described --
11     A  Uh-huh.
12     Q  -- the nature of the business, would it be a
13  violation of the duty to exercise reasonable care and
14  diligence to sell that client a policy that didn't
15  cover their primary risk of their business?
16        MS. CHANG: Again, let me interpose the same
17  objections, and I'll try not to be unduly repetitive,
18  but lack of foundation, calls for a legal conclusion,
19  vague and ambiguous, lack of foundation. Did I say
20  that already? Lack of foundation?
21        MS. MAHMOUD: Incomplete hypothetical --
22        MS. CHANG: Incomplete --
23        MS. MAHMOUD: -- and join.
24        MS. CHANG: -- hypothetical.
25        MS. HAMADA: Join.

Page 111

1        MS. CHANG: And you may -- this is for the,
2  this is for the court to rule on later on, but to the
3  extent that you can respond to it, you know, as a lay
4  witness, you may respond.
5     A  As a lay witness, I would say that, again, an
6  agent tries his best, but if a client doesn't tell him
7  something.
8  BY MS. PAVEY:
9     Q  Okay.
10     A  But if the client tells him everything and he
11  just misses something on the application, he forgets to
12  say something about the pool or whatever the case may
13  be, then, yes, it's the agent blew it.
14     Q  Okay, thank you. So we got an insurance
15  policy from you, I think, that is related to your
16  company being a named party to this lawsuit. Did you
17  tender this lawsuit to your own carrier?
18     A  Yes, I did.
19     Q  Okay, and have they agreed to defend you only
20  on your reservation of rights?
21     A  Yes.
22     Q  Okay, and what is your understanding, anyway,
23  of the content of their reservation of rights?
24        MS. CHANG: I'm going to object as calling
25  for a legal conclusion.

Page 112

1        MS. MAHMOUD: Join.
2  BY MS. PAVEY:
3     Q  If you know.
4     A  I don't know. I read it at the time, and
5  it's out of my mind.
6     Q  Okay, when -- are you aware of Fireman's
7  Fund's policy in terms of sending out reservation of
8  rights in every claim against a CGL policy?
9        MS. MAHMOUD: Objection. Assumes facts not
10  in evidence, lacks foundation, misstates the facts.
11     A  I'd have to say --
12        MS. CHANG: Yeah, I join.
13     A  -- that's not true.
14  BY MS. PAVEY:
15     Q  Okay.
16     A  From what my experience is with Fireman's
17  Fund.
18     Q  What is your experience with Fireman's Fund
19  on claims under CGL policies?
20     A  Now, I'll talk about my condos. I have
21  CGL --
22     Q  Are those CGL policies?
23     A  Yeah.
24     Q  Okay.
25     A  They're CGL policies.

## Page 117

1  Q  Okay, all right. That's it. Finished.
2  Thank you.
3              REEXAMINATION
4  BY MS. MAHMOUD:
5  Q  I just had one follow-up question.
6  A  Sorry.
7      MS. CHANG: She said one.
8      THE WITNESS: Okay. Well, can we limit her?
9      MS. CHANG: No, you can't.
10     THE WITNESS: Oh.
11 BY MS. MAHMOUD:
12 Q  If Mr. Moore had questions about a Fireman's
13 Fund policy, could he also just directly call up a
14 broker? Or, I'm sorry, not a broker, an underwriter
15 and ask questions?
16 A  If Ron, if McQuaid, Ron McQuaid of Transpac
17 allowed him to do that, yes.
18 Q  No further questions.
19     MS. PAVEY: Thank you.
20     (Brief off the record comments)
21     MS. CHANG: You have the opportunity to read
22 and review and make corrections to your deposition
23 testimony. We're required to ask you that on the
24 record, if you'd like to do that. And my answer to you
25 would be, as your counsel, that you would like to do

## Page 118

1  that, wouldn't you?
2      THE WITNESS: Yes, I would like to do that.
3      MS. CHANG: Thank you very much.
4      MS. MAHMOUD: Just if we could put this on
5  the record. The court reporter, is it okay if the
6  court reporter provides the original to you, should we
7  say thirty days for --
8      (Off the record comments regarding
9  stipulations in Hawaii)
10     THE VIDEOGRAPHER: The time is 2:24 p.m.
11 We're going off the record.
12     (Off the record at 2:24 p.m.)

## Page 119

1       I, SUE SAVIO, hereby acknowledge that I have
2  read the foregoing typewritten pages 1 through 120,
3  inclusive, and corrections, if any, were noted by me
4  and the same is now a true and correct transcript of my
5  testimony.
6
7  DATED: _____
8
9
10
11           _____
              SUE SAVIO
12
13
14 Signed before me this _____
15 day of _____, 20__
16 Witnessed by:
17 _____
18
19
20
21
22
23 American Automobile Insurance Company, et al vs Hawaii
24 Nut & Bolt, Inc., et al, Civil No. CV15-00245 ACK/KSC,
25 taken on the 15th of December, 2016, by K. Pearson

## Page 120

              CERTIFICATE
STATE OF HAWAII  )
                 )
COUNTY OF HONOLULU )
    I, Kathy Pearson, CSR, do hereby certify:
    That on Thursday, the 15th of December, 2016,
commencing at 12:02 p.m., appeared before me SUE SAVIO,
the witness whose deposition is contained herein; that
prior to being examined, was by me duly sworn or
affirmed pursuant to Act 110 of the 2010 Session of the
Hawaii State Legislature; that the proceedings were
taken by me in machine shorthand and reduced to print
by me; that the foregoing represents, to the best of my
ability, a true and correct transcript of the
proceedings had in the foregoing matter.

    That a request for an opportunity to review
and make changes to this transcript was made by the
deponent or a party (and/or their attorney) prior to
the completion of the deposition.
    I further certify that I am not an attorney
for any of the parties hereto, nor in any way
interested in the outcome of the cause named in the
caption.

    This 120 page deposition of SUE SAVIO, taken
on the 15th of December, 2016, was subscribed and sworn
to before me in the State of Hawaii.

DATED: _____


         _____
         Kathy Pearson, CSR No. 313